# EXHIBIT A

IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS

| | |
|---|---|
| EURONET PAYMENTS & REMITTANCE, INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 07 CV 02001 |
| | ) |
| v. | ) |
| | ) |
| ENVIOS DE VALORES LA NACIONAL CORP., | ) |
| ENVIOS DE VALORES LA NACIONAL, INC., | ) |
| AEROCARIBE TRAVEL AGENCY, INC., | ) |
| JOSE ANDRES HERNANDEZ ANDUJAR, | ) |
| CANDIDA DE HERNANDEZ, AND | ) |
| ROBERTO LOPEZ, | ) |
| | ) Jury Demand Attached |
| Defendants. | ) |
| | ) |

## AMENDED PETITION FOR RESCISSION, DECLARATORY JUDGMENT, AND DAMAGES PURSUANT TO K.S.A. CHAPTER 60

Plaintiff Euronet Payments & Remittance, Inc. ("Euronet"), by and through its undersigned counsel, for its Amended Petition, filed pursuant to K.S.A. 60-215 prior to the submission of a responsive pleading, against Defendants Envios de Valores La Nacional Corp., a New York corporation ("Envios NY"), Envios De Valores La Nacional, Inc., a New Jersey corporation ("Envios NJ"), AeroCaribe Travel Agency, Inc., a New York corporation ("AeroCaribe"), Jose Andres Hernandez Andujar, Candida de Hernandez (collectively, "La Nacional"), and Roberto Lopez (collectively, "Defendants"), alleges as follows:

### Introduction

1.    Through this action Euronet seeks rescission of the January 12, 2007 Stock Purchase Agreement ("SPA"), which was induced by fraud and through which

CLERK OF DISTRICT COURT
JOHNSON COUNTY, KS

2007 APR -5  PM 12: 27

Euronet was to acquire La Nacional and AeroCaribe for $26 Million. Alternatively, Euronet seeks a declaratory judgment determining that Euronet's termination of the SPA was legal and effective, together with an order directing U.S. Bank National Association, the Escrow Agent, to disburse and return to Euronet its $26 Million deposit held in Pre-Closing Escrow. Euronet also seeks an award of the damages, and attorney fees and costs incurred as a result of Defendants' wrongful actions.

2.     Despite Defendants' express assurances and representations that La Nacional and AeroCaribe were (a) in compliance with the Patriot Act and money laundering statutes, (b) had properly secured state licenses for their remittance businesses, (c) that La Nacional employed no individual convicted of any crime involving money laundering and that no employees were under investigation for such conduct and (d) La Nacional's key sales employees and Agents were loyal to La Nacional and would continue using it for their money transfer business now and into the future, Euronet has learned since the signing of the SPA that:

- On February 6, 2007, federal and state authorities were conducting a multiyear money laundering investigation of La Nacional which resulted in the arrest of two La Nacional employees for money laundering activities and involved the seizure of documents from multiple La Nacional stores;

- La Nacional knowingly hired as its General Sales Manager, Ramon Corporan, a felon convicted for conspiracy to launder money;

- Ramon Corporan previously worked for Remesas America Oriental ("RAO") a money remitter business owned by Defendant Roberto Lopez, which company was convicted, with Ramon Corporan, for laundering $4.4 Million. As a result of the conviction, the government closed RAO. La Nacional employed a number of top managers from RAO, who are still employed at La Nacional.

- La Nacional concealed the criminal record of the La Nacional General Sales Manager not only from Euronet but also from multiple regulatory

2

authorities through the false and improper filing of applications for, and renewals of, State licenses; and

- Defendants Hernandez and Lopez had embarked upon a scheme to sell La Nacional to Euronet, and then strip its business assets and employee and agent relationships following the sale.

Euronet therefore seeks the return of all amounts held in the Pre-Closing Escrow and such other damages as are warranted by Defendants' fraudulent and improper conduct.

### Parties

3.    Euronet has offices in many locations throughout the United States, including Leawood, Kansas.

4.    Envios NY is a New York corporation. Envios NY may be served at 566 West 207th Street, New York, New York 10034.

5.    Envios NJ is a New Jersey corporation. Envios NJ may be served by serving its Registered Agent at 18 Druid Hill Drive, Parsippany, New Jersey 07054.

6.    AeroCaribe is a New York corporation. AeroCaribe may be served at 573 West 207th Street, New York, New York 10034.

7.    Jose Andres Hernandez Andujar and Candida de Hernandez are citizens and residents of the Dominican Republic. They may be served at Club Rotorio #28, Ens. Ozama, Distrito Nacional, Dominican Republic. Candida de Hernandez is the Consenting Spouse to the SPA for the sole purpose of consenting to the sale by Seller (Jose Andres Hernandez Andujar) of the Stock and the execution and delivery of the SPA by Seller and any instruments delivered pursuant to the SPA. Candida de Hernandez is named in this action only to the extent she is a party necessary to secure the asserted remedies, including but not limited to, rescission, termination, and

3

declaratory judgment.  The specific references to Defendant Hernandez herein refer to Jose Andres Hernandez Andujar.

8.    Roberto Lopez is a citizen and resident of the Dominican Republic.  He may be served at Club Rotorio #28, Ens. Ozama, Distrito Nacional, Dominican Republic. Defendant Roberto Lopez served as an agent for Jose Andres Hernandez Andujar, the individual selling La Nacional, during the negotiations for the SPA.

### Jurisdiction and Venue

9.    The SPA was negotiated in large part in Kansas.    Defendants' negotiations in Kansas, specifically with Euronet's Leawood, Kansas office, included, without limitation, numerous facsimile transmissions, exchanges of letters and telephone conversations.

10.    Additionally, Defendants Roberto Lopez and Jose Andres Hernandez Andujar traveled to and were in Kansas for the execution of the Acquisition Term Sheet related to the proposed transaction on July 17, 2006, in connection with the negotiation of the SPA.

11.    Much of Euronet's performance under the SPA was to take place in Kansas, including, but not limited to, the Escrow Agent's receipt of funds from Euronet's Kansas bank account.  Euronet deposited $26 Million with the Escrow Agent subject to a Pre-Closing Escrow Agreement in furtherance of the SPA.

12.    Additionally, all of Euronet's consent filings were coordinated and administered in Leawood, Kansas.

13.    This Court has personal jurisdiction over all of the Defendants for the each of the independent following reasons:  a) Defendants transacted business within this

4

state (K.S.A. § 60-308(b)(1)); b) Defendants committed the tortious acts described in this Petition within this state (K.S.A. § 60-308(b)(2)); and c) Defendants contracted with a resident of this state and such contracts were to be performed in whole or in part within this state (K.S.A. § 60-308(b)(5)).

14.    Venue in Johnson County, Kansas is proper because Johnson County is the county in which Euronet maintains a place of business pursuant to K.S.A. § 60-605(1).

### Factual Allegations

15.    Euronet is an electronic money transmitter and bill payment company licensed in nineteen states, including Kansas. Euronet offers electronic-consumer-money-transfer services to customers from the United States to locations in Latin America, China, India and the Philippines, as well as electronic-financial-transaction-processing services to banks and consumers within the United States, Europe and Asia.

16.    La Nacional is a money remitter, and is a consumer-to-consumer brand for remittances to Latin America, primarily to the Dominican Republic. La Nacional provides money transfer services in fifteen states in the United States. This action arises out of the Seller's actions to sell the La Nacional money remittance business.

17.    A money remitter is a non-bank financial institution that receives money from customers to remit, or send, to the place designated by the customer. A typical legitimate customer of a money remitter is an immigrant who does not have the appropriate documentation necessary to open a bank account or for whom maintaining a bank account is too costly. In the money remitter industry, this is often referred to as the "unbanked" segment of the population. For the most part, these individuals are

5

recent immigrants to the United States who work at low-paying jobs and who use the money remitter to send money home to their families.

18.    Domestic financial institutions, including non-bank financial institutions such as money remitters, money order sellers and check cashers, are required by law and regulations to file a Currency Transaction Report (IRS Form 4789, hereinafter "CTR") with the Internal Revenue Service for each transaction in currency (such as a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution) in excess of $10,000, as required by 31 U.S. § 5313 and 31 CFR § 103.22(a) et. seq., and to maintain certain identification records regarding transactions over $3,000, as required by 31 USC § 5325, and 31 CFR § 103.29(a).

19.    In addition, the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as amended, and all orders, regulations and rules issued by the U.S. Department of Treasury (a.k.a. the "Patriot Act"), required all financial institutions to, inter alia, establish anti-money laundering programs, report suspicious activity, and verify the identity of customers. The Patriot Act also created new money laundering crimes and penalties. Money remitters are also highly regulated at the state level due to the potential to misuse the businesses for money laundering activities.

20.    Money laundering is the term given to financial transactions which have as their purpose the concealment of funds generated by illegal activity, and the efforts undertaken to give these funds the appearance of legitimacy by structuring the transactions to avoid the reporting and record keeping requirements. In the United States, drug trafficking is the criminal activity that generates the largest amount of illicit

funds, and, therefore, the largest amount of funds that require laundering.    Money

remitters are sometimes used by drug traffickers to launder drug proceeds.  Accordingly,

maintenance of sound compliance programs and practices that ensure employee

integrity are necessary and essential components of the money remittance business.

### The Stock Purchase Agreement

21.    On January 12, 2007, Euronet entered into an SPA to purchase all of the

issued and outstanding capital stock of La Nacional and AeroCaribe from Jose Andres

Hernandez Andujar for $26,000,000, subject to certain working capital adjustments

contained in the SPA. (A copy of the SPA is attached at Tab 1).

22.    Due to the highly regulated nature of the money remittance business, and

the potential for abuse and criminal conduct, Euronet sought and obtained very specific

representations and warranties from Defendants regarding La Nacional's compliance

with law (Section 2.14 of the SPA), and specifically the Patriot Act (Section 2.13 of the

SPA).    This included specific representations that La Nacional and none of its

employees are, or had been, engaged in, charged with or convicted of a money

laundering crime and that none of its employees were under investigation for any

money laundering offense (Section 2.13.2 of the SPA).

23.    The representation and warranty specifically stated:    "None of the

Companies, Seller, nor any of their respective Affiliates, employees, or Agent . . . has

engaged in or has conspired to engage in any transaction that evades or avoids, or has

the purpose of evading or avoiding, or attempts to violate, any of the requirements or

prohibitions set forth in the Executive Order, the PATRIOT Act, the Bank Secrecy Act or

any regulations promulgated thereunder, or any other Laws related to money

7

laundering . . . or has been charged, indicted or convicted of any PATRIOT Act Offense [broadly defined in the SPA to include money laundering offenses (See Section 11.2 of the SPA)]; or . . . is currently under investigation by any Governmental Authority for any alleged PATRIOT Act Offense or other criminal activity. " (See Section 2.13.2 of the SPA).

24.    In addition, Euronet received assurances from multiple La Nacional employees that La Nacional was in full compliance with the Patriot Act, money laundering laws, and the related reporting and record keeping requirements set forth above.  La Nacional further assured Euronet that a) none of the employees of La Nacional had been charged with, or indicted for, a money laundering offense, b) there were no facts or circumstances of non-compliance, and c) there were no facts or circumstances not disclosed that would be relevant to assessing La Nacional's compliance program or its state licenses.

25.    The Closing of the SPA has not occurred, and Euronet has not assumed ownership of La Nacional or AeroCaribe.  As a result of the events, circumstances, and information set forth herein, Euronet has terminated the SPA pursuant to Sections 6.1 and 10.1.3 thereof, and seeks the return of its deposit paid into the Pre-Closing Escrow pursuant to the Pre-Closing Escrow Agreement (Attached at Tab 2).  Euronet has rescinded the SPA.

### Less Than 30 Days After Signing the SPA, La Nacional Is Raided And La Nacional Employees Are Arrested for Money Laundering

26.    On February 6, 2007, federal and state authorities acted upon a multiyear investigation, resulting in searches and arrests at two separate La Nacional locations. Company documents were seized and two La Nacional employees were charged with

8

money laundering. (A copy of the Search Warrants are attached at Tabs 3 and 4). The search warrant was executed by agents from the Department of Homeland Security and officers from the State of New York.

27.    Based upon the detailed affidavits submitted by federal law enforcement officers, the raided La Nacional locations and the arrested La Nacional employees had been actively involved in the laundering of proceeds from illegal drug trafficking and transmitting funds to Columbia. (A copy of the Affidavits in Support of Arrest and Search Warrant are attached at Tabs 5 and 6). The federal law enforcement affidavits further indicate that additional La Nacional stores were knowingly involved with illegal money laundering activities. (*Id.*).

28.    As part of the criminal investigation, confidential informants and a cooperating defendant working for the government were sent into La Nacional stores for the purpose of laundering illegal drug money in order to generate evidence. La Nacional's employees knowingly and intentionally participated in the illegal money laundering prior to January 12, 2007 by, including but not limited to, failing to seek identification from the confidential informants and cooperating defendant, intentionally structuring the money transfers to avoid federal currency reporting requirements, and offering advice on how to avoid detection when laundering illegal funds (*See* Tabs 5 and 6).

29.    La Nacional did not inform Euronet in the first instance about the execution of a search warrant on two of its stores or the arrest of two of its employees, both of which related to money laundering. Instead, Euronet learned of these events from public sources.

9

**Euronet Learns That Defendants Concealed The**
**Fact That La Nacional's General Manager Of Sales Is A**
**Convicted Felon, Guilty Of Conspiracy To Money Launder**

30.    While gathering information relating to the execution of the search warrants and arrests of La Nacional employees, Euronet further discovered that La Nacional's General Manager of Sales, Ramon Corporan, hired on February 14, 2003 and "officially" promoted to General Manager of the Sales Department on or about April 8, 2005, is a convicted felon.

31.    Ramon Corporan was convicted of conspiracy to commit money laundering on or about July 31, 1998, and served more than four years in federal prison as a result of his conviction.

32.    Defendants were aware of Ramon Corporan's conviction for money laundering when he was hired.  Yet the Defendants not only failed to disclose Ramon Corporan's conviction for money laundering to Euronet, but affirmatively represented that they had no employees who had been indicted, let alone convicted of conspiracy to money launder.

33.    On further investigation into Ramon Corporan's conviction, Euronet further learned from sources other than La Nacional, that at the time of his conviction, Ramon Corporan was employed by RAO, a money remitter company owned by Defendant Roberto Lopez.

34.    RAO was indicted, together with Ramon Corporan, by a federal grand jury and subsequently convicted of laundering $4.4 Million in drug money transmitted to, among other places, the Dominican Republic and structuring transactions to evade reporting requirements.   As part of its conviction, RAO was required to pay a $100,000

10

fine and Defendant Lopez was required to surrender his shareholder interest in partial satisfaction of a $2.2 Million forfeiture judgment - - effectively shutting down the money laundering enterprise.

35.    On further independent investigation, following the conviction of RAO, La Nacional not only hired Ramon Corporan as its national sales manager, but also hired former members of the management team of the convicted and closed RAO, appointing Frank Feliz as La Nacional's Auditor, and Frank Reyes as La Nacional's Director of Operations, and subsequently appointing the convicted felon, Ramon Corporan, as the General Sales Manager.  Defendant Roberto Lopez, the former owner of RAO, serves as a consultant to La Nacional and acted as Defendant Hernandez' agent in the sale negotiations with Euronet.

36.    In addition to failing to disclose such information to Plaintiff, Defendants also failed to disclose the known conviction of Ramon Corporan to state regulators.  The failure to disclose the employment of a convicted felon in a money transmitter business constitutes a violation of various state regulatory laws, including, but not limited to, the laws of Delaware, Rhode Island, and Florida.

37.    Because of these violations, La Nacional is subject to disciplinary actions, including debarment, by the respective state regulatory agencies.

38.    In addition to state regulatory issues, La Nacional may be a target or subject of criminal investigations by the United States Attorney's office, the New York State Banking Department and/or the Financial Crimes Enforcement Network of the United States Department of the Treasury in connection with the arrests of the La Nacional employees for money laundering, and/or as a result of other violations of law.

11

39.     In response to Euronet's specific requests for information following the raids and arrests, La Nacional has only provided information on a belated and piecemeal basis.  Further, La Nacional has continued to withhold other information requested by Plaintiff, refusing Euronet's request for its lawyers to participate in a conference call with the U.S. Attorney, the New York State Banking Department and the Financial Crimes Enforcement Network of the United States Department of the Treasury in order to determine independently whether La Nacional is a subject or a target of a money laundering investigation.

40.     On information and belief, La Nacional is and has been willfully blind to its obligations to comply with federal and state laws and regulations related to the handling of currency transactions, including but not limited to, i) the Patriot Act, ii) 31 U.S.C. §§ 5313 and 5325; iii) 31 C.F.R. Part 103; and iv) New York State Banking Regulations. La Nacional could be subject to large penalties, significant multi-year regulatory oversight and orders, or other actions, up to and including closure, by federal or state law enforcement or regulatory officials.

41.     Euronet would not have entered into the SPA had it been made aware of La Nacional's failure to comply with federal and state law and regulatory requirements, the prior money laundering offenses committed by management level personnel, the RAO connections, and the violations of law, both state and federal, by La Nacional employees.  Such violations constitute a 'Material Adverse Effect' and Closing cannot occur under the terms of the SPA.

## Defendants Conspire to Sell and Strip the Business

42.    Defendants Hernandez and Lopez have also undertaken efforts and have been conspiring between themselves and with others to cause certain of La Nacional's key sales employees and Agents to divert their La Nacional business to another entity or entities owned or controlled, in whole or part, directly or indirectly, by Defendants Hernandez and Lopez, all to the material disadvantage of Euronet. They have done so by convincing and planning to convince current key La Nacional employees and Agents to move their La Nacional business post-Closing to a new enterprise.

43.    These efforts have created unstable working relationships with certain key sales employees and Agents. The Agents are the source of approximately 70% of the anticipated revenues of La Nacional. This business-stripping scheme constitutes a 'Material Adverse Effect' under the SPA.

44.    Euronet was not aware of Defendants Hernandez and Lopez' conspiracy to strip business away from La Nacional post-Closing for their own benefit and/or to conceal these business-stripping activities from Euronet. As a result of this conspiracy, Euronet agreed to offer $26 Million for a business that will not exist in the same form after Closing and will be worth materially and substantially less.

45.    The business-stripping conspiracy will result in the significantly diminished value of the La Nacional business and likewise constitutes another 'Material Adverse Effect' under the terms of the SPA. Had Euronet been aware of the business-stripping conspiracy, it would not have entered into the SPA.

46.    In furtherance of the business-stripping conspiracy, Defendant Roberto Lopez participated in the negotiations of the SPA on behalf of Jose Andres Hernandez

13

Andujar, and specifically represented that the La Nacional financial projections and estimates were both accurate and conservative. As a result of the concealed business-stripping conspiracy, these representations were false and Defendants knew them to be false at the time they were made.

47.    Defendants Roberto Lopez and Jose Hernandez also committed fraud by not disclosing their business-stripping conspiracy, a material omission, and by assuring Euronet's representatives that La Nacional's business would continue post-Closing as before since the key sales employees and Agents would remain with Euronet, and would be loyal to Euronet and not divert business to any competitor. As a result of the concealed business-stripping conspiracy, these representations were false and Defendants knew them to be false at the time they were made.

48.    Euronet negotiated for and obtained a noncompetition agreement with Jose Andres Hernandez Andujar to protect itself. The noncompetition agreement was to be executed at the Closing. Despite these promises and negotiations, Jose Andres Hernandez Andujar, directly and indirectly through the actions of his agent, Roberto Lopez, has endeavored to circumvent the noncompetition agreement and strip business away from La Nacional post-Closing.

**Euronet Terminates the SPA**

49.    On April 5, 2007, Euronet issued a letter terminating the SPA, pursuant to Sections 6.1 and 10.1.3 thereof, as a result of the events and information set forth above and for breaches of the representations and warranties contained in the SPA. (A copy of the termination letter is attached at Tab 7).

14

50.    Euronet terminated the SPA based upon, among other things, the violations of the following sections of the SPA (not intended to be a complete list of violations) each of which is independently sufficient to terminate the SPA. The relevant text of the termination letter follows:

(1)    Section 2.12. Permits. Seller and the Companies have admitted the untruth of their representations that, "There has been no material change in the facts or circumstances reported or assumed in the application for, or granting of, any Existing Permit." For example, the failure to previously disclose on its Amended Renewal Application for a transmission of money license in Delaware (the "Delaware Application") that its national sales manager is a known felon, and has served a prison term for violation of money-laundering statutes, cannot be cured for purposes of the Agreement because had Euronet known this fact, it would not have entered into the Agreement.

(2)    Section 2.13. PATRIOT Act Compliance. Seller's and Companies' representations that none of their employees were engaged in money laundering and that none of their employees had been convicted of any PATRIOT Act Offense were not true when made in that an employee, Ramon Corporan, had been convicted of money laundering and two employees were then under investigation and have now been arrested and charged with money laundering for acts occurring prior to the date of the SPA. These facts further contravene the represented effectiveness of the compliance representation and cannot be cured because had Euronet known these facts it would not have entered into the SPA.

(3)    Section 2.14. Compliance with Laws. Seller's and Companies' representations were not true when made in that two employees have since been arrested and charged with money laundering at two separate La Nacional stores, and the affidavits of federal law enforcement personnel indicate that additional La Nacional stores were engaged in money laundering activities when the representations were made. This breach cannot be cured because had Euronet known these facts it would not have entered into the SPA.

(4)    Section 2.17. Ordinary Course of Business. The representations in Section 2.17 were untrue because several Material Adverse Effects have been identified by Euronet since the Balance Sheet Date, including but not limited to the search of two La Nacional stores by state and federal law enforcement, the arrest of two La Nacional employees for money laundering, a known felon convicted of conspiracy to commit money laundering is serving as General Manager of the Companies' sales department, and the discovery of a conspiracy to cause a number of the Companies' key sales employees and Agents to divert post-Closing their substantial business from the Companies to other entities owned and controlled by Seller and his agents, all to the material adversity of the Companies and in contravention of your covenant not to compete.

15

(5)    Section 2.20. Financial Matters and Liabilities. The representations in Section 2.20.01 were untrue when made and are not susceptible of cure because Seller and one or more of its agents have been conspiring to cause certain of the Companies' key sales employees and Agents to divert their business post-Closing from the Companies to other entities owned by Seller or its agents, all to the material adversity of the Companies. These moves have already created a Material Adverse Effect because they have created unstable working relationships with some of the sales employees and Agents, who are the sources of a substantial portion of the Companies' revenues. Concealing this conspiracy had encouraged Euronet to agree to offer to pay $26 million for a business that will not exist in the same form after Closing and will be worth materially less.

(6)    Sections 2.22 and 4.2. Agents and Correspondents and Goodwill. Seller's and Companies' representation that, "Since the Balance Sheet Date, none of the top 50 Agents or top 25 Correspondents have indicated to the Companies that they will terminate any agreement with the Companies," is misleading since a number of key Agents have been enlisted by you and your agents to divert their business post-Closing to an entity other than La Nacional or its successor. This conspiracy further breaches Section 4.2 of the SPA. These breaches are not susceptible to cure.

(7)    Section 4.5.2.1. Seller has also breached its covenant to cause the Companies to be operated prior to and through the Closing in the Ordinary Course. See, for example, the above paragraphs related to Sections 2.20 and 2.22. This breach is not susceptible to cure.

(8)    Sections 2.7.1 and 4.16. The failure to include the Mateo Express material contract in the Document Package and the incomplete and belated explanation of that transaction constitute a breach of these provisions.

51.    Each of the above referenced breaches and circumstances constitute an independent basis to terminate the SPA, and entitle Euronet to damages and other relief as well.

### COUNT I – FRAUDULENT INDUCEMENT

52.    Plaintiff incorporates by reference, as though fully set out herein, each and every allegation contained in paragraphs 1 through 51.

53.    The relationship between Euronet and Defendants during the negotiation of the SPA was of such a nature so as to impose a duty on Defendants to disclose all

16

relevant, material information to Euronet and to rectify any prior misrepresentations made to Euronet and/or any omission of material information.

54.     During the negotiations related to the SPA, Defendants intentionally and knowingly omitted and/or made false statements to Euronet about material facts including, among other things, that i) La Nacional was operated in accordance with law and applicable regulations, and that all appropriate disclosures to state regulators had been made, ii) no employees of La Nacional had been convicted of any money laundering offense, iii) the financial projections, valuations and estimates provided to Euronet were accurate and conservative, and iv) the sales personnel and Agents of La Nacional would remain loyal to Euronet and would continue to be associated with La Nacional post-Closing and would continue to direct customers and business to La Nacional post-Closing as they had done previously.

55.     Defendants entered into negotiations with and made misrepresentations to Euronet with the intent to induce Euronet to enter into the SPA.

56.     Defendants knowingly and intentionally misrepresented, among other things that the representations and warranties contained in SPA §§ 2.12, 2.13, 2.14, 2.17, 2.20, 2.22, 4.5.2.1 and 4.16 were true and accurate.

57.     Defendants were at all relevant times aware of their true intent to strip business away from La Nacional post-Closing for their own benefit and made the false statements with knowledge of their falsity and/or with utter disregard and recklessness as to whether the statements were true or false.

17

58.    Defendants' misrepresentations concerned facts material to the business arrangement between it and Euronet, and on which any reasonable person would rely in entering into a business arrangement, such as the SPA.

59.    Defendants made the misrepresentations with the intent to mislead Euronet and induce it to enter into the SPA.

60.    Euronet did, in fact, justifiably rely on Defendants' misrepresentations and to its detriment entered into the SPA based upon these misrepresentations.

61.    As a result of Defendants' fraudulent inducement, Euronet is entitled to rescission of the SPA, and restitution of the costs and fees incurred.  Euronet has informed Defendants (with the exception of Roberto Lopez) that it has rescinded the SPA.  There is no adequate remedy at law due to the fraudulent inducement by Defendants.

62.    Alternatively, Euronet's reliance on Defendants' misrepresentations of material facts has and will continue to cause Euronet to suffer damages in excess of $75,000, and yet to be determined additional sums.

63.    Plaintiff is further entitled to attorneys' fees and costs of this litigation as the result of the wrongful conduct of Defendants.

WHEREFORE, Plaintiff prays for judgment in its favor under Count I of the Amended Petition; that judgment be entered ordering rescission of the SPA, together with an order directing Defendant Hernandez to instruct the Escrow Agent to return to the Plaintiff the $26 Million deposited by Plaintiff in connection with the SPA together with earnings thereon; awarding Plaintiff the costs and fees incurred, and damages in excess of $75,000; that interest be awarded at the statutory rate; that Plaintiff receive its

costs and reasonable attorneys' fees in this action; and for such further and additional relief as the Court deems just and proper.

## COUNT II – NEGLIGENT MISPRESENTATION

64.    Plaintiff incorporates by reference, as though fully set out herein, each and every allegation contained in paragraphs 1 through 63.

65.    The relationship between Euronet and Defendants during the negotiation of the SPA was of such a nature as to impose a duty on Defendants to provide information with care and to rectify any prior inaccurate or incomplete representations made to Euronet and/or any material omissions.

66.    During the negotiations related to the SPA, Defendants omitted information and/or made inaccurate statements to Euronet about material facts including, among other things, that i) La Nacional was operated in accordance with the law and applicable regulations, and that all appropriate disclosures to state regulators had been made, ii) no employees of La Nacional had been convicted of any money laundering offense, iii) no employees or agents were currently under investigation by governmental authorities, iv) the financial projections, valuations and estimates provided to Euronet were accurate and conservative, and v) the key sales employees and Agents of La Nacional would continue to be associated with La Nacional post-Closing and would continue to direct customers and business to La Nacional post-Closing as they had done previously. Defendants failed to exercise reasonable care or competence to obtain or communicate true information.

67.    Defendants entered into negotiations with and made negligent misrepresentations to Euronet with the understanding that the information provided

would be relied on for the purposes of Euronet when valuing La Nacional and the associated businesses, and/or entering into the SPA.

68.    Defendants negligently misrepresented, among other things, that the representations and warranties contained in SPA §§ 2.12, 2.13, 2.14, 2.17, 2.20, 2.22, 4.5.2.1 and 4.16 were true and accurate.

69.    Defendants' negligent misrepresentations concerned facts material to the contemplated business arrangement with Euronet, and on which any reasonable person would rely in entering into a business arrangement, such as the SPA.

70.    Defendants made the negligent misrepresentations which misled Euronet and induced it to enter into the SPA.

71.    Euronet did, in fact, justifiably rely on Defendants' negligent misrepresentations and, to its detriment, entered into the SPA based upon these misrepresentations.

72.    As a result of Defendants' negligent misrepresentations, Euronet is entitled to rescission of the SPA, and restitution of the costs and fees incurred.  Euronet has informed Defendants (with the exception of Roberto Lopez) that it has rescinded the SPA.  There is no adequate remedy at law due to the negligent misrepresentations by Defendants.

73.    Alternatively, Euronet's reliance on Defendants' negligent misrepresentations of material facts has and will continue to cause Euronet to suffer damages in excess of $75,000, and yet to be determined additional sums.

WHEREFORE, Plaintiff prays for judgment in its favor under Count II of the Amended Petition; that judgment be entered ordering rescission of the SPA, together

with an order directing Defendant Hernandez to instruct the Escrow Agent to return to the Plaintiff the $26 Million deposited by Plaintiff in connection with the SPA, together with the earnings thereon; awarding Plaintiff the costs and fees incurred, and damages in excess of $75,000; that interest be awarded at the statutory rate; that Plaintiff receive its costs and reasonable attorneys' fees in this action; and for such further and additional relief as the Court deems just and proper.

<h3 style="text-align:center;">COUNT III – BREACH OF CONTRACT</h3>

74.    Plaintiff incorporates by reference, as though fully set out herein, each and every allegation contained in paragraphs 1 through 73. This count is stated as to the defined La Nacional defendants only.

75.    The conditions precedent to Closing the SPA have not occurred due to the circumstances and breaches set forth above, and Euronet has properly exercised its right to terminate the SPA.

76.    In Article II of the SPA, La Nacional made various representations and warranties to Euronet.

77.    La Nacional has breached the SPA, including but not limited to the representations and warranties contained in SPA §§ 2.12, 2.13, 2.14, 2.17, 2.20, 2.22, 4.5.2.1 and 4.16, because of the arrests and criminal charges in connection with money laundering involving La Nacional stores and employees, the failure to disclose the criminal conviction of Ramon Corporan for conspiracy to commit money laundering, the failure to operate La Nacional in compliance with state and federal laws and regulations, and the formation of and participation in the business-stripping conspiracy.

21

78.    As a result of these breaches, and for the other reasons set forth herein, and in the termination letter incorporated herein by reference, La Nacional has failed to fulfill the conditions precedent to Closing the SPA, as set forth in Section 6.1 thereof, and Euronet has no obligation to consummate the transaction contemplated by the SPA. Euronet is entitled to terminate the SPA pursuant to Sec. 10.1.3, and Euronet is excused from further performance there under.

79.    Further, each of the breaches and/or the events and circumstances set forth herein permits termination of the SPA by Euronet pursuant to Sec. 10.1, and precluding Closing pursuant to Sec. 6.1.

80.    Despite Euronet's exercising its right to terminate the SPA, La Nacional, and specifically Defendant Hernandez, has failed to authorize the return of the $26 Million in the Pre-Closing Escrow to Euronet, as required by the terms of the Pre-Closing Escrow Agreement related to the SPA. (See Section 1.2.1 of the SPA).

81.    Euronet has fully performed all of its obligations and complied with all of its conditions precedent under the SPA.

82.    La Nacional's multiple breaches of the SPA, and the breach of the implied obligations of good faith and fair dealing, have caused and continue to cause Euronet damages. Euronet has been damaged by its inability to regain possession of the $26 Million that it placed in Pre-Closing Escrow, despite the proper, legal and effective termination of the SPA. Euronet has also incurred expenses in complying with the SPA, including, but not limited to, attorneys' fees, accountant fees and fees associated with filings for approvals by state governmental authorities.

WHEREFORE, Plaintiff prays for judgment in its favor under Count III of the Amended Petition; that judgment be entered ordering Defendant Hernandez to instruct the Escrow Agent to return to Euronet the $26 Million it deposited in Pre-Closing Escrow, together with all earnings thereon and for damages in excess of $75,000; that interest be awarded at the statutory rate; that Plaintiff receive its costs and reasonable attorneys' fees in this action; and for such further and additional relief as the Court deems just and proper.

## COUNT IV – DECLARATORY JUDGMENT

83.    Plaintiff incorporates by reference, as though fully set out herein, each and every allegation contained in paragraphs 1 through 82.  This count is stated as to the defined La Nacional defendants only.

84.    Pursuant to Sec. 10.1.3 of the SPA, Euronet may terminate the SPA upon a material breach by La Nacional.  A material breach is defined in Sec. 10.1.3 of the SPA as a failure of La Nacional to perform any of their representations, warranties or covenants contained in the SPA if such breach would give rise to a failure of a condition set forth in Sec. 6.1 of the SPA.

85.    On April 5, 2007, Euronet exercised its contractual right to terminate the SPA and issued a termination letter to La Nacional.  However, La Nacional, and specifically Defendant Hernandez, has failed to instruct the Escrow Agent to disburse to Euronet the $26 Million placed in Pre-Closing Escrow by Euronet.

86.    Pursuant to K.S.A. § 60-1704, Euronet requests that the Court declare Euronet's termination of the SPA was legal, binding upon La Nacional and effective as

23

of the date thereof, together with an order requiring Defendant Hernandez to instruct the Escrow Agent to disburse to Euronet the $26 Million deposited, with all earnings thereon.

87.    Euronet has fully performed all of its obligations that have become due under the SPA.

88.    Pursuant to K.S.A. § 60-1711, Plaintiff respectfully requests an award of costs.

WHEREFORE, Plaintiff prays for judgment in its favor under Count IV of the Amended Petition; that a declaratory judgment be entered stating that Euronet's termination of the SPA was valid, binding and effective, together with an Order directing the Defendant Hernandez to instruct the Escrow Agent to return to Plaintiff the $26 Million now in Pre-Closing Escrow and all earnings thereon; that Plaintiff receive its costs and reasonable attorneys' fees in this action; and for such further and additional relief as the Court deems just and proper.

## COUNT V - TORTIOUS INTERFERENCE

89.    Plaintiff incorporates by reference, as though fully set out herein, each and every allegation contained in paragraphs 1 through 88.

90.    Defendants Hernandez and Lopez have and are tortiously interfering with Euronet's prospective business relations with La Nacional.

91.    Pursuant to the terms of the SPA, Euronet was intended to benefit from the network of sales employees and Agents associated with La Nacional prior to Closing.

92.    Defendants Hernandez and Lopez had knowledge of and were aware of the intended transfer of ownership of La Nacional, including its current network of sales

24

employees and Agents, to Euronet, through their participation, directly and indirectly, in the negotiation of the SPA and noncompetition agreement.

93.    Without justification, Defendants Hernandez and Lopez intentionally disregarded this knowledge and the obligations of the SPA and noncompetition agreement, and actively orchestrated, initiated, participated in and/or ratified efforts to have certain La Nacional sales employees and Agents move their business referrals away from La Nacional post-Closing to another entity or entities in order to personally benefit themselves, directly or indirectly.

94.    Defendants Hernandez and Lopez intentionally acted wrongfully toward Euronet and/or in reckless disregard of Euronet's contractual rights.

95.    As a direct and proximate result of Defendant Hernandez and Lopez' tortious interference with the prospective business relationship, Euronet will suffer damages in excess of $75,000.

WHEREFORE, Plaintiff prays for judgment in their favor under Count V of the Petition; that judgment be entered in excess of $75,000; that interest be awarded at the statutory rate; that Plaintiff receive its costs and reasonable attorneys' fees in this action; and for such further and additional relief as the Court deems just and proper.

## COUNT VI - CIVIL CONSPIRACY

96.    Plaintiff incorporates by reference, as though fully set out herein, each and every allegation contained in paragraphs 1 through 95.

97.    Defendants Hernandez and Lopez entered into a conspiracy together with others to strip business away from La Nacional following the Closing of the SPA for their personal benefit, directly or indirectly, in direct contravention of the terms and spirit of

25

the SPA and noncompetition agreement, and in direct contravention of the representations made to Euronet to induce it to enter into the SPA. But for the conduct of the Defendants, Plaintiff would have been reasonably certain to have realized the full and expected future economic benefit of the SPA.

98.    Defendants Hernandez and Lopez came to a meeting of minds in their intent to wrongfully strip business away from La Nacional post-Closing for their personal benefit, directly or indirectly.

99.    In furtherance of their conspiracy to commit fraud and the conspiracy to commit breach of contract, Defendants Hernandez and Lopez, directly or indirectly, have contacted certain of La Nacional's sales employees and Agents, and plan to contact others, for the purpose of having them divert business away from La Nacional post-Closing, and to instead direct that business to another entity or entities owned or controlled, in whole or part, by Roberto Lopez and Jose Andres Hernandez Andujar and/or for their personal benefit, directly or indirectly.

100.   As a direct and proximate result of Defendants Hernandez and Lopez' conspiracy, Euronet has and will continue to suffer damages in excess of $75,000, and yet to be determined additional sums.

WHEREFORE,  Plaintiff prays for judgment in its favor under Count VI of the Petition; that judgment be entered in excess of $75,000; that interest be awarded at the statutory rate; that Plaintiff receive its costs and reasonable attorneys' fees in this action; and for such further and additional relief as the Court deems just and proper.

Respectfully submitted,

William M. Modrcin  KS #13020
George F. Verschelden  KS #21469
Stinson Morrison Hecker LLP
1201 Walnut Street
Kansas City, Missouri 64106
(816) 842-8600
FAX (816) 691-3495

Of Counsel:

Thomas S. Kilbane (OH # 0005938)
Howard J.C. Nicols (OH # 0007493)
Colin R. Jennings (OH # 0068704)
SQUIRE, SANDERS & DEMPSEY L.L.P.
4900 Key Tower
127 Public Square
Cleveland, Ohio  44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8795

Attorneys for Plaintiff

DATED:  April 5, 2007

27

## JURY DEMAND

Plaintiff hereby demands trial by jury for all issues herein so triable.

_____
Attorney for Plaintiff