THE SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

EURONET PAYMENTS & REMITTANCE, INC.,

      Petitioner,

      - against -

ENVIOS DE VALORES LA NACIONAL CORP.,
ENVIOS DE VALORES LA NACIONAL, INC.,
AEROCARIBE TRAVEL AGENCY, INC.,
JOSE ANDRES HERNANDEZ ANDUJAR,
CANDIDA DE HERNANDEZ, AND
ROBERTO LOPEZ,

      Respondents.

Index No. 601675/07

NEW YORK
COUNTY CLERK'S OFFICE

MAY 1 8 2007

NOT COMPARED
WITH COPY FILE

---

**MEMORANDUM IN SUPPORT OF EURONET'S PETITION TO STAY ARBITRATION
PENDING RESOLUTION OF THE ISSUE OF ARBITRABILITY
IN THE DISTRICT COURT OF KANSAS**

---

      Petitioner Euronet Payments & Remittance, Inc. ("Euronet"), respectfully submits this memorandum in support of its Petition to Stay the Arbitration demanded by Respondents pending resolution of the previously filed Motion To Stay Arbitration, which was filed in the pending action between the parties in the United Stated District Court for the District of Kansas ("District Court of Kansas"). A copy of the previously filed motion before the District Court of Kansas is attached as Exhibit C to the Petition to Stay the Arbitration. In the papers removing the pending Kansas action to federal court, Respondents' (with the exception of Respondent Lopez) indicated their intent to file a Motion for Stay to Enforce Arbitration Provision and, thereby, raise the issue of

arbitrability before the District Court of Kansas. Accordingly, there does not appear to be any dispute that the Kansas court has the jurisdiction to address the issue of arbitrability and the prior filed action is therefore a "pending action" as defined by CPLR §§ 7502(a).

## 1.    The Court Should Defer Ruling On This Special Proceeding Pending The Decision By The Kansas Court

Euronet filed its initial Petition (or complaint) against the Respondents in the District Court of Johnson County, Kansas on March 14, 2007.    That Petition was amended on April 5, 2007.    See Exhibit A to the Petition to Stay Arbitration. Respondents removed the Amended Petition to the District Court of Kansas on May 16, 2007.

In response to the Amended Petition (or complaint) in the Kansas court, Respondents demanded arbitration by letter dated April 30, 2007. See Exhibit B to the Petition to Stay Arbitration.    On May 17, 2007, Euronet filed a Motion to Stay the demanded arbitration, in accordance with CPLR §§ 7502(a) and 7503(b), in the pending action in the District Court of Kansas. See Exhibit C to the Petition to Stay Arbitration. Because the District Court of Kansas has the jurisdiction to determine all issues of arbitrability, it is a "pending action" within the meaning of CPLR § 7502(a). Accordingly, this Court should defer ruling on Euronet's Petition, pending resolution by the District Court of Kansas of the motion pending before it.[1]

"As a matter of New York state policy, the rule has been stated that 'proceedings begun in another State should not be interfered with unless there is some necessity clearly shown.... Generally the court which has first taken jurisdiction is the

---

[1] This Special Proceeding was filed as a prophylactic measure to avoid any issue or arguments of waiver pursuant to CPLR § 7503(c).

one in which the matter should be determined and it is a violation of the rules of comity to interfere.'" *White Light Prods. v. On The Scene Prods.*, 231 A.D.2d 90, 96 (1st Dept. 1997), *quoting City Trade & Indust., Ltd. v. New Cent. Jute Mills Co.*, 25 N.Y.2d 49, 58 (1969). The policy favoring comity is evidenced in CPLR § 7502(a), which provides: "[a] special proceeding shall be used to bring before a court the first application arising out of an arbitrable controversy *which is not made by motion in a pending action*." CPLR § 7502(a) (emphasis added). The New York statutory provision regarding applications to compel arbitration further provides that "[i]f an issue claimed to be arbitrable is involved in an action pending in a court having jurisdiction to hear a motion to compel arbitration, the application *shall be made by motion in that action.*" CPLR § 7503(a) (emphasis added). Therefore, it is clear that New York courts should defer all questions of arbitrability in favor of a prior filed motion to stay in a "pending action" where the deciding court has jurisdiction to determine all issues of arbitrability.

As set forth above, the District Court of Kansas has jurisdiction to determine all issue of arbitrability related to this dispute. Accordingly, this Court should defer to the first filed action in furtherance of CPLR §§ 7502(a), 7503, and the New York policy favoring comity.

### 2. Alternatively, Should This Court Not Be Inclined To Defer Resolution Of This Special Proceeding, The Demanded Arbitration Should Be Stayed Because The Underlying Agreement Is Permeated With Fraud

The parties to this action (with the exception of Respondent Roberto Lopez) were parties to a Stock Purchase Agreement ("SPA"), dated January 12, 2007, pursuant to which Euronet was to acquire, subject to certain closing conditions which were not satisfied, Envios de Valores La Nacional Corp., a New York corporation, Envios De Valores La Nacional, Inc., a New Jersey corporation, and AeroCaribe Travel Agency,

Inc., a New York corporation, from Jose Andres Hernandez Andujar (and his consenting spouse, Candida de Hernandez) (collectively referred to as "La Nacional"). The SPA has not closed, and $26 Million is being held in Pre-Closing Escrow.

Effective April 5, 2007, Euronet rescinded and terminated the SPA pursuant to its terms, due to events and information discovered after the execution of the SPA. Stated simply and as further set forth below, Euronet was defrauded in a scheme that (1) misrepresented the lawfulness of the businesses to be purchased (artificially inflating the value of the companies), (2) concealed the felony money laundering conviction of a key member of management, and (3) concealed a conspiracy through which Respondents and others would strip the core revenue-generating relationships from the companies post-closing.

Accordingly, La Nacional not only made false representations to extract the full market price for a purportedly law abiding and legitimate enterprise, but planned to strip even the legitimate portions of La Nacional after closing. As a result of Respondents' conduct, fraud permeates the entire agreement. The arbitration clause that was induced by fraud is therefore invalid and this matter should remain in court.

### Procedural History

As a result of the circumstances set forth in the Petition to Stay and more fully detailed below, Euronet issued a letter rescinding and terminating the SPA on April 5, 2007. A copy of this correspondence is attached as Exhibit 7 to the Amended Petition. On the same day, Euronet amended its Petition (or complaint) in the Kansas court, alleging the following causes of action:

1.  **Fraudulent Inducement** – against all the Respondents;

2.  **Negligent Misrepresentation** – against all the Respondents;

4

3. **Breach of Contract** – against La Nacional and Hernandez Respondents;

4. **Declaratory Judgment** – against La Nacional and Hernandez Respondents;

5. **Tortious Interference** – against Respondents Jose Hernandez and Lopez; and

6. **Civil Conspiracy** – against Respondents Jose Hernandez and Lopez.

In response to the Amended Petition, on April 30, 2007, counsel for Respondents issued a letter pursuant to CPLR § 503(c) [2] asserting that the claims in this action are subject to the arbitration clause in the SPA, and demanding arbitration or that Euronet file a motion to stay. The correspondence states in pertinent part:

> Pursuant to Paragraph 11.4 of the SPA, La Nacional hereby gives notice to Euronet that it requires that the dispute raised in the lawsuit filed by Euronet be submitted to arbitration in accord with Paragraph 11.4 of the SPA. . . . . As you are also aware, the SPA is governed by New York Law. SPA ¶ 11.5. Pursuant to New York law, section 7503(c) **you are hereby notified that if, within 20 days after receipt of this notice, you fail to serve an application to stay arbitration you will "thereafter be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in court .     [any] bar of a limitation of time."** CPLR § 7503(c). (emphasis added)

As a result, Euronet moved the District Court of Kansas (and has petitioned this Court to avoid any arguments or issues of waiver) to stay the arbitration demanded by

---

[2]     The SPA contains a choice of law provision, which provides:

> <u>Applicable Law</u>. THIS AGREEMENT WILL BE DEEMED TO BE A CONTRACT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND FOR ALL PURPOSES WILL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS PREVAILING IN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

*Id*. at Section 11.5.

Respondents, because the arbitration clause, and the SPA generally, were procured by fraud. The Respondents' fraud permeates the entire agreement, invalidating the arbitration provision. Moreover, the claims against Respondent Lopez are not subject to arbitration because he was not a party to the SPA. As a result, the claims asserted are not arbitrable, and this matter should remain in court.

### Facts

Euronet is an electronic money transmitter company that offers United States customers electronic-consumer-money-transfer services to locations in Latin America, China, India and the Philippines. In 2006, Euronet expressed interest in acquiring Envios NY and certain of its affiliates involved in the money remittance business serving Latin America and the Dominican Republic, which culminated in a SPA between Euronet and La Nacional.

On January 12, 2007, Euronet entered into the SPA to purchase Envios NY, Envios NJ and AeroCaribe from Respondent Jose Hernandez for $26,000,000. A copy of the SPA is attached as Exhibit 1 to the Amended Petition. Respondent Roberto Lopez was not a party to the SPA. The purchase price of $26 Million was deposited into a Pre-Closing Escrow pursuant to the parties' separate agreement. A copy of the Pre-Closing Escrow Agreement is attached as Exhibit 2 to the Amended Petition. Following deposit of the funds, the parties continued toward completion of the transaction.

The transfer of money from the United States is heavily regulated and subject to potential misuse/abuse by criminals (resulting in criminal and other liability/sanctions to the money remittance company). During the course of the negotiations in 2006 and 2007 Euronet therefore bargained for very broad and specific representations in the

6

SPA as to the lawfulness of La Nacional's operations and personnel. These representations include:

- None of La Nacional's employees have been convicted of any money laundering offense;
- None of La Nacional's employees were engaged in or conspired to engage in any money laundering transaction;
- La Nacional was in full compliance with the money laundering statutes, including the PATRIOT Act and the Bank Secrecy Act; and
- No agent or employee of La Nacional was under investigation for money laundering.

These clear and unqualified representations of fact given by La Nacional to induce Euronet to purchase the company were false when made and were revealed to Euronet to be so only weeks after the signing of the SPA. On February 6, 2007, twenty-one (21) days after signing the SPA, two La Nacional employees were arrested and charged with money laundering, and search warrants were executed by state and federal authorities at two La Nacional stores and at least four other locations operated by La Nacional agents. See Search Warrants attached as Exhibits 3 and 4 to Amended Petition. The execution of the arrest and search warrants were the result of a multi-year investigation into criminal activity at La Nacional stores. See Search Warrant affidavits attached as Exhibits 5 and 6 to the Amended Petition. La Nacional failed to inform Euronet about the arrests and raids. Euronet had to learn of these events from public sources.

The events of February 6, 2007 caused Euronet concern about the operations and personnel of La Nacional, which had been represented to be in full compliance with law and not under investigation. See SPA at Section 2.13.2 and 2.14. Subsequent investigation heightened Euronet's concerns as to the accuracy of the representations

7

in the SPA.   Specifically, Euronet discovered that in direct contravention of the contractual representations, La Nacional's General Sales Manager (Ramon Corporan) was a convicted felon, having been convicted of conspiracy to launder money and serving more than four years in federal prison prior to his release in 2003. *See* SPA at Section 2.13.2(iv); *United States of America v. Corporan, et. al.*, Case No. 96CR00919.

In addition to having a convicted money launderer responsible for the operations of La Nacional's sales force (*i.e.,* the individuals in the field responsible for those collecting funds), Euronet discovered that Respondent Roberto Lopez, a consultant for La Nacional, and one of the negotiators of the SPA on behalf of La Nacional, had owned Remesas America Oriental ("RAO"), the money remitter that employed Ramon Corporan at the time of his criminal conviction for conspiracy to money launder.   RAO was indicted and convicted, along with La Nacional's Sales Manager, for laundering $4.4 million to, among other places, the Dominican Republic.   As a result of its federal conviction, RAO was subjected to a $2.2 million forfeiture judgment, and Respondent Lopez was required to surrender his shareholder interests in RAO in partial satisfaction -- effectively shutting down the money laundering enterprise.

In addition to Mr. Corporan, numerous other members of La Nacional's current upper management were associated with the convicted and closed RAO enterprise. These individuals now hold key positions within La Nacional:

- La Nacional's General Sales Manager (Ramon Corporan) was employed by RAO at the time of his conviction and the conviction of RAO;

- The Director of Agent Operations (Frank R. Reyes) at La Nacional served in several roles at RAO and joined La Nacional following the conviction and closure of the RAO money laundering enterprise;

- The Controller of La Nacional (Ana Hernandez) served as the Controller for RAO;

8

- The President and Chief Executive Officer of La Nacional (Alan H. Friedman) served as the Executive Vice President and President of the parent company of RAO;

- La Nacional's Assistant to the President and Director of Branch Operations (Rosa M. Cruz) was similarly employed by the parent company of RAO; and

- La Nacional's Corporate Internal Auditor (Frank Feliz) was similarly employed by the parent company of RAO.

The information regarding the connection to -- and, in essence, re-creation of -- the indicted and closed RAO enterprise within the La Nacional management structure was not disclosed or discovered until after federal and state agents raided the two La Nacional stores and arrested two La Nacional employees for money laundering. It is unknown how many other RAO associated individuals are currently employed by or associated with La Nacional.

In addition to failing to disclose this information to Euronet, and representing falsely that there was no individual in their employ convicted of any money laundering offense, and that no agent or employee of La Nacional was under investigation for money laundering offenses, La Nacional failed to advise its state regulators (in violation of certain state laws) that it employed a convicted felon. Because of these violations, La Nacional is subject to disciplinary action, including debarment, by certain state regulatory agencies.

As if these revelations were not sufficiently adverse, Euronet also learned of a conspiracy to strip business away from the companies following closing. Respondent Jose Hernandez and his agent, Respondent Roberto Lopez, negotiated the SPA with the intent to first fraudulently induce Euronet to purchase La Nacional at full market value, and then to divert certain key La Nacional sales associates and agents (the revenue generating relationships of the companies) to another entity for their personal

9

benefit after closing.    Respondents Lopez and Jose Hernandez misled Euronet, in furtherance of their business-stripping conspiracy, by misrepresenting the lawfulness of La Nacional's operations and personnel, the value of companies in the future, and by failing to disclose their intent to strip the revenue generating relationships from the company.    As a result, the negotiations for the SPA were not at arms' length, but instead were perpetrated for the purpose of consummating a fraudulent scheme.

### III.  Law and Analysis

The role of the courts in ruling on a motion to stay arbitration is to determine: (1) whether there is a valid agreement to arbitrate; (2) whether the disputes fall within the scope of the arbitration clause; and (3) whether to stay the balance of the proceedings pending arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000); *Schenkers International Forwarders, Inc. v. Meyer*, 164 A.D.2d 541, 542-543 (1st Dept. 1991). Because of potential preemption issues arising under the Federal Arbitration Act, it first must be decided whether these determinations are to be made under federal or state law, and if under state law, which state law applies and which threshold issues are to be resolved by the Court.

**A.  The New York arbitration laws apply here because the parties expressly and unequivocally chose to have the SPA governed by New York law, regardless of conflict of laws principles.  Under that law, the Court, not the arbitrators, is to consider evidence as to whether the arbitration provision is to be enforced.**

As set forth above, the SPA contains a choice-of-law provision, which provides that the SPA "will be governed by and interpreted in accordance with" New York law "without regard to principles of conflict of laws." *See* SPA at Section 11.5.  The language of this provision unequivocally demonstrates the parties' intention to have the SPA, including its arbitration

clause, governed by New York law. Accordingly, pursuant to law established by the United
States Supreme Court, this Court should apply New York law to this dispute.

> **1.    The United States Supreme Court holds that an unambiguous
> "choice-of-law" provision will be enforced to the extent that the provision
> does not obstruct the purposes and objectives behind the Federal
> Arbitration Act.**

In *Volt Information Sciences, Inc. v. Board Of Trustees of Leland Stanford Junior
University*, 489 U.S. 468 (1989), the United States Supreme Court addressed the issue of
whether the Federal Arbitration Act ("FAA") preempts a particular state law chosen by
contracting parties pursuant to a choice-of-law provision contained in the agreement. In *Volt*,
the plaintiff university and the defendant contractor entered into a contract for services in
California and agreed to submit all disputes to arbitration.    The contract contained a
choice-of-law provision designating "the law of the place where the Project is located" to
govern the contract. *Volt*, 489 U.S. at 470. A dispute arose and the contractor filed a demand
for arbitration. While this arbitration claim was pending, the university filed claims in state court
against the contractor and other parties (with whom it did not have arbitration agreements),
and the contractor sought to compel arbitration of those claims pursuant to the contract. *Id.* at
470-471.    The university, meanwhile, moved the court to stay the original arbitration
proceedings with the contractor, as permitted by the arbitration rules of California.    *Id.* at
471-472. The state court refused to compel arbitration of the university's claims against the
contractor and stayed the prior, ongoing arbitration of the contractor's claims against the
university.    *Id.* at 471.    The California Court of Appeals affirmed, holding that the parties'
inclusion of the choice-of-law provision in their contract evinced intent to be bound by
California's rules of arbitration. *Id.* at 471-472.

The United States Supreme Court affirmed this decision. The Supreme Court
held, while "due regard must be given to the federal policy favoring arbitration . . . [t]here

is no federal policy favoring arbitration under a certain set of procedural rules." *Id*. at 477. The Supreme Court recognized that the FAA contains no express pre-emptive provision, "nor does it reflect a congressional intent to occupy the entire field of arbitration." *Id*. The Court further found that the California rules were "manifestly designed to encourage resort to the arbitral process," and even if they did not serve that goal in the case at hand, the Court ruled that parties to a contract have the authority to "specify . . . the rules under which [their] arbitration will be conducted." *Id*. at 479. Thus, the Court held that, in the absence of any express conflict between the provisions of the FAA and a state's arbitration laws, the FAA will be found to preempt state arbitration law *only* to the extent that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 477.

**2.    The New York law providing that questions of arbitrability be tried to the Court, not to arbitration, does not undermine the   policies supporting the FAA.**

The highest court of New York adopted *Volt* in *Smith Barney, Harris Upham & Co., Inc. v. Luckie*, 85 N.Y.2d 193, 206 (1995), observing that there was no significant distinction to be drawn between the policies supporting the FAA and the arbitration provisions under New York statutory law. *Id*. at 205-206 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, n.13. (1967)) Relying on *Volt*, the New York Court of Appeals held that the New York statutory rule under CPLR 7502 permitting the courts, not the arbitrators, to address threshold issues to arbitrability, such as statute of limitations defenses,  did not constrain the pro-arbitration policies underlying the FAA. *Id*. at 206. The court reasoned that honoring the parties' selection of New York law to

12

govern their agreement advances the federal policy enunciated in *Volt* of ensuring the enforceability of private agreements to arbitrate. *Id.*

### 3.    New York law holds that a court, not an arbitrator, must initially decide whether the alleged fraud "permeated the entire contract."

Under New York law, if the arbitration clause was induced by fraud, the matter is no longer arbitrable and the court decides the dispute. *See In re Weinrott (Carp)*, 322 N.Y.2d. 190 (1973). Furthermore, under New York law, where the fraud is part of a grand scheme that "permeated the entire contract," the invalidity of the agreement as a whole is demonstrated and the matter is not arbitrable. *Silverman v. Benmor Coats, Inc.*, 61 N.Y.2d 299, 307 (1984) (citing *In re Weinrott (Carp)*, 32 N.Y.2d 190 (1973)); *see also Kennelly v. Mobius Realty Holdings LLC*, 33 A.D.3d 380, 383 (1st Dept. 2006) (finding an evidentiary hearing was necessary because there was an issue present regarding whether the agreement was permeated with fraud, such that the arbitration clause would fall with the rest of the agreement); *O'Neill v. Krebs Communications Corp.*, 16 A.D.3d 144, 144-45 (1st Dept. 2005) (applying the exception that fraud "permeates the entire agreement so as to invalidate the arbitration clause as well"); *Stellmack Air Conditioning & Refrigeration Corp. v. Contractors Mgmt. Sys. of NH, Inc.*, 293 A.D.2d 956, 957 (3rd Dept. 2002) (applying the "fraud was part of a grand scheme that permeated the entire contract" exception); *In re Teleserve Systems, Inc.*, 230 A.D.2d 585, 592 (4th Dept. 1997) (acknowledging that New York law establishes two exceptions wherein a court decides whether a contract should be revoked due to fraud or a similar defense:  where the challenge is to the making of the arbitration clause itself, or where the alleged fraud permeates the contract as a whole); *Avalon Inter. Trading Corp. v. Receivables Mgmt. Corp.*, 220 A.D.2d 248, 249 (1st Dept. 1995) (applying the "fraud permeates" exception); *Cologne Reinsurance Co. v. Southern*

13

*Underwriters, Inc.*, 218 A.D.2d 680, 680 (2nd Dept. 1995) (applying the "alleged fraud was part of a grand scheme that permeated the entire contract" exception); *Oberlander v. Fine Care, Inc.*, 108 A.D.2d 798, 798-99 (2nd Dept. 1985) (finding it was error for the lower court not to hold an evidentiary hearing to resolve the dispute of "whether the alleged fraud was part of a grand scheme that permeated the entire contract"); *Housekeeper v. Lourie*, 39 A.D.2d 280, 285 (1st Dept. 1972) (finding that, after a sufficient prima facie showing of an issue as to whether there is a valid agreement to arbitrate, "a hearing is required to afford the parties an opportunity to present evidence and to examine and cross-examine witnesses").

**B. Euronet is entitled to an evidentiary hearing to show that, under New York law, Respondnets' fraud so "permeated" the entire SPA that the arbitration clause is unenforceable.**

It is well settled under New York law that, on an application to stay arbitration pursuant to CPLR § 7503(b), a trial or evidentiary hearing is required if there is any disputed issue of fact. *Burbank Broad. Co. v. Roslin Radio Sales, Inc.*, 99 A.D.2d 976, 977 (1st Dept. 1984); *see also M.I.F. Sec. Co. v. R.C. Stamm & Co.*, 94 A.D.2d 211, 213 (1st Dept. 1983) ("[I]t is a judicial responsibility, and not the arbitrator's, to decide the threshold question of whether the parties are bound by a valid agreement to arbitrate."). Under CPLR § 7503, the question of "whether a valid arbitration agreement was made or complied with" is for the courts to decide. CPLR §7503(a). If an issue claimed to be arbitrable is involved in a pending action, the court in the pending action must decide all issues of arbitrability. *Id*. As such, this Court must decide the threshold question of whether a valid arbitration agreement exists here.

Moreover, where an allegation of fraud in the inducement of the contract raises a "substantial question as to the existence of a valid agreement to arbitrate which ...

14

would warrant a stay of arbitration ..., a hearing is required at which the parties are to be afforded the opportunity to present evidence and examine and cross-examine witnesses." *Barrett Intercommunication Prods. Corp. v. Entron, Inc.*, 41 A.D.2d 567, 567 (2nd Dept. 1973) (citing *Housekeeper v. Lourie*, 39 A.D.2d 280, 285 (1st Dept. 1972)). Accordingly, an evidentiary hearing is required to resolve a dispute as to whether the alleged fraud "permeates the entire agreement" so as to make the arbitration agreement invalid. *See Kennelly v. Mobius Realty Holdings LLC*, 33 A.D.3d 380, 383 (1st Dept. 2006); *Oberlander v. Fine Care, Inc.*, 108 A.D.2d 798, 799 (2nd Dept. 1985); *Housekeeper v. Lourie*, 39 A.D.2d 280, 285 (1st Dept. 1972).

A New York appellate court recently found that an evidentiary hearing was required to determine if the agreement "was permeated with fraud, such that the arbitration clause would fall with the rest of the agreement." *Kennelly*, 33 A.D.3d at 380. In *Kennelly*, the plaintiff seeking to avoid arbitration alleged that a brokerage agreement between himself and a real estate brokerage firm was the product of fraud. *Id*. at 381. The court found that plaintiff raised threshold issues regarding the validity of the agreement that were for the court to determine. *Id*. at 382. The court emphasized that "it is a judicial responsibility, and not the arbitrator's, to decide the threshold question of whether the parties are bound by a valid agreement to arbitrate." *Id*. (quoting *M.I.F. Sec. Co. v. R.C. Stamm & Co.*, 94 A.D.2d 211, 213 (1st Dept. 1983)).

Similarly, in *Oberlander v. Fine Care, Inc.*, 108 A.D.2d 798, 799 (2nd Dept. 1985), the appellate court found error where the lower court failed to hold an evidentiary hearing to determine if fraud permeated the agreement. The plaintiffs, who sought to avoid arbitration, were partners in a nursing home facility and had entered into an agreement with a service organization to supply health-care services to the facility. The

plaintiffs alleged that the contract resulted from premeditated fraud orchestrated between the service organization and the nursing home's controller, who they claimed had an interest in the respondent company. *Id*. The record contained testimony of the service organization's president, that the agreement was a "front for the union and for the State agency." *Id*.[3] The New York appellate court found the record established the existence of disputed factual issues that could not be resolved absent an evidentiary hearing. *Id*.

In *Housekeeper v. Lourie*, 39 A.D.2d 280, 285 (1st Dept. 1972), the court found that allegations of fraudulent inducement against an attorney sufficiently raised triable issues as to whether the fraud permeated the entire agreement. In *Lourie*, the plaintiffs seeking to avoid arbitration alleged that they were induced to enter into an agreement to terminate a partnership by their attorney-partner, who fraudulently represented that such an agreement was the only way to terminate the partnership, and that failure to execute the agreement would result in continuation of the partnership. *Id*. at 282. Pursuant to these allegations, the court found that there was a material issue of fact regarding whether the agreement was a product of "arm's length" negotiations, thereby casting doubt on whether the parties intended to settle their disputes by arbitration. *Id*. at 285.

---

[3] Such record testimony, despite the absence of an evidentiary hearing, demonstrates

**C.    Euronet is entitled to an evidentiary hearing to show that its claims are not arbitrable because Euronet has made a prima facie showing that Respondents' fraud "permeated the entire contract," rendering the arbitration clause unenforceable.**

Euronet's Amended Petition clearly makes a prima facie showing that fraud permeated the entire SPA, rendering the arbitration clause unenforceable. Euronet has demonstrated that, among other things, Respondents fraudulently misrepresented to Euronet that La Nacional was operated in accordance with the law, that no La Nacional employee had been convicted of any money laundering offenses, that the financial projections related to La Nacional were accurate, and that the sales personnel and agents of La Nacional would remain loyal to Euronet post-closing and that La Nacional had made the proper required disclosures to state agencies. *See* Amended Petition ¶ 54.

Despite these representations, La Nacional employees were the target of a multi-year state and federal criminal investigation for money laundering, which resulted in the arrest of two La Nacional employees and the execution of search warrants at two La Nacional stores. *See* Search Warrant affidavits attached as Exhibits 5 and 6 to the Amended Petition. Moreover, La Nacional's General Sales Manager is a convicted felon – a fact known to La Nacional but in direct contravention of the representations given in the SPA and to state regulators. In addition to Ramon Corporan, numerous individuals associated with RAO -- the convicted and closed money laundering enterprise owned by Respondent Roberto Lopez -- are now in key management or consulting positions within La Nacional. The effective re-creation of the convicted and closed enterprise within La Nacional undermines the fundamental integrity of La Nacional's personnel and operations. Finally, Euronet alleges that, on information

that the New York court permitted discovery on the issue of arbitrability.

from multiple sources, Respondents Jose Hernandez and Roberto Lopez, at the time of the contract negotiations, were surreptitiously organizing the stripping of business/revenue generating relationships away from La Nacional post-closing for their own benefit. *See* Amended Petition ¶ 57.

These facts and allegations demonstrate that the Respondents intentionally lied to induce Euronet to agree to the terms of the SPA, with the full intention of further defrauding Euronet by stripping away La Nacional's future business/value post-closing. Respondents constructed this fraudulent scheme prior to the negotiations and bargained with the bad-faith objective of defrauding Euronet. Respondents' fraudulent scheme was so pervasive that fraud permeated the entire SPA, rendering every provision of the Agreement, including the arbitration clause, unenforceable. The bad-faith intent of the Respondents and the extensive nature of their fraud demonstrates that the SPA was not a result of an "arms' length" negotiation. Therefore, Euronet is entitled to a stay of the arbitration demanded by Respondents.

Euronet respectfully requests this Court conduct an evidentiary hearing on the issue of whether Respondents' fraud so permeates the entire SPA that the arbitration clause is unenforceable. The fraud demonstrated by Euronet is more prevalent and egregious than in the New York cases where courts found that an evidentiary hearing was required. *See Kennelly v. Mobius Realty Holdings LLC,* 33 A.D.3d 380 (1st Dept. 2006) (fraud allegations related only to the manner in which the real estate brokerage firm drafted the contract); *Housekeeper v. Lourie*, 39 A.D.2d 280, 285 (1st Dept. 1972) (fraud allegations related solely to attorney misrepresenting the requirements to terminate partnership). Euronet requests that the hearing be scheduled no sooner than ninety (90) days after the filing of this motion to allow necessary discovery to be taken in

preparation for the hearing. The period of ninety (90) days is requested due to the international scope of the necessary discovery.

### D. **Euronet's claims against Respondent Roberto Lopez are not arbitrable because he is a non-signatory to the SPA and has no right to compel arbitration.**

In addition to and irrespective of the above, Euronet asserts four causes of action against Respondent Roberto Lopez, a non-signatory to the SPA.[4] The contractual right to compel arbitration may not be invoked by one who is not a party to the agreement and does not otherwise posses the right to compel arbitration. *Waldron v. Goddess*, 93 A.D.2d 706, 709 (1st Dept. 1983) (reversed on other grounds), (quoting *Moruzzi v. Dynamics Corp. of Amer.*, 443 F.Supp 332 (S.D. N.Y. 1977)); *see also Lorber Industries of Cal. V. Los Angeles Printworks Corp.*, 803 F.2d 523, 525 (9th Cir. 1986). Roberto Lopez is not a party to the SPA and, accordingly, the claims against him should be litigated in any event.

Accordingly, if the Court is disinclined to stay all or part of the demanded arbitration, Euronet should nevertheless be permitted to pursue its claims against Respondent Lopez in litigation. Lopez is a non-party to the SPA, and therefore the questions of law and fact regarding the claims against him are separate and distinct from those asserted against the other Respondents.

---

[4] Fraudulent Inducement (Count I), Negligent Misrepresentation (Count II), Tortious Interference (Count V), and Civil Conspiracy (Count VI)

## CONCLUSION

Based upon the foregoing, Euronet respectfully requests this Court to defer ruling on its Petition to Stay the Arbitration, until resolution of the issue in the pending action in Johnson County, Kansas.  The Kansas court has jurisdiction to resolve all issues of arbitrability and, therefore, is the appropriate forum within which to resolve any issue of arbitrability related to this dispute.  In the alternative, Euronet requests this Court to stay all proceeding under the demand of arbitration.

Respectfully submitted,

Howard J.C. Nicols, Esq. (3895554) /CRJ
SQUIRE, SANDERS & DEMPSEY LLP
350 Park Avenue
New York,  NY  10022

Of Counsel:

Thomas S. Kilbane (OH # 0005938)
Colin R. Jennings (OH # 0068704)
SQUIRE, SANDERS & DEMPSEY L.L.P.
4900 Key Tower
127 Public Square
Cleveland, Ohio  44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8795

Attorneys for Petitioner

DATED:  May 17, 2007