# EXHIBIT 1

STOCK PURCHASE AGREEMENT

AMONG

EURONET PAYMENTS & REMITTANCE, INC.,

JOSE ANDRES HERNANDEZ ANDUJAR,

CANDIDA DE HERNANDEZ

AND

THE COMPANIES

(AS DEFINED HEREIN)

January  12, 2007

# TABLE OF CONTENTS

**Page**

ARTICLE I     PURCHASE AND SALE OF STOCK .......................................................... 1

1.1    Transfer of the Stock by Seller ...................................................... 1

1.2    Purchase of the Stock by Euronet/Purchase Price ................................... 1

1.3    Allocation of Purchase Price ........................................................ 4

1.4    The Closing ....................................................................... 4

1.5    Dominican Tax ..................................................................... 5

ARTICLE II    REPRESENTATIONS AND WARRANTIES OF THE COMPANIES AND SELLER ........................................................................ 5

2.1    Organization, Power and Authority .................................................. 5

2.2    Validity of Agreement ............................................................. 5

2.3    Capacity .......................................................................... 6

2.4    Capitalization; Company Records .................................................... 6

2.5    Absence of Equity Investments ...................................................... 6

2.6    No Breach ......................................................................... 6

2.7    Material Contracts ................................................................. 7

2.8    Title and Condition of Company Assets .............................................. 8

2.9    Real Property ..................................................................... 8

2.10   Zoning ............................................................................ 9

2.11   Consents .......................................................................... 9

2.12   Permits ........................................................................... 9

2.13   PATRIOT Act Compliance ............................................................ 9

2.14   Compliance with Laws ............................................................. 11

2.15   OSHA and ADA ..................................................................... 11

2.16   Political Contributions and Other Payments ....................................... 11

2.17   Ordinary Course of Business ...................................................... 11

2.18   Litigation ....................................................................... 11

2.19   Tax Matters ...................................................................... 11

2.20   Financial Matters and Liabilities ................................................ 13

2.21   Accounts Receivable .............................................................. 14

2.22   Agents and Correspondents ........................................................ 15

Error! Unknown document property name.

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 2.23 | Labor Relations | 15 |
| 2.24 | Employees and Employee Benefits and Plans | 15 |
| 2.25 | Insurance | 18 |
| 2.26 | Intellectual Property | 19 |
| 2.27 | Brokers, Finders and Agents | 20 |
| 2.28 | Seller's Residence | 20 |
| ARTICLE III | REPRESENTATIONS AND WARRANTIES OF EURONET | 20 |
| 3.1 | Organization, Power and Authority | 20 |
| 3.2 | Validity of Agreement | 20 |
| 3.3 | Brokers, Finders and Agents | 20 |
| 3.4 | Investment Intent | 21 |
| ARTICLE IV | COVENANTS OF THE COMPANIES, SELLER AND EURONET | 21 |
| 4.1 | Procure Regulatory Consents | 21 |
| 4.2 | Goodwill | 21 |
| 4.3 | Access to Information; Observer | 22 |
| 4.4 | Insurance | 22 |
| 4.5 | Conduct of Companies' Business | 22 |
| 4.6 | Employee Layoffs | 23 |
| 4.7 | Repayment of Seller Loans, Related Party Loans and Advances | 23 |
| 4.8 | Satisfaction of Conditions | 24 |
| 4.9 | Confidential Information | 24 |
| 4.10 | Tax Sharing Agreements | 25 |
| 4.11 | Certain Tax Matters | 25 |
| 4.12 | Further Assurances | 25 |
| 4.13 | Payoff of Seller Loans | 26 |
| 4.14 | Retention Bonus Agreements | 26 |
| 4.15 | Release of Seller Guarantees | 26 |
| 4.16 | Document Package | 26 |
| 4.17 | List of Material Contracts | 26 |
| 4.18 | List of Employees | 26 |

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 4.19 | List of Computers | 26 |
| ARTICLE V | SURVIVAL OF REPRESENTATIONS | 27 |
| ARTICLE VI | CONDITIONS PRECEDENT TO CLOSING | 27 |
| 6.1 | Conditions to Euronet Closing | 27 |
| 6.2 | Conditions to Seller and the Companies Closing | 28 |
| ARTICLE VII | CLOSING DOCUMENTS | 28 |
| 7.1 | Closing Deliveries of Seller and the Companies | 28 |
| 7.2 | Closing Deliveries of Euronet | 30 |
| ARTICLE VIII | INDEMNIFICATION | 30 |
| 8.1 | Indemnification by Euronet | 30 |
| 8.2 | Indemnification by Seller | 30 |
| 8.3 | Certain Tax Matters | 31 |
| 8.4 | Notice of Claim; Right to Participate and Defend Third Party Claim | 35 |
| 8.5 | Time and Amount Limitations | 36 |
| 8.6 | Waiver of Indemnification Rights by Seller | 36 |
| ARTICLE IX | RIGHT OF FIRST REFUSAL | 37 |
| 9.1 | Right of First Refusal | 37 |
| 9.2 | Procedure | 37 |
| ARTICLE X | TERMINATION | 38 |
| 10.1 | Termination | 38 |
| 10.2 | Specific Performance | 39 |
| ARTICLE XI | GENERAL | 39 |
| 11.1 | Notices | 39 |
| 11.2 | Certain Defined Terms | 40 |
| 11.3 | Certain Interpretive Matters | 48 |
| 11.4 | Arbitration | 48 |
| 11.5 | Applicable Law | 49 |
| 11.6 | Counterparts | 49 |
| 11.7 | Entire Agreement | 49 |
| 11.8 | Inurement | 49 |

## TABLE OF CONTENTS
(continued)

Page

11.9    Time of Essence ........................................................................................... 49

11.10   Rights of the Parties .................................................................................... 49

11.11   Severability ................................................................................................. 49

11.12   Expenses ...................................................................................................... 50

11.13   Remedies Not Exclusive .............................................................................. 50

11.14   Waiver of Trial by Jury ............................................................................... 50

11.15   Seller's Release ............................................................................................ 50

11.16   Consent of Consenting Spouse .................................................................... 51

11.17   AeroCaribe ................................................................................................... 51

## LIST OF SCHEDULES AND EXHIBITS

Schedules

| | |
|---|---|
| Schedule 1.2.3.1 | Method of Calculation of Preliminary Closing Date Balance Sheets |
| Schedule 1.3 | Allocation of Purchase Price |
| Schedule 2.1 | List of Companies and Jurisdictions |
| Schedule 2.4.1 | Description of Issued and Outstanding Stock and Stockholder |
| Schedule 2.4.2 | List of Companies' Officers and Directors |
| Schedule 2.8.1 | Companies' Assets |
| Schedule 2.8.2 | Liens |
| Schedule 2.9 | List of Leased Real Property and Related Consents |
| Schedule 2.12 | Permits |
| Schedule 2.18 | Litigation |
| Schedule 2.19.3 | Tax Liens |
| Schedule 2.20.1 | Financial Statements and Interim Financial Statements |
| Schedule 2.20.2 | Seller Loans |
| Schedule 2.20.4 | Loans to Employees |
| Schedule 2.21 | Companies' Accounts Receivable as of January 11, 2007 |
| Schedule 2.22 | Agents and Correspondents |
| Schedule 2.24.1 | Employee Plans |
| Schedule 2.24.2 | Copies of Employee Plans |
| Schedule 2.25 | Companies' Insurance Policies |
| Schedule 2.26.3 | Scheduled Intellectual Property Rights |
| Schedule 2.26.7 | Software and Software-Related Agreements |
| Schedule 4.1 | Required Regulatory Consents |
| Schedule 7.1.9 | Liens Not to be Terminated and Released |
| Schedule 11.12.2 | Brokers |

Exhibits

| | |
|---|---|
| Exhibit A | Indemnification Escrow Agreement |
| Exhibit B | Lender's Release |
| Exhibit C | Distribution Agreement |
| Exhibit D | Currency Exchange Services Agreement |
| Exhibit E | Noncompetition Agreement |
| Exhibit F | Broker's Release |
| Exhibit G-1 | FIRPTA Certificate (Envios NY) |
| Exhibit G-2 | FIRPTA Certificate (Envios NJ) |
| Exhibit G-3 | FIRPTA Certificate (AeroCaribe) |
| Exhibit H | Form of Stock Power |
| Exhibit I | Form of Retention Bonus Agreement |

# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement (this "Agreement") is entered into on January 12, 2007, among Euronet Payments & Remittance, Inc., a North Carolina corporation ("Euronet"), Envios de Valores La Nacional Corp., a New York corporation ("Envios NY"), Envios De Valores La Nacional, Inc., a New Jersey corporation ("Envios NJ"), and AeroCaribe Travel Agency, Inc., a New York corporation ("AeroCaribe") (collectively, the "Companies"), Jose Andres Hernandez Andujar, a citizen and resident of the Dominican Republic ("Seller"), and Candida de Hernandez, a citizen and resident of the Dominican Republic (the "Consenting Spouse").

Seller owns all of the issued and outstanding capital stock of the Companies other than Envios NJ, which capital stock is owned by Envios NY. Seller desires to sell, and Euronet desires to purchase all of the issued and outstanding capital stock of the Companies for the consideration, and on the terms and conditions, described herein.

Certain capitalized terms used herein are defined in Section 11.2.

The Consenting Spouse is a party to this Agreement for the sole purpose of consenting to the sale by Seller of the Stock and the execution and delivery of this Agreement by Seller and any instruments delivered pursuant to this Agreement.

Therefore, the parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF STOCK

1.1    Transfer of the Stock by Seller. Subject to the terms and conditions of this Agreement, Seller agrees to sell the Stock free and clear of all Liens and deliver or cause to be delivered, as applicable, the certificates evidencing the Stock to Euronet at the Closing. Such certificates will be properly endorsed for transfer to or accompanied by duly executed stock powers in favor of Euronet, endorsed in blank, and otherwise in a form reasonably acceptable to Euronet for transfer on the books of the Companies.

1.2    Purchase of the Stock by Euronet/Purchase Price. Subject to the terms and conditions of this Agreement, the aggregate purchase price for the Stock is $26,000,000 (the "Purchase Price"), as may be adjusted pursuant to this Section 1.2. The Purchase Price will be paid by Euronet in cash as follows, subject to any adjustments required by Section 1.2.4:

1.2.1    Pre-Closing Escrow. On the date hereof, and coincident with the execution and delivery of this Agreement, Euronet has deposited into an escrow account (the "Pre-Closing Escrow Account") with the Escrow Agent an amount equal to $26,000,000, to be held by the Escrow Agent in an interest-bearing account pursuant to the terms of an escrow agreement (the "Pre-Closing Escrow Agreement"), which agreement is being executed and delivered simultaneously with the execution and delivery of this Agreement. At the Closing, subject to the satisfaction of the conditions precedent to Closing, Euronet and Seller will issue joint written instructions to the Escrow Agent to (i) release and pay to

Seller $19,500,000, subject to any adjustment required by Section 1.2.4.1, via wire transfer to an account designated by Seller, (ii) transfer $6,500,000 to a separate interest-bearing account (the "<u>Indemnification Escrow Fund</u>"), to be held by the Escrow Agent pursuant to the terms of the Indemnification Escrow Agreement, and (iii) transfer the remaining funds to Euronet via wire transfer to an account designated by Euronet. Euronet will be entitled to all amounts earned on the Pre-Closing Escrow Account. Seller will pay all costs, and administrative and other fees associated with the Pre-Closing Escrow Account.

1.2.2   <u>Indemnification Escrow</u>.  As described in Section 1.2.1, at the Closing the Escrow Agent will transfer $6,500,000 into the Indemnification Escrow Fund, to be held, administered and distributed by the Escrow Agent in accordance with the terms of an escrow agreement substantially in the form attached as <u>Exhibit A</u> (the "<u>Indemnification Escrow Agreement</u>"). Subject to the terms and conditions of the Indemnification Escrow Agreement, $5,750,000 of the Indemnification Escrow Fund will be held in such escrow account by the Escrow Agent for a period of 18 months from the Closing Date and $500,000 will be held in such escrow account by the Escrow Agent until June 15, 2009. Euronet will pay all costs, and administrative and other fees associated with the Indemnification Escrow Fund.

1.2.3   <u>Closing Date Balance Sheet; Net Current Assets</u>.

1.2.3.1   <u>Preliminary Closing Date Balance Sheets</u>.  No later than seven days before the Closing Date, Seller shall prepare and deliver to Euronet unaudited balance sheets for each of the Companies, prepared in accordance with GAAP and on a basis consistent with <u>Schedule 1.2.3.1</u> (which is based on October 31, 2006 financials), estimated in good faith by Seller as of the Closing Date (the "<u>Preliminary Closing Date Balance Sheets</u>"), including a calculation of the Net Current Assets so estimated as of the Closing Date (the "<u>Preliminary Net Current Assets</u>").

1.2.3.2   <u>Final Closing Date Balance Sheets</u>.  As soon as practicable, but no later than 30 days after the Closing Date, Euronet shall perform a review of the Preliminary Closing Date Balance Sheets as of the Closing Date (the "<u>Final Closing Date Balance Sheets</u>"), including a computation as of the Closing Date of the Net Current Assets (the "<u>Final Net Current Assets</u>"). The Final Closing Date Balance Sheets, as well as the financial information supporting the computation of the Final Net Current Assets, shall be prepared in accordance with GAAP and on a basis consistent with <u>Schedule 1.2.3.1</u> and delivered to Seller. For a period of 30 days after receipt by Seller of the Final Closing Date Balance Sheets (the "<u>Review Period</u>"), Seller will be granted reasonable access during normal business hours to the books and records of the Companies to the extent they relate to the computation of the Final Net Current

Assets. No later than the last day of the Review Period, Seller may object to the computation of the Final Net Current Assets by delivering to Euronet a written statement setting forth a reasonably specific description of Seller's objections to the computation of the Final Net Current Assets (this statement, the "Statement of Objections"). If Seller fails to deliver the Statement of Objections within the Review Period, the Final Closing Date Balance Sheets and the computation of the Final Net Current Assets will be deemed to have been accepted by Seller and final for all purposes. If Seller delivers the Statement of Objections to Euronet within the Review Period, Seller and Euronet shall negotiate in good faith to resolve the objections described in the Statement of Objections and, if these objections are resolved, the Final Net Current Assets with such changes as may have been agreed to in writing between Seller and Euronet will be final and binding for all purposes. If Seller and Euronet fail to reach an agreement with respect to any of the matters set forth in the Statement of Objections within 30 days after Euronet's receipt of the Statement of Objections, then those unresolved matters will be submitted for resolution to the New York office of the accounting firm of Grant Thornton LLP, and if for any reason Grant Thornton LLP does not agree to serve as the Accounting Expert, then to an independent, impartial nationally recognized firm of U.S. independent certified accountants (other than Euronet's, Seller's or any of the Companies' accountants) selected by Euronet and approved by Seller (the "Accounting Expert"), and the Accounting Expert shall resolve only the remaining unresolved disputes set forth in the Statement of Objections and make any required adjustments to the Final Net Current Assets. The Accounting Expert must make a determination as soon as practicable, but no later than 30 days (or such other time as Seller and Euronet agree in writing) after its engagement, and its resolution of the unresolved matters will be binding and final for all purposes. If there is an adjustment to the Final Net Current Assets in excess of $25,000 in favor of Seller as a result of the Accounting Expert's determination, then the fees and costs of the Accounting Expert will be paid by Euronet; otherwise, the fees and costs of the Accounting Expert will be paid by Seller.

1.2.4    Purchase Price Adjustments.

    1.2.4.1    Closing Date Purchase Price Adjustment. If the Preliminary Net Current Assets is a positive number, Euronet will pay such amount to Seller via wire transfer of immediately available funds on the Closing Date, by transfer of excess funds from the Pre-Closing Escrow Account established pursuant to Section 1.2.1, or by a combination of these two methods. If the Preliminary Net Current Assets is a negative number, such amount will be deducted from the

amount to be released to Seller from the Pre-Closing Escrow Account established pursuant to Section 1.2.1 and will be transmitted by the Escrow Agent to Euronet.

1.2.4.2    Final Purchase Price Adjustment. If the Final Net Current Assets minus the Preliminary Net Current Assets (the "Net Current Assets Adjustment Amount") is a positive number, Euronet will pay such Net Current Assets Adjustment Amount to Seller via wire transfer of immediately available funds no later than five Business Days after the final determination of the Final Net Current Assets. If the Net Current Assets Adjustment Amount is a negative number, Seller will pay such Net Current Assets Adjustment Amount to Euronet via wire transfer of immediately available funds no later than five Business Days after the final determination of the Final Net Current Assets.

1.2.4.3    Excluded Receivables. If the Companies or Euronet collect any monies from or in respect of the Excluded Receivables during the first 180 days after the Closing Date, then Euronet or the Companies will promptly after the receipt thereof remit such sums to Seller. Following the end of this 180 day period (or, at any time prior to the end of this 180 day period, upon Seller's request), Euronet will provide Seller an accounting relative to the Excluded Receivables. Unless otherwise noted on the payment information received from an account debtor or unless the account debtor is disputing any receivable arising prior to the Closing Date, all collections from an account debtor will be applied against the oldest receivables owed to a Company. Any payment pursuant to this Section 1.2.4.3 will be deemed an adjustment to the Purchase Price. No payment will be made under this Section 1.2.4.3 in respect of collections made more than 180 days after the Closing Date.

1.3    Allocation of Purchase Price. The Purchase Price will be allocated among the Stock in accordance with the attached Schedule 1.3, and Euronet and Seller will file all information statements or forms required by Law consistent with Schedule 1.3. The parties will amend Schedule 1.3 upon determining the Purchase Price adjustment or adjustments, if any, pursuant to Sections 1.2.4.2 and 1.2.4.3.

1.4    The Closing. The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the office of Jones Day, located at 1420 Peachtree Street, Suite 800, Atlanta, Georgia 30309, promptly, but no later than the fifth Business Day, after all of the conditions to Closing listed in Articles VI and VII have been fulfilled (other than those conditions to be fulfilled on the Closing Date), or on such later date or place as Seller and Euronet may agree. The Closing may take place either in person or through an exchange of documents by facsimile, electronic mail or overnight courier, and by wire transfer of the sums to be paid in accordance with Section 1.2. The Closing will be deemed for all purposes to be effective as of 12:01 a.m. on the Closing Date. All

proceedings to be taken and all documents to be executed and delivered by the parties at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed taken nor any documents executed or delivered until all have been taken, executed and delivered.

1.5    Dominican Tax.  Seller will be responsible for, and will timely pay, all withholding Taxes or other Taxes applicable to the purchase and sale of the Stock and imposed under the Laws of the Dominican Republic.

**ARTICLE II**
**REPRESENTATIONS AND WARRANTIES OF THE COMPANIES AND SELLER**

The Companies and Seller hereby jointly and severally represent and warrant to Euronet as follows:

2.1    Organization, Power and Authority.  As of the date of this Agreement, each of Envios NY and Envios NJ is a corporation duly organized, validly existing and in good standing under the Laws of their respective states of incorporation, and AeroCaribe is administratively dissolved.  As of the Closing Date, each of the Companies will be a corporation duly organized, validly existing and in good standing under the Laws of their respective states of incorporation.  The Companies have the corporate power and authority to own, operate and lease their properties as and where currently owned, operated and leased and to carry on their business as it is presently being conducted. Attached as Schedule 2.1 is a list of all of the Companies and each jurisdiction in which the Companies are qualified to do business. The Companies are duly authorized, licensed or qualified to do business as a foreign corporation in each jurisdiction in which the nature of their business or the location of their properties make such qualification necessary, except where failure to be so authorized, licensed or qualified would not have a Material Adverse Effect.

2.2    Validity of Agreement.  This Agreement (i) has been duly executed and delivered by the Companies and Seller, (ii) assuming due authorization by Euronet, constitutes the legal, valid and binding obligation of the Companies and Seller, and (iii) subject to the General Enforceability Exceptions, is enforceable against the Companies and Seller in accordance with its terms. As of the Closing, each of the Ancillary Agreements will have been duly executed and delivered, by the Companies and/or Seller, as applicable, and will as of the Closing, assuming due authorization by Euronet (if applicable), constitute legal, valid and binding obligations of the Companies and Seller, as applicable, and, subject to the General Enforceability Exceptions, will be enforceable against the Companies and Seller, as applicable, in accordance with their respective terms.  This Agreement and the transactions contemplated hereby have been duly approved by (a) each of the Companies' board of directors, (b) Seller, as sole shareholder of each of the Companies other than Envios NJ, (c) Envios NY, as sole shareholder of Envios NJ, and (d) the Consenting Spouse pursuant to Section 11.16. No further authorization or approval on the part of the Companies or Seller is needed with respect to the execution, delivery and performance of this Agreement or any of the Ancillary Agreements.

2.3    Capacity.  The Companies and Seller have the requisite capacity, power and authority to enter into this Agreement and the Ancillary Agreements, as applicable, and to undertake and perform fully the transactions contemplated herein and therein.

2.4    Capitalization; Company Records.  Schedule 2.4.1 sets forth a true, correct and complete list identifying the issued and outstanding shares and the sole stockholder of each of the Companies.  All of the outstanding capital stock of the Companies has been duly authorized and validly issued and is fully paid and non-assessable, and no authorization or Consent of any other Person is required in order to consummate the transactions contemplated hereby by virtue of any such Person having an equitable or beneficial interest in the Companies or the capital stock of the Companies.  There are no other equity securities of the Companies, including outstanding options, warrants, calls, subscriptions, commitments or plans by the Companies to issue any additional stock, to pay any dividends on any shares of capital stock of the Companies or other securities or to purchase, redeem, or retire any outstanding shares of the capital stock of the Companies, nor are there outstanding any securities or obligations that are convertible into or exchangeable for any shares of capital stock or other securities of the Companies.  The Companies' ledgers and stock records are true, correct and complete.  Attached as Schedule 2.4.2 is a true, correct and complete list of all officers and members of the board of directors of each of the Companies.  Seller has legal and valid title to the Stock, free and clear of all Liens other than restrictions imposed by applicable securities laws.  Envios NY has legal and valid title to all of the issued and outstanding capital stock of Envios NJ, free and clear of all Liens other than restrictions imposed by applicable securities laws.  The Document Package contains true and correct copies of the articles of incorporation and bylaws of each of the Companies, each of which includes all amendments through the date hereof.

2.5    Absence of Equity Investments.  Except with respect to (a) the capital stock of Envios NJ, (b) 311,605 shares of common stock of Nuevo Financial Center, Inc., a Delaware corporation, and (c) a warrant to acquire 1,509,589 shares of common stock of Nuevo Financial Center, Inc., in each case all of which is owned by Envios NY, the Companies do not, either directly or indirectly, own of record or beneficially any capital stock or other securities in any corporation, partnership, limited partnership, limited liability company, limited liability partnership, joint venture, trust or other entity.

2.6    No Breach.  Neither the execution and delivery of this Agreement by Seller or the Companies nor the execution and delivery of this Agreement and the Ancillary Agreements by Seller or the Companies nor the performance of the Companies' or Seller's obligations hereunder or thereunder will (i) violate, conflict with or result in a breach of any Law to which Seller or any of the Companies is bound or the articles of incorporation or bylaws of the Companies or any provisions thereof, or resolutions of the board of directors or stockholder of the Companies, (ii) violate, conflict with or result in a breach or termination of, or otherwise give any contracting party additional rights or compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time, or both) a default under, any Material Contract or Order, (iii) result in the creation or imposition of any Liens with respect to, or otherwise have a Material Adverse Effect upon, any of the assets of any Company or of Seller, (iv) result in the material

violation or material breach of or conflict with any Law applicable to Seller or any of the Companies, or (v) constitute an event that, after notice or lapse of time or both, would result in such violation, conflict, default, acceleration, or creation or imposition of any Lien.    None of the Companies is in material violation of its respective articles of incorporation or bylaws.    Neither the Companies, nor Seller, is in material violation of or material default under any provision of any Material Contract or Order to which any Company or Seller is a party or is bound, and there exists no condition or event that, after notice or lapse of time or both, would result in any such material violation or material default.

2.7    Material Contracts.

    2.7.1    The term "Material Contract" means, collectively with the Real Property Leases, (i) each Contract with an aggregate annual payment or receivable by the Companies of $10,000 or more to which any Company is a party, or by which any Company or any of its assets are or may be bound, (ii) each employment agreement, consulting agreement, confidentiality and noncompetition agreement, mortgage, indenture, loan or credit agreement, security agreement, guaranty or indemnity or other agreement or instrument relating to the borrowing or lending of money or extension of credit, any option, warrant or other contract for the purchase of any debt or equity security of any Person, any settlement agreement of any administrative or judicial proceedings within the past three years, any intellectual property licensing agreement, outsourcing, application service provider and similar agreements to which the Companies are a party or pursuant to which any of the Companies' Assets are bound, (iii) each Contract that is material to the Companies, the Companies' Business or the Companies' Assets, (iv) each Contract between the Companies, on one hand, and Seller, any Affiliate of Seller or any family member of Seller or any Affiliate of such family member, (v) any Contract involving Nuevo Financial Center, Inc., and (vi) any contract not made in the Ordinary Course.    Included in the Document Package is a true, correct and complete copy of (1) the forms of agency agreements used by the Companies, (2) each agency agreement that deviates in any material respect from the relevant form of agency agreement (and a description of the deviation), except for those deviations relating to the removal of the exclusivity provision contained in the relevant form of agency agreement, (3) each of the 25 largest Contracts with Correspondents, (4) each Contract with an aggregate annual payment or receivable by the Companies of $50,000 or more, (5) each Contract described in items (iv), (v) or (vi) above (other than the Nuevo Financial Settlement Agreement), and (6) a description or summary of each Material Contract that is not in written form.

    2.7.2    Each of the Material Contracts of the Companies is in full force and effect, is a legal, binding and enforceable obligation of the Companies, as applicable, and each other party thereto.    Neither the Companies, nor any other party thereto, is in material default or material breach under the terms of any Material Contract and no event has occurred that constitutes or, with the giving of notice or

passage of time, or both, would constitute a material default thereunder or a material breach thereof by any party thereto or that could result in the acceleration of the performance of any obligation thereunder or termination thereof.

2.7.3 Assuming the receipt of all the Required Regulatory Consents and the Consents listed on <u>Schedule 2.9</u>, the consummation of the transactions contemplated by this Agreement will not conflict with or violate the terms of, or result in default under, or result in the termination or amendment of, or require third party approval or other action pursuant to, any Material Contract.

2.8 <u>Title and Condition of Company Assets</u>. <u>Schedule 2.8.1</u> contains a true, correct and complete list (broken down by store location) of all leasehold improvements owned by the Companies or leased, used or held for use in connection with the Companies' Business (these leasehold improvements, along with the computers owned by the Companies or leased, used or held for use in connection with the Companies' Business, collectively, the "<u>Companies' Assets</u>"). The Companies have good and marketable title to, or, where specifically disclosed on <u>Schedule 2.8.1</u>, a valid leasehold interest in, all of the Companies' Assets, free and clear of all Liens, except for (a) Liens set forth in <u>Schedule 2.8.2</u>, (b) Liens for mechanics, materialmen, laborers, employees, suppliers or similar Liens arising by operation of law for amounts not yet due, and (c) Liens for current real and personal property taxes not yet due (the Liens described in clause (a) other than those tax liens that are marked with an asterisk and the Liens described in clauses (b) and (c) being collectively referred to as "<u>Permitted Liens</u>"). Except with respect to Permitted Liens, no Person has any right to acquire, directly or indirectly, the Companies' Assets or any portion thereof. The Companies' Assets are (i) in good operating condition and repair (subject to normal wear and tear), (ii) sufficient for the operation of the Companies' Business as it is now conducted and (iii) all of the tangible assets, rights, properties and interests owned by the Companies or used or held for use in connection with the Companies' Business. At the Closing, the Companies' Assets will be owned by the Companies free and clear of any and all Liens except Permitted Liens. Since the Balance Sheet Date, none of the Companies' Assets have been (A) materially and adversely affected in any way as the result of any strike or other labor trouble, fire, explosion, earthquake, disaster, flood, accident or other similar or dissimilar casualty, whether or not covered by insurance or (B) operated or maintained in all material respects other than in the Ordinary Course.

2.9 <u>Real Property</u>. The Companies do not own any real property nor are the Companies a lessor or licensor of any real property. <u>Schedule 2.9</u> is a true, complete and correct list of all the written agreements for all real property leased, licensed, occupied or used by the Companies in connection with the Companies' Business (the "<u>Real Property Leases</u>"). Included in the Document Package are true, complete and correct copies of the Real Property Leases. The Companies do not lease, license, occupy or use any real property other than pursuant to the Real Property leases. Each Real Property Lease is a valid, binding and enforceable obligation of the Company that is party thereto in accordance with its terms, subject to the General Enforceability Exceptions, and is valid and binding upon, and enforceable against, the respective lessor or landlord thereunder. There are no

existing material defaults under any Real Property Lease by any of the Companies or any lessor, and no event has occurred that (with notice, lapse of time or both) would constitute a material breach or material default under any of the Real Property Leases by any party thereto or give any party thereto the right to terminate, accelerate or modify any Real Property Lease. The real property leased pursuant to the Real Property Leases (the "Leased Real Property") constitutes all of the real property that is reasonably necessary for the operation of the Companies' Business as it is currently operated. Except as set forth on Schedule 2.9, no Consent is required from the lessor under any of the Real Property Leases in order to consummate the transactions contemplated by this Agreement.

2.10    Zoning. None of the real property covered by the Real Property Leases, nor the present use thereof by the Companies, is in material violation of any Law, including any building or zoning ordinance, code, rule or regulation.

2.11    Consents. Except as set forth in Section 2.9 and except for the Required Regulatory Consents, no Consent is required to be obtained, satisfied or made pursuant to any Laws, Permits, Orders or Material Contracts in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements.

2.12    Permits. Schedule 2.12 is a true, correct and complete list of all Permits required to allow the present operations, presently planned expansion of operations, and any past or ongoing alterations of the operations of the Companies under any applicable Law or Order other than local certificates of occupancy and similar local business licenses (the "Existing Permits"). All Existing Permits are held by the Companies and are in full force and effect. There has been no material change in the facts or circumstances reported or assumed in the application for, or granting of, any Existing Permit. There are no material restrictions in the Existing Permits or to the Companies' ability to renew any of the Existing Permits. The consummation of the transactions contemplated hereby will not materially conflict with or materially violate the terms of, or result in material default under, any Existing Permit or result in the termination or amendment of, or require third party approval or other action pursuant to, any Existing Permits except for the Required Regulatory Consents. The Companies are in full compliance with all Existing Permits, except to the extent noncompliance would not result in a Material Adverse Effect.

2.13    PATRIOT Act Compliance.

2.13.1    None of the Companies, Seller, their Affiliates, any of their respective officers or directors (including officers or directors of any such Affiliates), nor any of their respective customers, Agents or Correspondents is a Prohibited Person.

2.13.2    None of the Companies, Seller, nor any of their respective Affiliates, employees or Agents (i) has conducted any business or has engaged in any transaction or dealing with any Prohibited Person, including making or receiving any contribution or transfer of funds, goods or services to or for the benefit of any Prohibited Person; (ii) has dealt in, or otherwise has engaged in any transaction relating to, any cash, securities or other property or interests in property blocked

- 9 -

pursuant to the Executive Order; (iii) has engaged in or has conspired to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the requirements or prohibitions set forth in the Executive Order, the PATRIOT Act, the Bank Secrecy Act or any regulations promulgated thereunder, or any other Laws relating to money laundering or terrorism and any executive orders related thereto; (iv) has been charged, indicted or convicted of any PATRIOT Act Offense; or (v) is currently under investigation by any Governmental Authority for any alleged PATRIOT Act Offense or other criminal activity.

2.13.3    The Companies and Seller are in material compliance with all applicable orders, rules, regulations and interpretive releases issued by, and recommendations of, the U.S. Department of the Treasury and OFAC pursuant to the IEEPA, the TEA, the PATRIOT Act, the Bank Secrecy Act and other Laws relating to money laundering or terrorism.

2.13.4    The Companies have established, maintain and enforce an anti-money laundering and anti-terrorism financing program that contains written policies, procedures and internal controls reasonably designed to prevent the Companies' Business from being used to facilitate money laundering and the financing of terrorist activities and otherwise in accordance with all applicable Laws, including the PATRIOT Act, the Bank Secrecy Act, and other Laws relating to money laundering or terrorism, and copies of all such written policies, procedures and internal controls have been provided to Euronet.

2.13.5    The Companies and Seller have taken all appropriate due diligence efforts to (i) ensure whether a customer or Agent of the Companies is a Prohibited Person, in each case in accordance with all applicable Laws, including the PATRIOT Act, the Bank Secrecy Act, and other Laws relating to money laundering or terrorism, and (ii) know if any such investor, customer, counterparty and agent is a "Senior Foreign Political Figure" (as defined in the PATRIOT Act) and, to the extent that any investor is a Senior Foreign Political Figure, has disclosed such information to Euronet.

2.13.6    The Companies have notified or reported all unusual or suspicious transactions or activities in accordance with the PATRIOT Act, the Bank Secrecy Act, and other Laws relating to money laundering or terrorism.

2.13.7    The Companies have applied its respective anti-money laundering program and related policies, procedures and internal controls to all of its employees, customers, and Agents, and have taken all appropriate steps in accordance with all applicable Laws (including the PATRIOT Act and the Bank Secrecy Act) to ensure that all required relevant documentation and other records are obtained and retained, including identification relating to such employees, customers and Agents.

2.13.8   There is no reason to believe that any of the Companies' customers or Agents is a "<u>Prohibited Foreign Shell Bank</u>" (as defined in the PATRIOT Act).

2.14   <u>Compliance with Laws</u>.  The Companies' Business, the Companies' Assets and any other activities of the Companies are and have been conducted in material compliance with all applicable Laws and the Companies have not received any notice of any alleged noncompliance relating to the Companies, the Companies' Business or the Companies' Assets, which noncompliance has not been cured.  There is no fact, circumstance, condition or situation existing that, after notice or lapse of time or both, would constitute material noncompliance by the Companies or give rise to any future liability of the Companies with respect to any applicable Law.

2.15   <u>OSHA and ADA</u>.  There are no facts or circumstances that would constitute any material noncompliance by the Companies with the requirements of the Occupational Safety and Health Act ("<u>OSHA</u>") and the Americans with Disabilities Act ("<u>ADA</u>") pertaining to the facilities and operations of the Companies.

2.16   <u>Political Contributions and Other Payments</u>.  Neither the Companies, Seller, nor any Person acting on behalf of the Companies or Seller, has, during the past five years, (a) made any payment to any governmental official or other governmental employee or agent (domestic or foreign) to induce the recipient or the recipient's employer to do business with, grant favorable treatment to or compromise or forego any claim against the Companies or (b) made any significant payment or conferred any benefit to promote or retain sales or to help, procure or maintain good relations with suppliers that is not permitted under applicable Law.

2.17   <u>Ordinary Course of Business</u>.  Since the Balance Sheet Date, the Companies have operated and conducted the Companies' Business in the Ordinary Course and have not engaged in any action that would constitute a material violation of Section 4.5 had such Section applied during such time period.  Since the Balance Sheet Date, there has not been any Material Adverse Effect on the Companies.

2.18   <u>Litigation</u>.  Except as disclosed in <u>Schedule 2.18</u>, the Companies are not (a) subject to any unsatisfied Order or (b) a party to, or threatened to be made a party to, any Proceeding, other than with respect to Taxes, which are exclusively the subject of Section 2.19.  The Nuevo Financial Settlement Agreement does not require the payment of money by the Companies nor does it contain any obligations or undertakings on the part of the Companies that would arise or continue after the Closing.

2.19   <u>Tax Matters</u>.

2.19.1   On or before the Closing Date, the Companies will have filed or caused to be filed with the appropriate Governmental Authorities all Tax Returns required to be filed by them on or prior to the Closing Date (taking into account all extensions of due dates) and take any additional necessary steps to be in full compliance with all applicable Tax Laws.  All such Tax Returns are or will be correct and complete in all material respects, and all amounts shown to be due

- 11 -

on such Tax Returns, as well as all other amounts in respect of Taxes ultimately due or claimed to be due by any Governmental Authority or other taxing authority with respect to Taxes whether or not shown on such Tax Returns, have been or will have been fully paid on or prior to the Closing.

2.19.2    None of the Companies is currently a beneficiary of any extension of time within which to file any Tax Return. The Companies have not been granted any extension or waiver of the statute of limitations period applicable to any material Tax or Tax Returns, or agreed to any extension of time with respect to a Tax assessment or deficiency, which period (after giving effect to such extension or waiver) has not yet expired.

2.19.3    No claim has been made by a Governmental Authority in any jurisdiction where the Companies do not file Tax Returns that the Companies are or may be subject to taxation in such jurisdiction, and no such assertion of non-compliance is or has been threatened. No issue has been raised by any Governmental Authority that reasonably can be expected to result in a deficiency for the Companies for any taxable period, and the Companies are neither party to, nor have received notice of, any pending or threatened administrative or judicial action or proceeding by any Governmental Authority for the assessment or collection of any Taxes except for the notice dated October 23, 2006 from the Internal Revenue Service informing that the tax returns for 2005 has been selected for examination, a copy of which is included in the Document Package. Except for those Liens listed on Schedule 2.19.3 (each of which Seller will cause to be released prior to the Closing), there are no Liens on any of the Companies' Assets that arose in connection with any failure (or alleged failure) to pay any Tax.

2.19.4    The Companies are not required to include in a Tax period ending after the Closing Date taxable income attributable to income that accrued in a prior Tax period but was not recognized in any prior Tax period as a result of any of the following factors: (i) installment sale or open transaction disposition made prior to the Closing Date, (ii) the long-term contract method of accounting, (iii) change in method of accounting for a taxable period ending on or before the Closing Date, (iv) intercompany transactions or any excess loss account described in Treasury Regulations under Code Section 1502 (or any corresponding or similar provision of state, local, or foreign income Tax law), or (v) prepaid amount received on or prior to the Closing Date.

2.19.5    The Companies have in all material respects (i) withheld proper and accurate amounts in compliance with the tax withholding provisions of all applicable Laws from its employees and former employees for all periods that, as of the date hereof, remain open under applicable Laws for assessment or collection, (ii) correctly and properly prepared and duly and timely filed all returns and reports relating to Taxes withheld from its employees and former employees and for its employer liability for employment Taxes under all applicable Laws, and (iii) duly and timely paid and remitted to the appropriate taxing authorities all

amounts withheld from its employees and former employees and any additional amounts that represent its employer liability for employment Taxes under applicable Law.

2.19.6   The Companies have in all material respects (i) withheld or paid proper and accurate amounts in compliance with the sales and use tax withholding and payment provisions in all applicable states where business has been conducted by the Companies, (ii) correctly and properly prepared and duly and timely filed all returns and reports relating to sales and use taxes under all applicable state Laws, and (iii) duly and timely paid and remitted to the appropriate taxing authorities all amounts withheld or payable for sales and use taxes under applicable state Law.

2.19.7   None of the Companies has been a beneficiary nor has it otherwise participated in: (i) any reportable transaction within the meaning of Treasury Regulation Section 1.6011-4(b)(1), (ii) any transaction that was required to be registered as a "tax shelter" pursuant to Section 6111 of the Code, or (iii) any transaction subject to comparable provisions of any state, local or foreign Law. The Companies have disclosed on their federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.

2.19.8   The Companies are not party to any tax sharing agreements.

2.19.9   There are no Dominican Republic transfer, stamp, gains, gross receipts, excise, sales or use Taxes or other similar Dominican Republic Taxes attributable to or arising from the purchase and sale of the Stock, nor are there any Dominican Republic recording fees related to the purchase and sale of the Stock.

2.19.10 None of the Companies has filed a consent under the Code §341(f) concerning collapsible corporations. None of the Companies has made any payments, is obligated to make any payments, or is a party to any agreement that under certain circumstances could obligate it to make any payments that will not be deductible under Code §280G. None of the Companies has been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(iii). None of the Companies (A) has been a member of an Affiliated Group filing a consolidated federal income Tax Return (other than a group the common parent of which was one of the Companies), or (B) has any Liability for the Taxes of any Person (other than any of the Companies) under Reg. §1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract, or otherwise.

2.20   Financial Matters and Liabilities.

2.20.1   Attached as Schedule 2.20.1 is the balance sheet and the related statement of income and cash flow for each of the Companies (other than AeroCaribe) for

- 13 -

the ten-month period ended October 31, 2006 (the "Interim Financial Statements"), and the audited balance sheets and the related statements of income and cash flows of each of the Companies for the years ended December 31, 2005 (in the case of the Companies) and December 31, 2004 (in the case of the Companies other than AeroCaribe) (the "Financial Statements"). Except as set forth on Schedule 2.20.1, the Financial Statements and the Interim Financial Statements present fairly, in all material respects, the financial position, results, cash flows and operations of the Companies at the dates and for the time periods indicated and have been prepared in all material respects in accordance with GAAP, consistently applied, by the Companies throughout the periods indicated, except for the absence of footnote disclosure and any customary year-end adjustments in the case of the Interim Financial Statements. The Financial Statements and the Interim Financial Statements were derived from the books and records of the Companies. There are no additional sets of books, duplicate sets, "second sets" or other documents or records of the Companies that purport to show the financial condition of the Companies that have not been delivered to or inspected by Euronet. Since the Balance Sheet Date, there has not been (i) any material adverse change in the Companies' financial condition and results of operations, or any event that might reasonably be expected to result, either before or after the Closing, in any such change, (ii) any sale or transfer of any assets or properties, including the Companies' Assets, except in the Ordinary Course, (iii) any change that would materially and adversely affect the Companies' Assets, or any event that might reasonably be expected to result, either before or after the Closing in any such change, (iv) capital expenditures by the Companies involving payment in the aggregate in excess of $25,000 or (v) any compromise or settlement of any material litigation, action, suit, claim, proceeding or investigation affecting the Companies or the Companies' Assets.

2.20.2   Schedule 2.20.2 is a true, correct and complete list of each loan from an Affiliate of Seller and each other loan, if any, where interest was paid and withholding was not made, in each case indicating for each such loan the lender, the principal, interest and other amounts outstanding in respect of such loan as of the date of this Agreement.

2.20.3   The Companies do not have any material obligations or liabilities of any nature (matured or unmatured, fixed or contingent) of the type required under GAAP to be included as a liability on a balance sheet other than (i) those set forth or adequately provided for in the Financial Statements and the Interim Financial Statements, (ii) those incurred in the conduct of the Companies' Business since the Balance Sheet Date in the Ordinary Course, and (iii) under this Agreement.

2.20.4   A list of all loans by the Companies to any of its employees as of the date of this Agreement is set forth on Schedule 2.20.4.

2.21   Accounts Receivable.  All of the accounts receivable of the Companies, subject to any reserves set forth in the Financial Statements or the Interim Financial Statements,

represent bona fide claims arising from services performed by the Companies in the Ordinary Course, and are not subject to discount except for normal cash and immaterial trade discounts. Schedule 2.21 contains a list of all accounts receivable as of January 11, 2007. The amount carried for doubtful accounts and allowances disclosed in the Financial Statements and the Interim Financial Statements was calculated in accordance with GAAP and in a manner consistent with prior periods, except for the absence of · footnote disclosure and any customary year-end adjustments in the case of the Interim Financial Statements, and is sufficient to provide for any losses that may be sustained on realization of the receivables.

2.22    Agents and Correspondents.    Schedule 2.22 lists all Agents of the Companies by principal amount remitted in the last 12 months and all Correspondents by principal amount remitted in the last 12 months. Since the Balance Sheet Date, none of the top 50 Agents or top 25 Correspondents have indicated to the Companies that they will terminate any agreement with the Companies.

2.23    Labor Relations.    None of the Companies are party to any collective bargaining or union contract, and there is no current union organization effort with respect to employees of the Companies. During the most recent two-year period, the Companies have not received any notice of any unfair labor practice complaints. During the most recent two-year period, none of the Companies have received any notice of, and there have not been, any strikes, slowdowns, work stoppages, lockouts or threats thereof, by or with respect to any of the Companies' employees.

2.24    Employees and Employee Benefits and Plans.

    2.24.1    Schedule 2.24.1 contains true, correct and complete lists of all Employee Plans.

    2.24.2    Neither the Companies nor any ERISA Affiliate has taken any action directly or indirectly to obligate the Companies or any ERISA Affiliate to create, incur liability with respect to or cause to exist any employee benefit plan, program, arrangement, contract or scheme or to modify any Employee Plan. Seller and the Companies have delivered to Euronet true, correct and complete copies of all Employee Plans and related documents, including amendments thereto, any related trust agreements, any actuarial valuation reports, any documents setting out the Companies' personnel policies and procedures, any insurance contracts under which benefits are provided, as currently in effect, and descriptions of any Employee Plan that is not written. The Companies have delivered to Euronet a copy of each Summary Plan Description and Summary of Material Modifications, if applicable, for each Employee Plan, as well as copies of any other summaries or descriptions of any Employee Plans that have been provided to employees or other beneficiaries during the previous three calendar years. Attached as Schedule 2.24.2 are a copy of each Summary Plan Description and Summary of Material Modifications, if applicable, for each Employee Plan, as well as copies of any other summaries or descriptions of any Employee Plans that have been provided to employees or other

beneficiaries during the previous three calendar years. Attached as <u>Schedule 2.24.2</u> are copies of the three most recent annual reports on Form 5500 (with all schedules) for each Employee Plan (if applicable). Included in the Document Package are a copy of all plan documents and amendments thereto and any opinion letters with respect to prototype plans.

2.24.3    No Employee Plan is or ever has been subject to Title IV of ERISA, Section 302 of ERISA or Section 412 of the Code. The Companies have made all payments to all Employee Plans as required by the terms of each such Employee Plan. The Companies have funded or will fund each Employee Plan in accordance with its terms through the Closing, including the payment of applicable premiums on any insurance contract providing benefits under or funding any Employee Plan for coverage provided through the Closing. To the extent that any annual contribution for the current year is not yet required for any Employee Plan as of the Closing Date, the Companies have made a pro rata contribution to said plan for the period ended on the Closing Date or said contribution will be considered liabilities on the Preliminary and Final Closing Balance Sheets. All contributions, premiums or payments required to be made with respect to each Employee Plan have been made on or before their due dates. All such contributions properly deductible on an income tax return the due date for which (taking into account extensions) has occurred prior to the date of this Agreement have been fully deducted for income tax purposes and no such deduction has been challenged or disallowed by any Governmental Authority, and no fact or event exists which could give rise to any such challenge or disallowance.

2.24.4    Neither the Companies nor any other party in interest within the meaning of Section 3(14) of ERISA has engaged in a non-exempt prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code with respect to any Employee Plan, nor have there been any breaches of the duties imposed by ERISA on "fiduciaries" (within the meaning of Section 3(21) of ERISA) with respect to any Employee Plan. Neither the Companies nor any ERISA Affiliate has incurred any liability for any excise tax arising under the Code with respect to an Employee Plan, and no fact or event exists that could give rise to such liability.

2.24.5    For each Employee Plan that is intended to be qualified under Section 401(a) of the Code, (i) the Internal Revenue Service has issued a letter determining that such Employee Plan is so qualified and its related trust is exempt under Section 501(a) of the Code or, an opinion letter in the case of a prototype plan for which a determination letter has not been obtained by the Companies, (ii) nothing has occurred that would adversely affect such qualification, and (iii) Seller or the Companies have delivered to Euronet a copy of each such favorable determination letter or opinion letter. Neither the Companies nor any ERISA Affiliate maintains a plan or arrangement intended to qualify under Section 501(c)(9) of the Code. None of the Pension Benefit Guaranty Corporation, the Internal Revenue Service or the Department of Labor is

- 16 -

currently auditing or reviewing any Employee Plan, and neither the Companies nor any ERISA Affiliate has received notice, written or otherwise, of an impending audit or review of any such arrangements from the Pension Benefit Guaranty Corporation, the Internal Revenue Service or the Department of Labor.

2.24.6    No employer contributions to any profit-sharing plan (other than salary deferral contributions pursuant to employee salary reduction agreements), equity-based bonus plan or other retirement plan have been made by the Companies during the past five years.

2.24.7    No Employee Plan provides post-retirement medical benefits (other than benefits required by Law), death benefits or other post-retirement welfare benefits. No Employee Plan is a "nonqualified deferred compensation plan" within the meaning of Section 409A(d) of the Code.

2.24.8    No reportable event within the meaning of Section 4043 of ERISA and no event described in Sections 4062 or 4063 of ERISA has occurred in connection with any Employee Plan. Neither the Companies nor any ERISA Affiliate has (i) engaged in, or is a successor or parent corporation to an entity that has engaged in, a transaction described in Sections 4069 or 4212(c) of ERISA or (ii) incurred, or reasonably expects to incur, or could have (A) any liability under Title IV of ERISA (other than the payment of premiums to the Pension Benefit Guaranty Corporation) or (B) any liability under Section 4971 of the Code that in either case could become a liability of the Companies or Euronet after the Closing Date, and no fact exists or is threatened that could result in such liability.

2.24.9    No accumulated funding deficiency within the meaning of Section 412 of the Code has been incurred nor has any waiver of the minimum funding standards of Section 302 of ERISA or Section 412 of the Code been requested from or granted by the Internal Revenue Service with respect to any Employee Plan. The Companies' Assets are not now, nor will they be after the passage of time, subject to any lien imposed under Section 412(n) of the Code by reason of a failure of the Companies or any ERISA Affiliate to make timely installments or other payments required under Section 412 of the Code. None of the Companies have been required to provide security to any Employee Plan pursuant to Section 401(a)(29) of the Code.

2.24.10    As of the Balance Sheet Date, the fair market value of the assets of each Employee Plan that is an employee pension benefit plan within the meaning of Section 3(2) of ERISA (excluding for these purposes any accrued but unpaid contributions) equaled or exceeded the present value of all benefits accrued under such Employee Plan, as determined for purposes of SFAS 87 and SFAS 132. The aggregate unfunded liability, as of the most recent practicable date, of the Companies in respect of all Employee Plans described under Sections 4(b)(5) or 401(a)(1) of ERISA, was computed using the same assumptions as

- 17 -

used in the Companies' consolidated financial statements to value such liability and determined as if all benefits under such plans were vested and payable as of such date, will be reflected in the financial statements provided in accordance with Section 2.20.1.

2.24.11    The Companies and the ERISA Affiliates have reserved all rights necessary to amend or terminate each of the Employee Plans without the consent of any other Person.

2.24.12    No Employee Plan is a multiemployer plan within the meaning of Sections 3(37) or 4001(a)(3) of ERISA or a multiple employer plan within the meaning of Section 413(c) of the Code, and no event could cause the Companies or any ERISA Affiliate to incur withdrawal liability with respect to a multiemployer plan.

2.24.13    Each Employee Plan is in compliance with and has always been operated and administered in all respects in accordance with its terms and the requirements of all applicable Laws, including ERISA and the Code, and no inconsistent representation or interpretation has been made to any employee, plan participant or beneficiary, and each of the Companies and the ERISA Affiliates has satisfied in all material respects all of its statutory, regulatory and contractual obligations with respect to each Employee Plan. No legal action, suit or claim is pending or threatened with respect to any Employee Plan (other than claims for benefits in the Ordinary Course) and no fact or event exists that could give rise to any such action, suit or claim.

2.24.14    There has been no amendment to, written interpretation of or announcement (whether or not written) by the Companies or any ERISA Affiliate relating to, or change in employee participation or coverage under, any Employee Plan that would materially increase the expense of maintaining such Employee Plan above the level of the expense incurred in respect thereto for the most recent fiscal year ended prior to the date of this Agreement.

2.24.15    No employee or former employee of the Companies or any ERISA Affiliate will become entitled to any bonus, retirement, severance, job security or similar benefit or enhanced benefit (including acceleration of vesting or exercise of an incentive award) as a result of the transactions contemplated by this Agreement.

2.25    Insurance.    Schedule 2.25 is a true, correct and complete list of all insurance policies maintained by the Companies with respect to their businesses, properties and employees. All such policies are in full force and effect and will remain in full force and effect through the Closing Date, and no event has occurred that would give any insurance carrier a right to terminate any such policy. Such policies, with respect to their amounts and types of coverage, are adequate to comply with applicable Laws. All premiums due on such policies have been paid in full or have been duly provided for, and none of such policies provide for retrospective premium adjustments.

2.26   Intellectual Property.

  2.26.1   As used herein, the term "Intellectual Property Rights" means all trademarks, service marks, trade names, designs, logos and slogans (whether registered or at common law, including applications for registration) (collectively, "Trademarks"), copyrights (including copyrights in software) (whether or not registered including applications for registration) and patents (including applications therefor), and all inventions, know-how, customer and supplier lists, confidential business and technical information, trade secrets, industrial designs, drawings, processes, specifications, formulae, and Internet domain name registrations, owned by the Companies or used or held for use or licensed in connection with the Companies' Business, including those listed on Schedule 2.26.3.

  2.26.2   The Intellectual Property Rights constitute the only intellectual property or proprietary rights owned by the Companies, or used or held for use in connection with the conduct of the Companies' Business, and the Intellectual Property Rights constitute all of the intellectual property and proprietary rights necessary to conduct the Companies' Business as now conducted and will be adequate and sufficient to operate the Companies' Business after Closing in substantially the same manner as conducted as of the date of this Agreement.

  2.26.3   Schedule 2.26.3 lists or describes all patents, Trademarks and registered copyrights and applications therefor and all other material Intellectual Property Rights, including Internet domain name registrations (collectively, the "Scheduled Intellectual Property Rights"). The Scheduled Intellectual Property Rights are listed by legal owner, record owner, type, jurisdiction, registration or application number (as applicable), grant or filing date (as applicable) and including future renewal and maintenance fee dates. Except as disclosed on Schedule 2.26.3, the Scheduled Intellectual Property Rights have been properly obtained and are valid and enforceable, and there are no facts, circumstances or matters that would render the Scheduled Intellectual Property Rights invalid or unenforceable.

  2.26.4   Except as disclosed in Schedule 2.26.7, the Companies are the sole legal owner of all Intellectual Property Rights and the record owner of each Companies' Patent, Trademark and registered copyright and applications therefor such that its legal ownership has been properly recorded with the appropriate Governmental Authority.

  2.26.5   The conduct of the Companies' Business has not infringed, violated or misappropriated and does not now infringe, violate, or misappropriate and no claim or allegation has been made that the conduct of the Companies' Business infringes on, violates or misappropriates any Trademark, copyright, patent, trade secret, invention, know-how, confidential business or technical information, industrial design, drawing, process, specification, formula or other proprietary right of any Person. No Person has infringed, violated or

misappropriated or now infringes, violates or misappropriates the Intellectual Property Rights. No Person has challenged the validity of any Intellectual Property Right.

2.26.6    The Companies have taken reasonable steps to protect the secrecy and confidentiality of all trade secrets and confidential information held in any form.

2.26.7    Schedule 2.26.7 is a true, correct and complete list of (i) all software currently used in the Company Business, other than commercially available software the cost of which does not exceed $5,000, (ii) the owner of the software, and (iii) any license agreement pursuant to which the software is used in the Companies' Business or licensed to other Persons by the Companies. As of Closing, the Companies will have adequate and sufficient ownership or license rights to use the software listed on Schedule 2.26.7 as it is currently used in the Companies' Business.    Schedule 2.26.7 lists all software development agreements, software consulting agreements and similar agreements to which the Companies are a party or by which the Companies' Assets are bound.

2.27    Brokers, Finders and Agents.  Except as indicated in Section 11.12.2, neither Seller nor any of the Companies is directly or indirectly obligated to anyone acting as a broker, finder, financial advisor or in any similar capacity in connection with this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby.

2.28    Seller's Residence.  Seller is not and has never been a U.S. citizen, a lawful permanent resident of the U.S. or a resident within the meaning of Section 7701(b) of the Code.

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF EURONET

Euronet hereby represents and warrants to Seller as follows:

3.1    Organization, Power and Authority.  Euronet is a corporation duly organized, validly existing and in good standing under the laws of the State of North Carolina and has the corporate power and authority to own, operate and lease its properties and to carry on its business as presently being conducted.

3.2    Validity of Agreement.  This Agreement (i) has been duly executed and delivered by Euronet, (ii) assuming due authorization by the Companies and Seller, constitutes the legal, valid and binding obligation of Euronet and (iii) subject to the General Enforceability Exceptions, is enforceable against Euronet in accordance with its terms. This Agreement and the transactions contemplated hereby have been duly approved by the board of directors of Euronet and no further authorization or approval is needed with respect to the execution, delivery and performance of this Agreement.

3.3    Brokers, Finders and Agents.  Except as indicated in Section 11.12.2, neither Euronet nor anyone acting on Euronet's behalf has taken any action that would directly or indirectly obligate the Company to anyone acting as a broker, finder, financial advisor or in any

other similar capacity in connection with this Agreement, the Ancillary Agreements or the transactions contemplated hereby or thereby.

3.4    Investment Intent. Euronet is acquiring the Stock as contemplated by this Agreement for its own account and not with a view toward resale or redistribution in a manner that would require registration under the Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state.

### ARTICLE IV
### COVENANTS OF THE COMPANIES, SELLER AND EURONET

4.1    Procure Regulatory Consents.    The Companies and Seller will cooperate in a commercially reasonable manner with Euronet's efforts to obtain all of the Consents set forth on Schedule 4.1 (the "Required Regulatory Consents") and any other Consents desired by Euronet, if any. The Companies and Seller will timely provide all information (all of which must be accurate and complete) relating to Seller, the Companies, the Companies' Assets and the Companies' Business required to obtain these Consents. Euronet will use commercially reasonable efforts to obtain the Required Regulatory Consents prior to the Closing, and will keep the Companies and Seller informed as to the status of each Required Regulatory Consent. All of the Required Regulatory Consents will be made at Euronet's sole cost and expense. Euronet, Seller and the Companies, as directed by the Governmental Authorities, shall respond promptly to, and comply with, to the extent reasonably practicable, requests made by Governmental Authorities relating to the Required Regulatory Consents. Subject to timely receiving accurate and complete information from the Companies and Seller, Euronet will use commercially reasonable efforts to make all initial filings with respect to the Required Regulatory Consents on or before February 12, 2007, and, in any event, will make such initial filings no later than March 12, 2007. Euronet will not be responsible for any delays or other problems resulting from Seller's or the Companies' delay or failure to provide accurate and complete information or to otherwise comply with requests of Governmental Authorities. From time to time (or at any time upon request of Seller), Euronet will provide Seller with a written status update relating to the Required Regulatory Consents and, as reasonably requested by Seller, provide Seller copies of any documents and other applications filed by Euronet with respect to the Required Regulatory Consents, except that Euronet may redact or not provide any documents or other applications to the extent they contain confidential or personal financial information.

4.2    Goodwill. The Companies and Seller will use commercially reasonable efforts to protect the ongoing goodwill of the Companies' Business and to ensure that key employees and key independent contractors continue their association with the Companies through the Closing Date. In addition, the Company will use commercially reasonable efforts prior to the Closing to reasonably facilitate an efficient and smooth integration subsequent to Closing of the Companies with Euronet's existing business; provided however the Companies will not be required to take any actions that will disrupt, other than in an immaterial manner, the business or operations of the Companies, nor take any action that would be in violation of, or inconsistent with the covenants of this Agreement, nor incur any out-of-pocket costs, other than incidental or immaterial costs.

4.3     Access to Information; Observer.  Commencing on the date of this Agreement and continuing until the earlier of the Closing Date or the termination of this Agreement, the Companies will provide Euronet reasonable access during regular business hours to the Companies' Assets and all personnel, properties, books, accounts, records (including financial records and associated work papers), Contracts and documents of or relating to the Companies, the Companies' Assets and the Companies' Business.  In addition, an individual designated by Euronet will be allowed access into all business planning and strategy meetings as well as all operational meetings.  The Companies will use commercially reasonable efforts to provide this individual dedicated space (*i.e.*, a cubicle, office or conference room) and telecommunications equipment similar to that provided to employees of the Companies.

4.4     Insurance.  The Companies and Seller will cause the Companies to maintain in full force and effect through the Closing Date the Companies' existing policies of insurance, or replacement policies providing generally comparable insurance coverage.  The Companies and the Companies' Assets will remain at the risk of the Companies prior to the Closing.

4.5     Conduct of Companies' Business.

    4.5.1     Unless otherwise approved by Euronet in writing, prior to and through the Closing, Seller will cause the Companies not to:

        4.5.1.1     make any increase in the compensation payable to, or enter into or modify any agreement with, any employee of the Companies, except in the Ordinary Course (not to exceed 5% in any instance) or as required by Law;

        4.5.1.2     transfer, license or otherwise dispose of or agree to transfer, license or otherwise dispose of any of the Companies' Assets, except in the Ordinary Course;

        4.5.1.3     enter into any compromise or settlement of any litigation, action, suit, claim, proceeding or investigation that could restrict the activities of the Companies' Business or involves the payment by the Companies of more than $50,000;

        4.5.1.4     make or permit any change in the Companies' articles of incorporation or bylaws, or in its authorized, issued or outstanding equity or debt securities;

        4.5.1.5     except for announcements approved by Euronet, make any announcement or disclosure of the prospective purchase and sale contemplated by this Agreement;

        4.5.1.6     except in the Ordinary Course consistent with past practice or as otherwise provided for herein or contemplated hereby, enter into any new, or modify any material terms of, any Material Contract;

- 22 -

4.5.1.7   other than in a negotiated, "arm's length" transaction, enter into any transaction or other arrangement outside the Ordinary Course with Seller, any officer of the Companies or any member of the board of directors of the Companies;

4.5.1.8   make any material changes in its accounting methods or practices;

4.5.1.9   adopt or increase any benefits under any Employee Plan, except regularly scheduled increases in the Ordinary Course or as required by Law;

4.5.1.10  grant, create, or suffer a Lien on any of the Companies' Assets other than Permitted Liens; or

4.5.1.11  make any capital expenditure in excess of $15,000, except with respect to the purchase of personal computers for Agents purchased in the Ordinary Course of Business.

4.5.2    Prior to and through the Closing, Seller will cause the Companies to:

4.5.2.1   operate in the Ordinary Course;

4.5.2.2   if required by Law, file all applicable applications or other documents necessary to properly register the Companies' Business with the U.S. Federal Communications Commission;

4.5.2.3   provide to Euronet copies of all documents submitted by Seller or the Companies to the New York Banking Department, whether in response to its examination letter dated December 14, 2006 or otherwise; and

4.5.2.4   promptly advise Euronet in writing of any matters arising or discovered after the date of this Agreement that, if existing or known as at the date of this Agreement, would be required to be set forth or described in this Agreement or the Schedules hereto.

4.6   Employee Layoffs. The Companies will notify Euronet prior to Closing of any layoffs of any employees of the Companies during the period prior to the Closing (including the location of such terminated employees). Neither the Companies nor Seller will take any action at or prior to the Closing that would cause any termination of employment of any employees to constitute a "plant closing" or "mass layoff" under the WARN Act or any similar statute.

4.7   Repayment of Seller Loans, Related Party Loans and Advances. Prior to the Closing, the Companies and Seller will cause to be repaid along with all accrued interest, bonus or penalty, as applicable, all amounts (i) owed by the Companies to Seller or any director, officer, or employee of the Companies or entity controlled by any of them (other than sums to employees (other than Seller) made in the Ordinary Course), (ii) owed to the