Companies by Seller or any director, officer or employee of the Companies or any entity controlled by any of them (other than (a) reimbursements for business expenses made to employees in the Ordinary Course and (b) loans to employees up to $15,000 per employee, not to exceed $55,000 in the aggregate for all such employee loans), and (iii) all Seller Loans.

4.8     Satisfaction of Conditions.    The Companies and Seller will use their commercially reasonable efforts to satisfy promptly all conditions precedent to the obligations of Euronet to consummate the transactions contemplated by this Agreement. Euronet will use its commercially reasonable efforts to satisfy promptly all conditions precedent to the obligations of the Companies and Seller to consummate the transactions contemplated by this Agreement.

4.9     Confidential Information.

4.9.1     From and after the Closing, Seller will keep in strict confidence, and will not, directly or indirectly, at any time, disclose, furnish, disseminate, publish, or make available, except to the extent required to exercise Seller's rights or perform Seller's obligations under this Agreement or as may be required by Law, any Confidential Information regarding the Companies, the Companies' Assets or the Companies' Business. Seller may disclose the Confidential Information regarding the Companies, the Companies' Assets or the Companies' Business to those of its employees or agents as may be reasonably necessary to carry out the provisions of this Agreement or as may be required by Law; provided, however, that before any such disclosure, the Companies and Seller will make those employees and agents aware of the obligations of confidentiality under this Agreement and will at all times procure compliance by, and be responsible for any non-compliance by, those employees or agents with such confidentiality obligations.

4.9.2     Seller specifically acknowledges, (i) that all Confidential Information regarding the Companies, the Companies' Assets and the Companies' Business, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of employees and Affiliates of the Companies and Seller, derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from its disclosure or use, (ii) that reasonable efforts have been made by the Companies and Seller to maintain the secrecy of such information, (iii) that upon Closing, such information is the sole property of the Companies, and (iv) that any retention and use of such information after Closing by Seller constitutes a misappropriation of the Companies' trade secrets.

4.9.3     If Seller is legally compelled or required by any Governmental Authority to disclose any of the Confidential Information regarding the Companies, the Companies' Assets or the Companies' Business, Seller will promptly provide written notice to Euronet to enable Euronet or the Companies to seek a protective order, in camera process or other appropriate remedy to avoid public

- 24 -

or third-party disclosure of such Confidential Information. If such protective order or other remedy is not obtained, Seller will furnish only so much of such Confidential Information regarding the Companies, the Companies' Assets or the Companies' Business as Seller is legally compelled to disclose and will exercise his reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information. Seller will cooperate with and assist Euronet or the Companies in seeking any protective order or other relief requested pursuant to this Section 4.9.3.

4.9.4    This Agreement will be considered Confidential Information until such time as Euronet issues a press release relating to this Agreement and the transactions contemplated hereby. Seller and Euronet will coordinate the filing of this initial press release. It is anticipated that this press release will not be sent until all of the individuals listed in Section 4.14 have been presented with a retention bonus agreement.

4.9.5    If the Closing occurs, this Agreement will supersede and replace the Confidentiality and Nondisclosure Agreement, dated May 19, 2006, between Envios NY and Euronet Worldwide, Inc.

4.10    <u>Tax Sharing Agreements</u>. All tax sharing agreements or similar arrangements with respect to or involving the Companies must be terminated prior to the Closing Date and, after the Closing Date, Euronet, the Companies and their Affiliates, if any, will not be bound thereby or have any liability thereunder for amounts due in respect of periods ending on or before the Closing Date.

4.11    <u>Certain Tax Matters</u>.

4.11.1    Within 30 days after the date of this Agreement, the Companies will file tax returns or amendments thereto, or make other necessary filings, pertaining to income tax withholding due on interest payments made under the Seller Loans during all prior years.

4.11.2    The Companies will deliver copies of their draft 2006 income tax returns to Euronet on or before March 31, 2007 in order to enable Euronet to review, comment on and approve these 2006 tax returns (such approval not to be unreasonably withheld). The Companies will cooperate with Euronet in connection with Euronet's review and will provide Euronet such additional information related to these 2006 tax returns as Euronet may reasonably request. The Companies will file these 2006 tax returns within five days after their approval by Euronet. In filing these 2006 tax returns, the Companies will reflect a related party Dominican Republic delivery cost of $1.25 per transaction.

4.12    <u>Further Assurances</u>. From and after the Closing, each party to this Agreement will execute all documents and do all such further deeds, acts, things and assurances that may

be reasonably requested by the other parties to this Agreement to carry out the transactions contemplated by this Agreement.

4.13    Payoff of Seller Loans. Seller will cause the Seller Loans to be paid in full on or prior to the Closing Date and will cause all Liens, if any, pertaining to the Seller Loans to be released and discharged.

4.14    Retention Bonus Agreements. The Companies will use commercially reasonable efforts to, within 20 days after the date hereof, enter into retention bonus agreements in substantially the form attached as Exhibit I with the following individuals providing cash retention bonuses equal to the amounts set forth in Exhibit I: Margarita Cruz, Frank R. Reyes, Ramon Corporan, Ana Hernandez, Lorena Teran and Manuel Mogollon. The Companies will present a retention bonus agreement to each of these individuals within five days after the date hereof. The Companies will provide to Euronet copies of the executed retention bonus agreements promptly after they are executed.

4.15    Release of Seller Guarantees. Within ten days after the date of this Agreement, Seller will provide to Euronet a list of all guarantees by Seller under any Contract, to the extent known to Seller. Seller will supplement this list as additional Seller guarantees, if any, are discovered. The parties will work in good faith to determine whether to seek the release of these guarantees (and any other guarantees discovered by Seller) or whether to provide a guaranty by Euronet or other form of assurance to Seller so that Seller's obligations under these guarantees (and any other guarantees discovered by Seller) are relieved by, for example, a backup guaranty or indemnification by Euronet, but without affecting any indemnification obligations of Seller hereunder.

4.16    Document Package. Within 30 days after the date hereof, Seller will deliver to Euronet the complete Document Package (notwithstanding that Seller may have previously delivered portions of the Document Package).

4.17    List of Material Contracts. Within 30 days after the date hereof, Seller will deliver to Euronet a complete and accurate list of all Material Contracts as of the date hereof. If, after the date hereof, any new Material Contract is entered into or if any Material Contract is amended, Seller will promptly deliver a complete and accurate copy of the new Material Contract or amendment.

4.18    List of Employees. Within ten days after the date hereof, Seller will deliver to Euronet a complete and accurate list of all employees of the Companies as of the date hereof and their respective starting dates, current titles, current rates of pay and benefits, including vacation entitlement.

4.19    List of Computers. Within ten days after the date hereof, Seller will deliver to Euronet a complete and accurate list (broken down by store location) of all computers owned by the Companies or leased, used or held for use in connection with the Companies' Business.

## ARTICLE V
## SURVIVAL OF REPRESENTATIONS

Notwithstanding any investigations or inquiries made by or on behalf of Euronet or the waiver of any conditions by Euronet, the representations and warranties of Seller will survive the Closing and will continue in full force and effect, subject to the limitations on indemnification for breaches of representations and warranties contained in Article VIII.

## ARTICLE VI
## CONDITIONS PRECEDENT TO CLOSING

6.1    Conditions to Euronet Closing.    The obligations of Euronet to consummate the transactions contemplated by this Agreement are subject to the satisfaction on or before the Closing of the following conditions, any one or more of which may be waived by Euronet at its option:

6.1.1    the representations and warranties of Seller and the Companies set forth in this Agreement, without giving effect to any qualification or limitation as to "materiality", "Material Adverse Effect" or similar terms, words or phrases in any such representation or warranty, are true and correct as of the date hereof and as of the Closing Date as though made on the Closing Date (except as to any such representation or warranty that speaks as of a specific date, which must only be true and correct as of the specific date), except where the failure of such representations and warranties to be so true and correct would not have a Material Adverse Effect;

6.1.2    the Companies and Seller have performed or complied with, in all material respects, all covenants and agreements contemplated by this Agreement to be performed or complied with by them at or prior to the Closing, including those set forth in Article IV and Section 7.1;

6.1.3    no preliminary or permanent injunction or other order of any court of competent jurisdiction restraining or prohibiting the consummation of the transactions contemplated by this Agreement is in effect and no Governmental Authority is then seeking to restrain or prohibit the consummation of the transactions contemplated by this Agreement;

6.1.4    no actions, suits, proceedings, assessments or judgments are pending or threatened that seek (and in the reasonable judgment of Euronet have a reasonable possibility of obtaining the relief they seek) (a) any damages in excess of $1,000,000 in connection with the consummation of the transactions contemplated by this Agreement, (b) any divestiture of Euronet's or any of its Affiliate's assets, (c) any divestiture of a portion of the Companies' Business that would reasonably be expected to have a Material Adverse Effect, or (c) to revoke or suspend or modify or limit any Material Contract or Existing Permit, which revocation or suspension could reasonably be expected to have a

         Material Adverse Effect, by reason of any or all of the transactions contemplated by this Agreement;

6.1.5     there has been no Material Adverse Effect since the date of the Interim Financial Statements; and

6.1.6     all Required Regulatory Consents have been made, given and obtained and are in full force and effect.

6.2     <u>Conditions to Seller and the Companies Closing</u>.  The obligations of Seller and the Companies to consummate the transactions contemplated by this Agreement are subject to the satisfaction on or before the Closing of the following conditions, any one or more of which may be waived by Seller or the Companies at their option:

6.2.1     the representations and warranties of Euronet set forth in this Agreement are true and correct in all material respects as of the date hereof and as of the Closing Date as though made on the Closing Date (except as to any such representation or warranty that speaks as of a specific date, which must only be true and correct in all material respects as of the specific date);

6.2.2     Euronet has performed or complied with, in all material respects, all covenants and agreements contemplated by this Agreement to be performed or complied with by Euronet at or prior to the Closing, including those set forth in Article IV and Section 7.2;

6.2.3     no preliminary or permanent injunction or other order of any court of competent jurisdiction restraining or prohibiting the consummation of the transactions contemplated by this Agreement is in effect and no Governmental Authority is then seeking to restrain or prohibit the consummation of the transactions contemplated by this Agreement; and

6.2.4     all Required Regulatory Consents have been made, given and obtained and are in full force and effect.

### ARTICLE VII
### CLOSING DOCUMENTS

7.1     <u>Closing Deliveries of Seller and the Companies</u>.  At the Closing, Seller and the Companies will deliver to Euronet the following documents in form and substance reasonably satisfactory to Euronet, duly executed as required:

7.1.1     a certificate of Seller and each of the Companies' chief executive officers, dated the Closing Date, to the effect that the conditions set forth in Sections 6.1.1, 6.1.2, 6.1.5 and 6.1.6 have been satisfied;

7.1.2     a release from the lenders listed on <u>Schedule 2.20.2</u> in the form attached hereto as <u>Exhibit B</u>;

7.1.3     a distribution agreement in the form attached hereto as Exhibit C (the "Distribution Agreement"), duly executed by Agente de Cambio Caribe Express, C. x A., a corporation incorporated under the laws of the Dominican Republic;

7.1.4     a currency exchange services agreement in the form attached hereto as Exhibit D (the "Currency Exchange Services Agreement"), duly executed by Agente· de Cambio La Nacional, C x A., a corporation incorporated under the laws of the Dominican Republic;

7.1.5     a noncompetition agreement in the form attached hereto as Exhibit E (the "Noncompetition Agreement"), duly executed by Seller;

7.1.6     the Escrow Agreement and the Indemnification Escrow Agreement, each duly executed by Seller and the Escrow Agent;

7.1.7     a certificate of good standing or existence (as available from the relevant jurisdiction) of each of the Companies (including AeroCaribe) issued by the Secretary of State of the state in which the Companies are incorporated, dated not more than ten days prior to the Closing Date;

7.1.7     a certificate signed by Seller certifying to and attaching the articles of incorporation and bylaws of each of the Companies and all amendments thereto;

7.1.8     copies of all filings made with taxing authorities pursuant to Section 4.11;

7.1.9     proof of termination of all tax liens and UCC financing statements covering any assets, tangible or intangible, of the Companies other than those UCC financing statements listed on Schedule 7.1.9;

7.1.10    proof that all Liens listed on Schedule 2.19.3 have been released;

7.1.10    the certificates evidencing the Stock accompanied by duly executed stock powers in favor of Euronet in the form attached as Exhibit H; and

7.1.11    a receipt signed by Seller acknowledging payment of the Purchase Price;

7.1.12    FIRPTA certificates signed by the Companies in the forms attached as Exhibit G-1, G-2 and G-3;

7.1.13    executed resignations of all officers and directors of the Companies, including those listed on Schedule 2.4.2, other than Rafael Tejada (or, in lieu thereof, certified copies of resolutions of the stockholder and directors of the Companies removing such officers and directors, which resolutions must be in form and substance reasonably acceptable to Euronet); and

7.1.14    the Companies have terminated or amended as necessary all Employee Plans in a manner designed to migrate the employees of the Companies into Euronet's benefit plans, and the Companies have provided Euronet documents, in form and substance reasonably acceptable to Euronet, showing that all Employee Plans have been terminated.

7.2    Closing Deliveries of Euronet.  At the Closing, Euronet will deliver to Seller the following:

7.2.1    a certificate of Euronet, signed by an officer thereof, to the effect that the conditions set forth in Sections 6.2.1 and 6.2.2 have been satisfied;

7.2.2    the Escrow Agreement, duly executed by Euronet;

7.2.3    in the manner specified in Section 1.2.1, the Purchase Price subject to any adjustments pursuant to Sections 1.2.1 and 1.2.4;

7.2.4    the Noncompetition Agreement, duly executed by Euronet;

7.2.5    the Distribution Agreement, duly executed by Euronet;

7.2.6    the Currency Exchange Services Agreement, duly executed by Euronet; and

7.2.7    a certificate of good standing or existence (as available from the relevant jurisdiction) of Euronet issued by the North Carolina Secretary of State, dated not more than ten days prior to the Closing Date.

## ARTICLE VIII
## INDEMNIFICATION

8.1    Indemnification by Euronet. From and after the Closing, Euronet will indemnify, defend and hold Seller harmless from and against any and all Losses suffered or incurred by Seller, directly or indirectly, caused by, resulting from or arising out of (a) any material breach of any of the representations or warranties made in or pursuant to Article III and (b) the nonperformance of any covenant or agreement made by Euronet under this Agreement.

8.2    Indemnification by Seller. From and after the Closing, Seller will indemnify, defend and hold Euronet, the Companies and their respective officers, directors, employees and agents (collectively the "Euronet Indemnified Parties") harmless from and against any and all Losses suffered or incurred by such Euronet Indemnified Parties, directly or indirectly, caused by, resulting from or arising out of (a) any breach of any of the representations or warranties made in or pursuant to Article II, without giving effect to any qualification or limitation as to "materiality", "Material Adverse Effect" or similar terms, words or phrases in any such representation or warranty, and for purposes of clarity, to the extent that GAAP itself incorporates the concept of materiality, the concept of materiality incorporated into GAAP will not be disregarded and (b) the nonperformance of any covenant or agreement made by Seller or any of the Companies

under this Agreement. In recovering any Losses, Euronet will first look to the amounts held in the Indemnification Escrow Fund.

8.3    Certain Tax Matters.

8.3.1    Seller Indemnity. Seller will indemnify, defend and hold harmless Euronet and the Companies against (i) any Tax due and payable by or on behalf of any Company after the Closing that is attributable to a Pre-Closing Tax Period (collectively, all of such Taxes are referred to as the "Aggregate Pre-Closing Taxes"), and (ii) any Tax deficiencies and any increases in any Tax payable by or on behalf of any Company arising from any audit by any Governmental Authority with respect to any of the Aggregate Pre-Closing Taxes; provided, however, that the Aggregate Pre-Closing Taxes, or any deficiencies in respect thereof, will not include Taxes or other amounts to the extent included as a liability or other reserve for Tax liability (other than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) in the calculation of the Final Net Current Assets ("Tax Reserve Amounts"). The term "Pre Closing Tax Period" means all taxable periods ending before the Closing Date and the portion of a Straddle Period ending on the Closing Date.

8.3.2    Company Indemnity. The Companies will be liable for and will pay (and will indemnify, defend and hold Seller harmless from and against) all Taxes of the Companies that are attributable to any Post-Closing Tax Period (subject to the right of indemnification from Seller for Taxes attributable to the portion of the Straddle Period ending on or before the Closing Date and excluding any Taxes covered by the Tax Reserve Amounts). The term "Post-Closing Tax Period" means all taxable periods that begin on or after the Closing Date and the portion of the Straddle Period beginning on the Closing Date of any taxable period that includes (but does not end on) the Closing Date.

8.3.3    Straddle Period. For purposes of Section 8.3.1 and Section 8.3.2, in the case of any Taxes that are payable for a Tax period that includes (but does not end on) the Closing Date ("Straddle Period"), the portion of such Tax attributable to the Pre-Closing Tax Period will (i) in the case of any Taxes other than Taxes based upon or related to income, sales, gross receipts, wages, capital expenditures or expenses, be deemed to be the amount of such Tax for the Straddle Period multiplied by a fraction the numerator of which is the number of days in the Pre-Closing Tax Period and the denominator of which is the number of days in the Straddle Period, and (ii) in the case of any Tax based upon or related to income, sales, gross receipts, wages, capital expenditures or expenses, be deemed equal to the amount that would be payable if the Pre-Closing Tax Period ended on the Closing Date.

8.3.4    Cooperation in Tax Matters. Each party will provide the other parties with such assistance as may be reasonably requested by such party in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority, or any judicial or administrative proceedings relating to

Liability for, or a refund of, Taxes, and will retain and provide the other parties with any records or information that may be relevant to such Tax Return, audit, examination, proceedings or determination (but only to the extent he or it had possession of such records or other information immediately after the Closing). Such assistance will include making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and will include providing copies of any relevant Tax Return and supporting work schedules. The party requesting assistance hereunder will reimburse the other parties for reasonable out-of-pocket expenses incurred in providing such assistance. Notwithstanding anything to the contrary in this Agreement, Seller and Euronet will retain, and Euronet will cause the Companies to retain, all Tax Returns, work papers and all material records or other documents in their respective possession (or in the possession of their respective Affiliates) relating to Tax matters of the Companies for any taxable period that includes the Closing Date and for all prior taxable periods until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions and (ii) six years following the due date (without extension) for such Tax Returns. After such time, before Seller or Euronet may dispose of any such documents in their possession (or in the possession of their Affiliates), the other party must be given an opportunity, after 90 days prior written notice, to remove and retain all or any part of such documents as such other party may select (at such other party's expense). Any information obtained under this Section 8.3.4 must be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting an audit or other proceeding.

8.3.5    Refunds. Any Tax refund (including any interest with respect thereto) relating to the Companies for any Pre-Closing Period will be the property of Seller, and if received by Euronet or any of the Companies will be paid over promptly to Seller. Notwithstanding the foregoing, (a) any Tax refund (or equivalent benefit to Seller through a reduction in Tax liability) for any Pre-Closing Period arising out of the carryback of a loss or credit incurred by any of the Companies in any Post-Closing Period will be the property of the Companies and Euronet and, if received by Seller, will be paid over promptly to the Companies and Euronet and (b) if a taxing authority subsequently disallows any refund with respect to which Seller has received a payment pursuant to this Section 8.3, Seller must promptly pay (or cause to be paid) to the Companies the full amount of such refund (including any interest with respect thereto).

8.3.6    Contests.

8.3.6.1    After the Closing, Euronet will promptly notify Seller of any written notice of a proposed assessment or claim in an audit or administrative or judicial proceeding of Euronet or any of the Companies that, if determined adversely to the taxpayer, would be grounds for indemnification under this Article VIII; provided, however, that the

failure to give such notice will not effect Euronet's right to indemnification under this Article VIII unless Seller's contesting of such assessment or claim would be materially prejudiced by Euronet's failure to promptly give such notice.

8.3.6.2    In the case of an audit or administrative or judicial proceeding that relates to Pre-Closing Periods, provided that, and only to the extent that, Seller acknowledges in writing his liability under this Agreement to hold Euronet and the Companies harmless against (i) in the case of such audit or proceeding that relates to Pre-Closing Periods, the full amount of any adjustment that may be made as a result of such audit or proceeding that relates to such Pre-Closing Periods other than to the extent of Straddle Periods included in such Pre-Closing Periods and other than in respect of the Tax Reserve Amounts specifically attributable to such Tax and such Pre-Closing Period, and (ii) in the case of such audit or proceeding that relates to Pre-Closing Periods but only to the extent any such period includes a Straddle Period, an adjustment ultimately determined as allocable under Section 8.3.3 to the portion of such Straddle Period ending on or before the Closing Date), Seller may, at his expense, participate in and control the conduct of such audit or proceeding; Euronet and the Companies also may participate in any such audit or proceeding, at its own expense and, if Seller does not assume the defense of any such audit or proceeding, Euronet and the Companies may defend the same in such manner as they may deem appropriate, including settling such audit or proceeding after 25 days prior written notice to Seller setting forth the terms and conditions of settlement. If issues relating to a potential adjustment for which Seller has acknowledged his liability are required to be contested in the same audit or proceeding as separate issues relating to a potential adjustment for which Euronet and the Companies would be liable, Euronet and the Companies may, at their expense, control the audit or proceeding with respect to the latter issues.

8.3.6.3    With respect to issues relating to a potential adjustment for which both Seller (as evidenced by his written acknowledgement under this Section 8.3.6) and the Companies could be liable, (i) both Seller and Euronet and the Companies may participate in the audit or proceeding and (ii) the audit or proceeding will be controlled by that party that would bear the burden of the greater portion of the sum of the adjustment and any corresponding adjustments that may reasonably be anticipated for future taxable periods. The principle set forth in this Section 8.3.6.3 will also govern for purposes of deciding any issue that must be decided jointly (including choice of judicial forum) in situations in which separate issues are otherwise controlled under this Article VIII by Euronet and Seller.

- 33 -

8.3.6.4   With respect to any Tax audit or proceeding for a taxable period that begins before the Closing Date, neither Euronet and the Companies nor Seller will enter into any compromise or agree to settle any claim pursuant to such audit or proceeding that would adversely affect the other party for such taxable period or a subsequent taxable period without the written consent of the other party, which consent may not be unreasonably withheld. The parties will cooperate in the defense against or compromise of any claim in any such audit or proceeding.

8.3.7   Time of Payment. Notwithstanding anything to the contrary in this Agreement, payment by Seller of any amounts due under this Article VIII in respect of Taxes will be made first out of the Indemnification Escrow Fund, to the extent available, and otherwise directly by Seller (a) at least three Business Days before the due date of the applicable estimated or final Tax Return required to be filed by Euronet or the Companies on which is required to be reported income for a taxable period ending after the Closing Date for which Seller is responsible under Sections 8.3.1 without regard to whether the Tax Return shows overall net income or loss for such period or (b) within three Business Days following an agreement between Seller and Euronet that an indemnity amount is payable, an assessment of a Tax by a taxing authority that is due and payable, or a "determination" as defined in Section 1313(a) of the Code. If liability under this Article VIII is in respect of costs or expenses other than Taxes, payment by Seller of any amounts due under this Article VIII will be made within five Business Days after the date when Seller has been notified by Euronet that Seller has a liability for a determinable amount under this Article VIII and are provided with calculations or other supporting materials in sufficient detail to enable Seller to determine whether such liability has arisen and is accurately computed.

8.3.8   Miscellaneous. Seller and Euronet will treat all payments made by either of them to or for the benefit of the other (including any payments to the Companies) under this Article VIII, under other indemnity provisions of this Agreement and for any misrepresentations or breaches of warranties or covenants as adjustments to the Purchase Price or as capital contributions for Tax purposes and such treatment will govern for purposes hereof except to the extent that applicable Law provides otherwise, in which case such payments will be made in an amount sufficient to indemnify the relevant party on an after-Tax basis.

8.3.9   Extension of Statute of Limitations. If the Closing occurs, Seller will have no liability as to any claim for indemnification under Section 8.3 unless before the expiration of the statute of limitations applicable thereto (without regard to any extension thereof to which Seller has not consented to in writing) Euronet has provided Seller with a notice of such claim setting forth in reasonable detail the nature and basis for such claim.

8.4     Notice of Claim; Right to Participate and Defend Third Party Claim.

8.4.1     If any party hereunder (for purposes of this Section 8.4, an "Indemnified Party") receives notice of the assertion of any claim, the commencement of any suit, action or proceeding, or the imposition of any penalty or assessment by a third party in respect of which indemnity may be sought hereunder (a "Third Party Claim"), and the Indemnified Party intends to seek indemnity hereunder, then the Indemnified Party will promptly provide the indemnifying party with prompt written notice of the Third Party Claim, but in any event not later than 30 days after receipt of such notice of a Third Party Claim. The failure by an Indemnified Party to notify an indemnifying party of a Third Party Claim will not relieve the indemnifying party of any indemnification responsibility under this Article VIII, except to the extent, if any, that such failure materially prejudices the ability of the indemnifying party to defend such Third Party Claim.

8.4.2     The indemnifying party will have the right to control the defense, compromise or settlement of the Third Party Claim with its own counsel if the indemnifying party delivers written notice to the Indemnified Party within ten days following the indemnifying party's receipt of notice of the Third Party Claim from the Indemnified Party acknowledging its obligations to indemnify the Indemnified Party with respect to such Third Party Claim in accordance with this Article VIII; provided, however, that the indemnifying party will not enter into any settlement of any Third Party Claim that would impose or create any obligation or any financial or other liability on the part of the Indemnified Party if such liability or obligation (i) requires more than the payment of a liquidated sum or (ii) is not covered by the indemnification provided to the Indemnified Party hereunder. In its defense of any Third Party Claim, the indemnifying party will timely provide the Indemnified Party with such information with respect to such defense, compromise or settlement as the Indemnified Party may request, and will not assume any position or take any action that would impose an obligation of any kind on, or restrict the actions of, the Indemnified Party. The Indemnified Party will be entitled (at the Indemnified Party's expense) to participate in the defense by the indemnifying party of any Third Party Claim with its own counsel.

8.4.3     If the indemnifying party does not undertake the defense, compromise or settlement of a Third Party Claim in accordance with Section 8.4.2, the Indemnified Party will have the right to control the defense or settlement of such Third Party Claim with counsel of its choosing; provided, however, that the Indemnified Party will not settle or compromise any Third Party Claim without the indemnifying party's prior written consent, unless (i) the terms of such settlement or compromise release the Indemnified Party and the indemnifying party from any and all liability with respect to the Third Party Claim and (ii) the indemnifying party has acknowledged its obligations to indemnify the Indemnified Party with respect to such Third Party Claim in accordance with this Article VIII. The indemnifying party will be entitled (at

- 35 -

the indemnifying party's expense) to participate in the defense of any Third Party Claim with its own counsel.

8.4.4    Any indemnifiable claim hereunder that is not a Third Party Claim will be asserted by the Indemnified Party by delivering notice thereof to the indemnifying party. If the indemnifying party does not respond to such notice within 60 days after its receipt, it will have no further right to contest the validity of such claim.

8.5    Time and Amount Limitations.

8.5.1    If the Closing occurs, Euronet will have no liability for indemnification under Section 8.1(a) with respect to any representation or warranty in Article III (other than those in Sections 3.1, 3.2 and 3.3, as to which this sentence is inapplicable) unless on or before the end of the 18 month anniversary of the Closing Date Seller notifies Euronet of a claim for indemnification with respect to such representation or warranty which notice sets forth in reasonable detail the nature and basis for such claim. If the Closing occurs, Seller will have no liability for indemnification under Section 8.2(a) with respect to any representation or warranty in Article II (other than those in Sections 2.1 (the first three sentences only), 2.2, 2.3, 2.4, 2.27 and 2.28 (collectively, the "Seller Excluded Representations"), as to which this sentence is inapplicable) unless on or before the end of the 18 month anniversary of the Closing Date Euronet notifies Seller of a claim for indemnification with respect to such representation or warranty which notice sets forth in reasonable detail the nature and basis for such claim.

8.5.2    No party will have liability for indemnification under Sections 8.1(a) or 8.2(a) with respect to any representation or warranty in Articles II or III (other than those in the Seller Excluded Representations and in Sections 3.1, 3.2 or 3.3, as to which this sentence is inapplicable) until the total of all Losses with respect to such matters exceeds $260,000 (this amount, the "Deductible"), and once the Deductible has been exceeded, such party will be liable for indemnification for the total of all Losses incurred in excess of the Deductible; provided, however, no individual claim for indemnification amounting to $10,000 or less will be counted in determining whether the Deductible has been reached.

8.5.3    Each party's aggregate liability under Sections 8.1 and 8.2 (other than indemnification relating to a breach of a representation, warranty, covenant or agreement contained in Articles I, IV, VIII and IX or the Seller Excluded Representations, as to which this sentence is inapplicable) is limited to $6,500,000.

8.6    Waiver of Indemnification Rights by Seller. Seller (a) expressly waives any rights of indemnification of Seller against the Companies for acts, circumstances and events that give rise to indemnification obligations of Seller arising under this Article VIII, and (b) agrees and acknowledges that Seller will have no right of contribution from, or right of

subrogation against, the Companies if Seller is required to take, or refrain from taking, action, whether by the payment of any money or otherwise, as a result of this Article VIII.

## ARTICLE IX
## RIGHT OF FIRST REFUSAL

9.1    <u>Right of First Refusal</u>.  Seller hereby grants to Euronet a right of first refusal, in accordance with the procedure set forth in Section 9.2, for a period of three years following the Closing Date to purchase all of the stock or acquire substantially all of the assets of Remesas La Nacional (P.R.) Corp., a Puerto Rico corporation owned by Seller ("<u>Remesas</u>").

9.2    <u>Procedure</u>.

   9.2.1    <u>Option Notice</u>.  If Seller desires to transfer any or all of the capital stock of Remesas to any Person, or if Remesas desires to transfer all or substantially all of the assets of Remesas to any Person, Seller will, or will cause Remesas to, before transferring any of such capital stock or assets to the proposed transferee, (a) obtain a bona fide written offer to purchase (in the form of a letter of intent or term sheet containing the principal terms of the proposed transaction) such capital stock or assets at a stated dollar price for cash from the prospective transferee, and (b) give written notice (the "<u>Option Notice</u>") to Euronet.  The Option Notice must:

   (1)    certify that Seller or Remesas, as applicable, has received a bona fide written offer to purchase such capital stock or assets and enclose a complete copy of such offer;

   (2)    identify the Person who has made the bona fide offer; and

   (3)    state the purchase price per share or the purchase price for the assets, as applicable, along with a specific description of the assets.

   9.2.2    <u>Exercise Notice</u>. On or before the 30th day after the Option Notice is delivered to Euronet, Euronet may exercise its option to purchase all, but not less than all, of the capital stock or assets described in the Option Notice for the same purchase price and on the same terms and conditions as the proposed transferee's offer set forth in the Option Notice.  Euronet must exercise its option by giving written notice to Seller (the "<u>Exercise Notice</u>").

   9.2.3    <u>Closing</u>. The closing for the purchase by Euronet of the capital stock or assets under the previous paragraph will be held at 10:00 a.m. at the office of Stinson Morrison Hecker LLP located at 1201 Walnut, Kansas City, Missouri or at such other place agreed upon by Euronet and Seller, within ten days after delivery of the Exercise Notice.

   9.2.4    <u>Consummation of Original Transfer</u>. If Euronet does not elect to purchase all of the capital stock or assets, or fails to send the Exercise Notice within the ten-day

period set forth in Section 9.2.2, Seller or Remesas, as applicable, may transfer such capital stock or assets (but no other capital stock or assets) to the proposed transferee named in the Option Notice for the consideration and upon the terms set forth in the Option Notice and the closing must be consummated, within the later to occur of 90 days after the Option Notice is delivered to Euronet or 20 days following the issuance of the regulatory approvals required for the sale of the capital stock or assets. Any attempted transfer after the expiration of such period and any attempted transfer to a different transferee or subject to terms and conditions different from those set forth in the Option Notice will be null and void.

### ARTICLE X
### TERMINATION

10.1    Termination. Anything herein to the contrary notwithstanding, this Agreement and the transactions contemplated by this Agreement may be terminated at any time before the Closing as follows and in no other manner:

10.1.1    Mutual Consent. By mutual consent in writing of Euronet and Seller.

10.1.2    Outside Date. By Seller or Euronet if the Closing has not occurred on or before July 12, 2007 (the "Outside Date"); provided, that if on the Outside Date the conditions to Closing set forth in Section 6.1.6 and 6.2.4 have not been fulfilled but all other conditions to the Closing have been fulfilled or are capable of being fulfilled, then either party may extend the Outside Date to January 12, 2008 (the "Extended Outside Date") by providing written notice to the other party on or before the Outside Date; provided, further, that the right to terminate this Agreement pursuant to this Section 10.1.2 will not be available to any party whose failure to perform any of its obligations under this Agreement results in the failure of the Closing to have occurred by the Outside Date or the Extended Outside Date.

10.1.3    Material Breach by Seller. By Euronet, if Seller or any Company breaches or fails to perform any of its representations, warranties or covenants contained in this Agreement, which breach or failure to perform would if uncured give rise to the failure of a condition set forth in Section 6.1; provided, however, that if such breach or failure is susceptible to cure, Seller and the Companies will have 30 days after receipt of reasonably specific notice from Euronet of a description of the breach or failure and their intention to terminate this Agreement if such breach or failure continues in which to cure such breach or failure and, provided further, however, that Euronet may not terminate this Agreement pursuant to this Section 10.1.3 if Euronet is then in material breach of any representation, warranty or covenant contained in this Agreement.

10.1.4    Material Breach by Euronet. By Seller, if Euronet breaches or fails to perform any of its representations, warranties or covenants contained in this Agreement, which breach or failure to perform would if uncured give rise to the failure of a condition set forth in Section 6.2; provided, however, that if such breach or

- 38 -

failure is susceptible to cure, Euronet will have 30 days after receipt of reasonably specific notice from Seller of a description of the breach or failure and its intention to terminate this Agreement if such breach or failure continues in which to cure such breach or failure and, <u>provided further, however</u>, that Seller may not terminate this Agreement pursuant to this Section 10.1.4 if Seller or any Company is then in material breach of any representation, warranty or covenant contained in this Agreement.

10.2    <u>Specific Performance</u>. Each party's obligation under this Agreement is unique. If Seller or Euronet breaches his or its covenants contained in this Agreement, the parties each acknowledge that it would be extremely impracticable to measure the resulting damages to the non-breaching party. Accordingly, the non-breaching party, in lieu of all other rights or remedies available under this Agreement, at law or equity, may sue in equity for specific performance, and each party expressly waives the defense that a remedy in damages will be adequate; provided, however, that specific performance (a) will not be available to a party that is in breach of this Agreement or (b) will not be available if the granting of specific performance would result in the violation of any Law by the Companies or the breaching party or the failure to obtain for more than 180 days (or revocation of) any Required Regulatory Permit.

## ARTICLE XI
## GENERAL

11.1    <u>Notices</u>. All notices and other communications required or permitted hereunder will be in writing and, unless otherwise provided in this Agreement, will be deemed to have been duly given when delivered in person or when dispatched by electronic facsimile transfer (confirmed in writing by mail simultaneously dispatched) or one Business Day after having been dispatched by a nationally recognized overnight courier service to the appropriate party at the address specified below:

Seller:          Jose Andres Hernandez Andujar
                 c/o Club Rotorio #28
                 Ens. Ozama
                 Distrito Nacional
                 Dominican Republic
                 Facsimile: (809) 686-6633 or (809) 592-3011

                 with a copy to:

                 John E. Zamer
                 Jones Day
                 1420 Peachtree Street, Suite 800
                 Atlanta, Georgia 30309-3053
                 Facsimile: (404) 581-8330

Companies:       Jose Andres Hernandez Andujar
                 Envios de Valores La Nacional Corp.

- 39 -

566 W. 207th Street
New York, NY 10034
Facsimile: (809) 686-6633 or (809) 592-3011

Euronet:           Eric Mettemeyer
Euronet Payments & Remittance, Inc.
c/o Euronet Worldwide, Inc.
4601 College Boulevard, Suite 300
Leawood, Kansas 66211
Facsimile: (913) 327-1921

with a copy to:

Jeffrey B. Newman, General Counsel
Euronet Worldwide, Inc.
2nd Floor, Devonshire House
1 Devonshire Street
London W1W 5DS
United Kingdom
Facsimile: +44-1268-242-224

with a copy to

Scot Hill
Stinson Morrison Hecker LLP
1201 Walnut St., Suite 2900
Kansas City, MO 64106
Facsimile: (816) 691-3495

11.2    Certain Defined Terms.  As used in this Agreement, the terms listed below have the respective meanings indicated.

"AAA" has the meaning set forth in Section 11.4.

"Accounting Expert" has the meaning set forth in Section 1.2.3.2.

"ADA" has the meaning set forth in Section 2.15.

"Affiliate" means, with respect to any Person, any other Person who at such time controls, is controlled by, or is under common control with, such Person.

"Affiliated Group" means any affiliated group within the meaning of Code § 1504(a), or any similar group defined under a similar provision of state, local or foreign Law.

"Agent" means any Person designated or appointed by Seller to receive money transfer orders.

"Aggregate Pre-Closing Taxes" has the meaning set forth in Section 8.3.1.

- 40 -

"**Agreement**" has the meaning set forth in the first introductory paragraph.

"**Ancillary Agreements**" means collectively, the Escrow Agreement, the Distribution Agreement, the Currency Exchange Services Agreement, the Noncompetition Agreement, and all other agreements required to be executed by or delivered by Seller, the Companies or Euronet at or prior to the Closing.

"**Balance Sheet Date**" means October 31, 2006.

"**Bank Secrecy Act**" means Title I and II of Pub. Law No. 91-508, as amended, codified at 12 U.S.C. § 18296, 12 U.S.C. §§ 1951-1959, and 31 U.S.C. §§ 5311-5330, as amended, and all orders, regulations, rules and interpretative releases issued by the U.S. Department of the Treasury or any of its agencies or offices (including the U.S. Financial Crimes Enforcement Network) thereunder (including 31 CFR Part 103).

"**Business Day**" means any day other than a Saturday or Sunday or a day on which the Federal Reserve Bank of New York is closed.

"**Closing**" has the meaning set forth in Section 1.4.

"**Closing Date**" means the date of the Closing.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Companies**" has the meaning set forth in the first introductory paragraph.

"**Companies' Assets**" has the meaning set forth in Section 2.8.

"**Companies' Business**" means the business of money transfer and related services (including bill payment, phone card and cash card) as conducted by the Companies on the date of this Agreement.

"**Confidential Information**" means, with respect to a Person, any information concerning the businesses and affairs of such Person, including any trade secrets or confidential business or technical information of such Person or its products, customers, licensees, suppliers or development or alliance partners or vendors, regardless of when or how such Person may have acquired such information, product development methods and business techniques, work plans, formulas, test results and information, applications, algorithms, technical information, manufacturing information, design information, cost or pricing information, know-how, technology, prototypes, ideas, inventions, improvements, training, sales volume service and business manuals, unpublished promotional materials, development partnerships and other alliances, customer lists, prospective customer lists and other business information, materials and property; provided, however, that such Confidential Information does not include information that (a) has become generally available and publicly known through no wrongful act or breach of any obligation of confidentiality by any party or any of its Affiliates or any of their respective employees, officers, directors, representatives or agents or (b) was approved in writing for release by the party entitled to its protection.

"**Consent**" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Authority or other Person.

"**Consenting Spouse**" has the meaning set forth in the first introductory paragraph.

"**Contracts**" means any contracts, leases and subleases, agreements, arrangements, commitments, letters of intent, memoranda of understanding, promises, obligations, rights, instruments, documents, indentures, mortgages, security interests, guarantees, and other similar arrangements whether written or oral.

"**Correspondent**" means a Person that acts as the correspondent of the Companies for purposes of delivering money transfer received by the Companies or their agents.

"**Currency Exchange Services Agreement**" has the meaning set forth in Section 7.1.4.

"**Deductible**" has the meaning set forth in Section 8.5.2.

"**Document Package**" means the document titled "Document Package" delivered by Seller to Euronet pursuant to Section 4.16 and containing the items referred to in this Agreement.

"**Distribution Agreement**" has the meaning set forth in Section 7.1.3.

"**Employee Plans**" means all employee benefit plans as defined in Section 3(3) of ERISA, all other fringe or employee benefit plans, programs, contracts, schemes, agreements or arrangements and all compensation plans, programs, contracts, schemes, agreements or arrangements, written or otherwise, statutory or contractual, for the benefit of or relating to any current or former employee, officer or director of the Companies or of any ERISA Affiliate.

"**Envios NY**" has the meaning set forth in the first introductory paragraph.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person that, together with the Company or its Subsidiary, would be considered a single employer within the meaning of Section 4001 of ERISA or Section 414 of the Code or was considered at any time during the six years preceding the date of this Agreement.

"**Escrow Agent**" means U.S. Bank National Association.

"**Euronet**" has the meaning set forth in the first introductory paragraph.

"**Euronet's Broker**" means the Person identified on Schedule 11.12.2.

"**Euronet Indemnified Parties**" has the meaning set forth in Section 8.2.

"**Excluded Receivables**" means accounts receivable of the Companies that are older than ten days.

**"Executive Order"** means Presidential Executive Order No. 13224 on Terrorist Financing, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49079 (Sept. 25, 2001).

**"Exercise Notice"** has the meaning set forth in Section 9.2.2.

**"Extended Outside Date"** has the meaning set forth in Section 10.1.2.

**"Final Closing Date Balance Sheets"** has the meaning set forth in Section 1.2.3.2.

**"Final Net Current Assets"** has the meaning set forth in Section 1.2.3.2.

**"Financial Statements"** has the meaning set forth in Section 2.20.1.

**"GAAP"** means United States generally accepted accounting principles as in effect from time to time.

**"General Enforceability Exceptions"** means applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, fraudulent conveyance and other similar Laws and principles of equity affecting creditors' rights and remedies generally.

**"Governmental Authority"** means any federal, state, local or foreign government or any subdivision, authority, department, commission, board, bureau, agency, court, administrative panel or other instrumentality thereof.

**"IEEPA"** means the International Emergency Economic Power Act, 50 U.S.C. §§ 1701 *et seq.*, as amended.

**"Indebtedness"** means with respect to any Person, without duplication, (i) all obligations of such Person for borrowed money, whether short-term or long-term, and whether secured or unsecured, or with respect to deposits or advances of any kind (other than deposits and advances of any Person relating to the purchase of products or services in the Ordinary Course), (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of such Person upon which interest charges are customarily paid (other than trade payables incurred in the Ordinary Course), (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (v) all obligations of such Person issued or assumed as the deferred purchase price of property or services (other than current trade payables incurred in the Ordinary Course), (vi) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (vii) all guarantees, endorsements and other contingent obligations by such Person of the Indebtedness of others, (viii) all capital lease obligations of such Person, (ix) all net payments that such Person would have to make in the event of an early termination, on the date Indebtedness of such Person is being determined, in respect of outstanding interest rate protection agreements, foreign currency exchange arrangements or other

interest or exchange rate hedging arrangements, (x) all obligations including reimbursement obligations of such Person in respect of letters of credit, fidelity bonds, surety bonds, performance bonds and bankers' acceptances, (xi) obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, (xii) renewals, extensions, refundings, deferrals, restructurings, amendments and modifications of any such Indebtedness, obligations or guarantee and (xiii) any other obligation that in accordance with GAAP is required to be reflected as debt on the balance sheet of such Person. The Indebtedness of any Person will include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof.

"**Indemnification Claims**" has the meaning set forth in Section 8.2.

"**Indemnification Escrow Agreement**" has the meaning set forth in Section 1.2.2.

"**Indemnification Escrow Fund**" has the meaning set forth in Section 1.2.1.

"**Indemnified Party**" has the meaning set forth in Section 8.3.1.

"**Intellectual Property Rights**" has the meaning set forth in Section 2.26.1.

"**Interim Financial Statements**" has the meaning set forth in Section 2.20.1.

"**IRS**" means the United States Internal Revenue Service.

"**Laws**" means any laws, statutes, rules, regulations, ordinances, orders, codes, arbitration awards, judgments, decrees or other legal requirements of any Governmental Authorities.

"**Liens**" means, without limitation, any and all liens, mortgages, claims, charges, security interests, options, preemptive purchase rights, easements, restrictions or other encumbrances.

"**Losses**" means any and all actions, suits, demands, assessments, judgments, losses, liabilities, damages, costs and expenses (including interest, penalties, attorneys' fees, accounting fees and investigation costs).

"**Material Adverse Effect**" means any action, event or circumstance that has occurred prior to the date of this Agreement (or that has occurred prior to the Closing Date, as applicable) whose effect has been materially adverse, individually or in the aggregate, to the business, assets, condition (financial or otherwise) or operations of the Companies, taken as a whole. Without limiting the previous sentence, a Material Adverse Effect will be deemed to have occurred if: (a) there is a decline in the monthly average volume of money transfer transactions of the Companies from the 2006 Monthly Average Volume to the Closing Date Monthly Volume by 15% or more of the 2006 Monthly Average Volume. For purposes of this definition, "**2006 Monthly Average Volume**" means 215,716 money transfer transactions, and "**Closing Date Monthly Volume**" means the

volume of money transfer transactions for the most recent full calendar month since January 1, 2007; or (b) there is a decline in the monthly average gross revenues of the Companies from the 2006 Monthly Average Revenue to the Closing Date Monthly Revenue by 15% or more of the 2006 Monthly Average Revenue. For purposes of this definition, "**2006 Monthly Average Revenue**" means $2,070,722, and "**Closing Date Monthly Revenue**" means the gross revenue of the Companies for the most recent full calendar month since January 1, 2007. Notwithstanding the foregoing, the determination of Material Adverse Effect does not include, either alone or in combination, the effects of general economic conditions or any conditions affecting the money transfer industry generally (in either case, only to the extent such effects do not have a disproportionate impact on the Companies when compared to other companies in the consumer money transfer business).

"**Material Contracts**" has the meaning set forth in Section 2.7.1.

"**Material Regulatory Permits**" has the meaning set forth in Section 2.12.

"**Net Current Assets**" means all current assets (as defined under GAAP) of the Companies less all liabilities of the Companies required under GAAP to be included as liabilities on a balance sheet; provided, however, (a) current assets will not include Excluded Receivables, (b) liabilities will include the $585,000 payable to Seller's Broker as indicated in Section 11.12.2(ii) and (c) liabilities will include 50% of the aggregate amount of the retention bonus arrangements, regardless of the time of payment, referred to in Section 4.14.

"**Net Current Assets Adjustment Amount**" has the meaning set forth in Section 1.2.4.2.

"**Noncompetition Agreement**" has the meaning set forth in Section 7.1.5.

"**Nuevo Financial Settlement Agreement**" means the settlement agreement, dated December 20, 2006, between Nuevo Financial Center, Inc. and Envios NY.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"**Option Notice**" has the meaning set forth in Section 9.2.1.

"**Order**" means any judgment, injunction, order or decree that is issued by a Governmental Authority.

"**Ordinary Course**" means the ordinary and usual course of the conduct of the Companies' Business in a manner consistent with past practices.

"**OSHA**" has the meaning set forth in Section 2.15.

"**Outside Date**" has the meaning set forth in Section 10.1.2.

"**PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law

107-56) (The USA PATRIOT Act), as amended, and all orders, regulations and rules issued by the U.S. Department of the Treasury or any of its agencies or offices (including the U.S. Financial Crimes Enforcement Network) thereunder.

"**PATRIOT Act Offense**" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (A) the criminal laws against terrorism, (B) the criminal laws against money laundering, (C) the Bank Secrecy Act, as amended, (D) the United States Money Laundering Control Act of 1986, as amended, (E) the United States international Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, (F) the PATRIOT Act and (G) any crime of conspiracy to commit, or aiding and abetting another to commit, any of the foregoing offenses.

"**Permits**" means any licenses, permits, approvals, registrations, certificates (including certificates of occupancy) issued by a Governmental Authority.

"**Permitted Liens**" has the meaning set forth in Section 2.8.

"**Person**" means any individual, firm, corporation, partnership, trust, estate, association or other entity, and includes any party hereto.

"**Post Closing Tax Period**" has the meaning set forth in Section 8.3.2.

"**Pre-Closing Escrow Account**" has the meaning set forth in Section 1.2.1.

"**Pre-Closing Escrow Agreement**" has the meaning set forth in Section 1.2.1.

"**Pre Closing Tax Period**" has the meaning set forth in Section 8.3.1.

"**Preliminary Closing Date Balance Sheet**" has the meaning set forth in Section 1.2.3.1.

"**Preliminary Net Current Assets**" has the meaning set forth in Section 1.2.3.1.

"**Proceeding**" means any judicial or arbitral action, suit, or proceeding, including administrative proceedings, investigations or actions brought by regulatory agencies.

"**Prohibited Foreign Shell Bank**" has the meaning set forth in Section 2.13.8.

"**Prohibited Person**" means any Person: (a) listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (b) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of the Executive Order; (c) with whom the Companies or Seller is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Laws, including the PATRIOT Act and the Executive Order; (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; (e) that is named as a "specifically designated national

- 46 -

(SDN)" on the most current list published by the OFAC at its official website, http://www.treas.gov.ofac/t11sdn.pdf or at any replacement website or other replacement official publication of such list or is named on any other U.S. or foreign government or regulatory list issued post-September 11, 2001; (f) that is covered by IEEPA, TEA, OFAC, or any other Law relating to the imposition of economic sanctions against any country, region or individual pursuant to United States law or United Nations resolution; (g) that is named on any applicable list of known suspected terrorists, terrorist organizations or of other sanctioned persons issued by any Governmental Authority of any jurisdiction in which the Companies have conducted their business; or (h) that, to the knowledge of the Companies, is an Affiliate (including any principal, officer, immediate family member or close associate) of a Person described in one or more of clauses (a) - (g) of this definition of Prohibited Person.

"**Purchase Price**" has the meaning set forth in Section 1.2.

"**Real Property Leases**" has the meaning set forth in Section 2.9.

"**Remesas**" has the meaning set forth in Section 9.1.

"**Required Regulatory Consents**" has the meaning set forth in Section 4.1.

"**Review Period**" has the meaning set forth in Section 1.2.3.2.

"**Scheduled Intellectual Property Rights**" has the meaning set forth in Section 2.26.3.

"**Securities Act**" has the meaning set forth in Section 3.4.

"**Seller**" has the meaning set forth in the first introductory paragraph.

"**Seller's Broker**" means the Person identified on Schedule 11.12.2.

"**Seller Excluded Representations**" has the meaning set forth in Section 8.5.1.

"**Seller Loans**" means the loans listed on Schedule 2.20.2.

"**Senior Foreign Potential Figure**" has the meaning set forth in Section 2.13.5.

"**Statement of Objections**" has the meaning set forth in Section 1.2.3.2.

"**Stock**" means all of the issued and outstanding capital stock of the Companies other than Envios NJ, as further described in Schedule 2.4.1.

"**Straddle Period**" has the meaning set forth in Section 8.3.3.

"**Summary of Material Modifications**" has the meaning given such term in ERISA.

"**Summary Plan Description**" has the meaning given such term in ERISA.

"**Tax**" means any federal, state, local or foreign net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, service, service use, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, customs, duties, obligations to turn over unclaimed property or otherwise act with respect to escheat or other type of fiscal levy and all other taxes, governmental fees, registration fees, assessments or charges of any kind whatsoever, together with any interest and penalties, additions to tax or additional amounts imposed or assessed with respect thereto.

"**Tax Reserve Amounts**" has the meaning set forth in Section 8.3.1.

"**Tax Returns**" means all returns, reports, declarations and information returns and statements relating to Taxes, including any amendments thereto.

"**TEA**" means the Trading With the Enemy Act, 50 U.S.C. App. 1 *et seq.*, as amended.

"**Third Party Claim**" has the meaning set forth in Section 8.4.1.

"**Trademarks**" has the meaning set forth in Section 2.26.1.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, as amended.

11.3    Certain Interpretive Matters.

11.3.1 Unless the context otherwise requires, (i) all references to Sections, Exhibits, Articles or Schedules are to be Sections, Exhibits, Articles and Schedules of or to this Agreement, (ii) each of the Schedules will apply only to the corresponding Section or subsection of this Agreement, (iii) each term defined in this Agreement has the meaning assigned to it, (iv) words in the singular include the plural and vice versa, (v) the term "including" means "including without limitation," (vi) all references to $ or dollar amounts will be to lawful currency of the United States, (vii) to the extent the term "day" or "days" is used, it means calendar days, (viii) the pronoun "his" refers to the masculine, feminine and neuter, (ix) the words "herein", "hereby", "hereof", and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular article, section, paragraph or other subdivision of this Agreement, and (x) except to the extent expressly set forth herein, each accounting term not otherwise defined in this Agreement has the meaning ascribed to it in accordance with GAAP.

11.3.2 No provision of this Agreement will be interpreted in favor of, or against, any of the parties by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

11.4    Arbitration.  In the event of any dispute concerning this Agreement, its effect, or the transactions contemplated hereby, either party may, by notice to the other parties, require such dispute or difference to be submitted to arbitration, which shall be conducted in accordance with the Commercial Arbitration Rules and Mediation Procedures of

American Arbitration Association (the "AAA") as amended by this Section 11.4. The arbitrator will be selected by agreement of the parties or, if they cannot agree on an arbitrator within 30 days after the notice of such party's desire to have the question settled by arbitration, then the arbitrator will be selected by the AAA office in New York, New York. Any such arbitration will occur in New York City. If available under Section 10.2, the arbitrator may grant specific performance of this Agreement if requested by any of the parties. Punitive damages will not be permitted under any circumstances. The arbitrator shall have no authority to amend or disregard any provision of this Agreement, including this Section 11.4. The arbitration award will be final and binding upon the parties. The arbitrator will allocate its own fees, the administrative fees of the AAA, and the expenses, including attorneys' fees and costs reasonably incurred by the parties to the arbitration in an equitable manner based on the relative merits of the parties respective claims. Judgment upon the award may be entered in any court of competent jurisdiction.

11.5    Applicable Law. THIS AGREEMENT WILL BE DEEMED TO BE A CONTRACT MADE UNDER THE LAWS OF THE STATE OF NEW YORK AND FOR ALL PURPOSES WILL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS PREVAILING IN THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

11.6    Counterparts. This Agreement may be executed in several counterparts, each of which when so executed will be deemed to be an original and all of which will together constitute one and the same agreement.

11.7    Entire Agreement. The terms and provisions of this Agreement and its Schedules and Exhibits constitute the entire agreement between the parties and there are no collateral agreements or representations or warranties other than as expressly set forth or referred to in this Agreement. This Agreement (including the Schedules and Exhibits) supersedes any other agreement, whether written or oral, that may have been made or entered into by any party to this Agreement or any of their respective Affiliates (or by any director, officer or representative hereof) relating to the matters contemplated by this Agreement, including the term sheet and amendment. If the Closing occurs, this Agreement will replace and supersede the Confidentiality and Non Disclosure Agreement dated May 19, 2006 between Euronet's Affiliate and Euronet's Broker.

11.8    Inurement. This Agreement will inure to the benefit of and be binding upon the parties, their heirs, administrators, successors and assigns.

11.9    Time of Essence. Time is of the essence in this Agreement.

11.10   Rights of the Parties. Nothing expressed or implied in this Agreement is intended or will be construed to confer upon or give any Person other than the parties any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.

11.11   Severability. If a court of competent jurisdiction should find any term or provision of this Agreement to be unenforceable and invalid by reason of being overly broad, the parties agree that the court will limit the scope or duration of such provision to the maximum

enforceable scope or duration allowed by Law. Any term or provision deemed by a court of competent jurisdiction to be unenforceable and invalid for any other reason will be severed from this Agreement, and the remainder of this Agreement will continue in full force and effect.

11.12  Expenses.

    11.12.1  Except as otherwise provided in this Agreement or any Ancillary Agreement, each party will be solely responsible for any fees or expenses that it incurs in connection with the transactions contemplated by this Agreement and the Ancillary Agreements, including attorneys fees, brokers fees, accountant fees, investment banker fees, fees associated with filings for approvals by Governmental Authorities and any other consultant fees.

    11.12.2  At Closing Euronet shall pay, against the delivery at Closing to Seller and Euronet of a release in the form attached hereto as Exhibit F (i) the fee due to Euronet's Broker pursuant to that certain Investment Advisory Agreement with Euronet's Broker dated June 12, 2006 in the amount indicated on Schedule 11.12.2 and (ii) the fee due to Seller's Broker pursuant to that certain letter agreement between Seller and Seller's Broker dated May 19, 2006, in the amount indicated on Schedule 11.12.2. The sum payable under clause (i) will be for the account of Euronet, and the sum payable under clause (ii) will be for the account of the Seller and will be listed as and constitute a liability in the calculation of the Net Current Assets.

11.13  Remedies Not Exclusive. No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy and each remedy will be cumulative and will be in addition to every other remedy given hereunder or hereafter existing at Law or in equity or by statute or otherwise. The election of any one or more remedies will not constitute a waiver of the right to pursue other available remedies. Upon and after the Closing, the sole and exclusive remedy available to the parties under or in respect of this Agreement or the subject matter thereof will be indemnification pursuant to Article VIII; provided, however, that this sentence does not apply to any Ancillary Agreements, each of which, when executed, will be enforceable in accordance with their respective terms without reference to Article VIII.

11.14  Waiver of Trial by Jury. Subject to the arbitration provisions set forth in Section 11.14, THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY OF THE DOCUMENTS OR CERTIFICATES EXECUTED IN CONNECTION WITH THIS AGREEMENT, OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING TO THIS AGREEMENT OR ANY OF THE DOCUMENTS OR CERTIFICATES EXECUTED IN CONNECTION WITH THIS AGREEMENT.

11.15  Seller's Release. EXCEPT FOR CLAIMS OF BREACH OF THIS AGREEMENT, THE ESCROW AGREEMENT OR THE INDEMNIFICATION ESCROW AGREEMENT,

EFFECTIVE AS OF THE CLOSING, SELLER RELEASES AND FOREVER DISCHARGES, THE COMPANIES, EURONET AND THEIR RESPECTIVE AFFILIATES, SUCCESSORS AND ASSIGNS OF AND FROM ALL CLAIMS AND CAUSES OF ACTION KNOWN OR UNKNOWN, ACCRUED OR UNACCRUED, THAT SELLER HAS OR MAY HAVE AGAINST ANY OF THE COMPANIES.

11.16  Consent of Consenting Spouse.  Consenting Spouse represents that she is the spouse of Seller and she hereby irrevocably and unconditionally consents to the sale of the Stock and the execution, delivery and performance of this Agreement, the Ancillary Agreements, any amendments hereto or thereto and any other documents or instruments necessary, required or advisable in order carry out, consummate and implement the sale and transfer of the Stock to Euronet.

11.17  AeroCaribe. To the extent AeroCaribe is not in good standing as of the date of this Agreement, AeroCaribe hereby waives any remedy of rescission or termination with respect to this Agreement that it may have as a result of its failure to secure or remain in good standing. In addition, the Companies and Seller hereby agree that any resulting rescission or termination of, or attempt to rescind or terminate, this Agreement by AeroCaribe will not result in a right of rescission or termination in favor of any of the Companies or Seller hereunder, nor impact in any way the obligations of the Companies or Seller under this Agreement or any of the Ancillary Agreements.

[SIGNATURE PAGE FOLLOWS]

The parties have executed this Agreement on the day and year first above written.

EURONET PAYMENTS & REMITTANCE, INC.

By: _Eric T. Mettemeyer_

Name:  Eric Mettemeyer
Title:  Treasurer


_____

JOSE ANDRES HERNANDEZ ANDUJAR

ENVIOS DE VALORES LA NACIONAL
CORP. (a New York corporation)

By:_____
Name:_____
Title:_____

ENVIOS DE VALORES LA NACIONAL, INC.
(a New Jersey corporation)

By:_____
Name:_____
Title:_____

AEROCARIBE TRAVEL AGENCY, INC.

By:_____
Name:_____
Title:_____


_____

CANDIDA DE HERNANDEZ

The parties have executed this Agreement on the day and year first above written.

EURONET PAYMENTS & REMITTANCE, INC.

By:_____
Name: Eric Mettemeyer
Title: Treasurer

_____
JOSE ANDRES HERNANDEZ ANDUJAR

ENVIOS DE VALORES LA NACIONAL
CORP. (a New York corporation)

By:_____
Name: JOSE A. HERNANDEZ ANDUJAR
Title: Authorized Representative

ENVIOS DE VALORES LA NACIONAL, INC.
(a New Jersey corporation)

By:_____
Name: JOSE A. HERNANDEZ
Title: Authorized Representative

AEROCARIBE TRAVEL AGENCY, INC.

By:_____
Name: Jose A. Hernandez Andujar
Title: Authorized Representative

_____
CANDIDA DE HERNANDEZ

The parties have executed this Agreement on the day and year first above written.

EURONET PAYMENTS & REMITTANCE, INC.

By:_____
Name: Eric Mettemeyer
Title: Treasurer


_____
JOSE ANDRES HERNANDEZ ANDUJAR

ENVIOS DE VALORES LA NACIONAL
CORP. (a New York corporation)

By:_____
Name:_____
Title:_____

ENVIOS DE VALORES LA NACIONAL, INC.
(a New Jersey corporation)

By:_____
Name:_____
Title:_____

AEROCARIBE TRAVEL AGENCY, INC.

By:_____
Name:_____
Title:_____


_____
CANDIDA DE HERNANDEZ