# EXHIBIT 5

02/07/2007 17:18   212-471-2997   MERLE & BROWN, PC   PAGE 01

CP:BSK

UNITED STATES DISTRICT COURT          07-144 M
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA              To Be Filed
                                      Under Seal
   - against -
                                      AFFIDAVIT IN SUPPORT
                                      OF ARREST AND SEARCH
PATRICIA NAVARRO CANALES,             WARRANTS
                                      (Title 18, U.S.C., §§
           Defendant.                 1956 (a)(2)(B)(i))

- - - - - - - - - - - - - - - - - X

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

IN RE THE SEARCH OF
THE PREMISES KNOWN AS:
LA NACIONAL
120 East Post Rd.
White Plains, N.Y.

- - - - - - - - - - - - - - - - - X
EASTERN DISTRICT OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK, SS:

      Anthony Kressevich, being duly sworn, hereby deposes and says as follows:

      On or about and between August 14, 2006, and January 11, 2007, within the Eastern District of New York and elsewhere, the defendant PATRICIA NAVARRO did conduct financial transactions that affected interstate commerce, to wit: the transmission of United States currency from a place in the United States, to wit: White Plains, New York, to or through a place outside the United

02/07/2007 17:18   212-471-2997   MERLE & BROWN, PC   PAGE 02

States, to wit: Colombia, knowing that the funds involved in the transmissions represented the proceeds of some form of unlawful activity, and knowing that the transmissions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, to wit: narcotics trafficking.

(Title 18, United States Code, Section 1956(a)(2)(B)(i)).

Upon information and belief, there is probable cause to believe that there is currently concealed on the Premises known as LA NACIONAL, located at 120 East Post Rd. White Plains, N.Y. (the "Subject Premises") certain property, to wit: records and documents reflecting structuring of financial transactions, including, money order receipts, structuring lists, invoices, lists of sender and/or recipient names, currency amounts, senders and beneficiaries/recipients, data stored in fax machine memory, data stored on computers and computer systems, including any and all equipment which can collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic, optical or similar computer impulses or data, any data-processing devices, such as central processing units and laptop or notebook computers, floppy disk drives and diskettes, tape drives and tapes and other memory storage devices, computer printouts, records and faxes pertaining to the transfer, mailing, receipt,

02/07/2006 12:15   212-421-2957   ERCE & BROWN, PC   PAGE 03

purchase, possession, export and/or import of currency, money counting machines, cash or other monetary instruments in excess of $3,000, and bank statements, for the time period August 14, 2006 to the present, all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1956, laundering of monetary instruments and Title 31, United States Code, Section 5313(a), 5322, 5324 and 5325, failure to file currency transaction reports, failure to maintain identification as required by Section 103.33(f) of Title 31, Code of Federal Regulations and structuring financial transactions to avoid the currency reporting requirements.

The source of Your deponent's information and the grounds for his belief are as follows:

1. I, Det. Anthony Kressevich, am a Task Force Officer with Immigration and Customs Enforcement ("ICE"), Department of Homeland Security. I have been a Detective for approximately sixteen years. I am currently assigned to the El Dorado Task Force, a Task Force consisting of Special Agents with the Department of Homeland Security, Secret Service Agents, New York City Police Department Detectives, a City of White Plains New York Police Detective, New York State Troopers and other local law enforcement agencies which purpose is to investigate narcotics money laundering. I have had experience investigating money remitters involved in money laundering. Previous to my

assignment at the El Dorado Task Force, I have served as a Task Force Officer assigned to the Justice Department Drug Enforcement Administration Westchester County New York (DEATF), and as an Investigator assigned to the Westchester County District Attorneys Office Narcotics initiative (WDANI).

Currency Reporting Requirements

2. Transactions in currency were defined as transactions involving the physical transfer of money, as defined in Title 31, Code of Federal Regulations, Sections 103.11(h) and (ii).

3. Domestic financial institutions, including nonbank financial institutions such as money remitters, money order sellers and check cashers, are required by law and regulation to file a Currency Transaction Report (IRS Form 4789, hereinafter referred to as a "CTR") with the Internal Revenue Service ("IRS") for each transaction in currency, such as a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution, in excess of $10,000, as required by Title 31, United States Code, Section 5313 and Title 31, Code of Federal Regulations, Sections 103.22(a) et seq. CTRs are filed with the IRS on forms which required, among other things, disclosure of the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed. CTRs are required to be filed to

02/87/2007 14:518  2124471 2997    PIERCE & BROWN, PC    PAGE 05

assist the United States in criminal, tax and regulatory investigations and proceedings, as required by Title 31, Code of Federal Regulations, Section 103.21.

    4. Bank and nonbank financial institutions must maintain records of the following information in the case of any remittance or any sale of money orders in the amount of $3,000 or more: the purchaser's name, address, social security number or alien identification number and date of birth; the date of purchase; the types of instruments purchased; the serial numbers of the instruments purchased; and the dollar amount of each of the instruments, as required by Title 31, United States Code, Section 5325 and Title 31, Code of Federal Regulations, Section 103.29(a). These records are subject to inspection on demand by an Internal Revenue Service examiner.

    5. "Structuring" financial transactions means the breaking down of amounts of currency into: (i) amounts of $10,000 or less prior to transacting business with one or more domestic financial institutions or businesses, or (ii) amounts of less than $3,000 prior to purchasing money orders, traveler's checks, cashier's checks or bank checks, in an attempt to evade the above-described currency reporting requirements, as stated in Title 31, Code of Federal Regulations, Section 103.11(rr).

**Money Remitters**

02/07/2007 13:08   212-471-2997   MERCER & BROWN, PC   PAGE 06

6. A money remitter is a nonbank financial institution which received money from customers to remit, or send, to the place designated by the customer. The typical legitimate customer of the ethnic money remitter is an immigrant who does not have the appropriate documentation necessary to open a bank account or for whom maintaining a bank account is too costly. In the money remitter industry, this is often referred to as the "unbanked" segment of the population. For the most part, these individuals are recent immigrants to the United States who work at low paying jobs and who use the money remitter to send money home to their families.

7. Almost all of the licensed money remitters in New York State operate through agents. The agent of the licensed money remitter receives the remittance from the sender, along with sender information, such as name, address, and telephone number, and recipient information, usually name and telephone number. The agent enters this information into a computer provided by the money remitter, and a pre-numbered invoice is generated. The agent then sends the information to the money remitter by computer or by fax. The agent must deposit the money into a bank account set up for the agent but controlled by the money remitter. The agent is not permitted to make withdrawals from this account; only the money remitter can withdraw funds. On a daily basis, the money remitter will transfer all of the

02/07/2007  ... 2125471-2937 ... MERCER BROWN PC ... PAGE

Case 1:07-mj-00144-JMA    Document 1    Filed 02/02/2007    Page 7 of 17

money into one of several main transmission accounts. The funds are then moved through the domestic and foreign banking system by way of wire transfer. Copies of the remittance invoices are retained both by the agent and by the money remitter. In addition, information relating to the agent's remittances are kept in the computer of both the agent and the money remitter. Most money remitter agents are agents of several licensed remitters.

    8.    Most agents of money remitters operate several businesses at the same location. Typically, the money remitter agent will also offer services such as the sale of money orders, travel agency services and an international phone booth. Beeper companies, cellular phone companies, money order sellers, and car insurance agents are often located on these premises as well. Like the money remitter, these other businesses, when operating legitimately, service immigrant communities.

Money Laundering

    9.    Money laundering is the term given to financial transactions which have as their purpose the concealment of funds which are generated by illegal activity, and the efforts undertaken to give those funds the appearance of legitimacy. In the United States, the criminal activity which generates the largest amount of illicit funds, and, therefore, the largest amount of funds which require laundering, is drug trafficking.

02/07/2007 17:38  212-471-2997   MERCER BROWN, PC                    PAGE

Money remitters are frequently used by drug traffickers to launder drug proceeds.

10. The primary method of laundering drug money through money remitters is by structuring the transactions to avoid reporting requirements. The money remitter agent accepts illicit funds, structures the remittances to avoid the reporting requirements, and then transmits the funds to the designated recipient location. The remittance locations in Hispanic countries are referred to as "casas de cambio." By way of example, the trafficker brings in a large amount of currency which needs to be returned to a drug source country, for example, Colombia. The money remitter agent creates invoices which make it appear as if the money was brought in by a number of different senders, in amounts less than $10,000 to avoid the CTR requirements and less than $3,000 to avoid the identification requirements. The sender then provides the money remitter with a structuring list which typically contains a list of recipient names and contact information in the foreign country for each of the remittances, again using a different name for each remittance. In this way, it appears as if there are a number of smaller, unrelated remittances instead of one remittance in excess of $10,000 or $3,000 which would trigger the filing of a CTR or the obtaining and maintaining of identification.

11. As part of this process, in the case of money

02/07/2007 17:15 FAX 212-471-2997   MERCER&BROWN, PC   PAGE

Case 1:07-mj-00144-JMA   Document 1   Filed 02/02/2007   Page 9 of 17

remitters, the money launderer or drug trafficker must have correspondents in the drug source country. The remittances are sent to these correspondents, which pay out the remittances in pesos. The money launderers must also have individuals in the drug source country who are prepared to pick up the remittances. These individuals are usually paid a small percentage of the money they pick up. While the sender information for the remittances is almost always false, the recipient information in most cases must be accurate; otherwise, the correspondent would be unable to contact the recipient to notify the recipient that the remittance had arrived.

12. Another common method of laundering drug money is the use of money orders. As described above, a money order seller must obtain identification from anyone who wishes to purchase $3,000 or more in money orders. In order to evade the identification requirement, the money order seller will accept the drug money and then issue money orders throughout the day, in blocks of less than $3,000, so that the money orders do not appear to have been issued sequentially and so that they appear to have been purchased by different individuals.

Probable Cause

13. Defendant PATRICIA NAVARRO CANALES is currently an employee of LA NACIONAL a money remitter business located at 120 East Post Rd., White Plains, N.Y.

02/07/2007 17:12  212-471-2997                    BROWN, PC                    PAGE 10/17

Case 1:07-mj-00144-JMA   Document 1   Filed 02/02/2007   Page 10 of 17

14. The El Dorado Task Force is involved in an investigation to identify drug proceeds and bank accounts into which those drug proceeds flow. As part of this investigation, confidential informants acting under the direction of the El Dorado Task Force receive instructions from cooperating individuals in Colombia to pick up drug money generated in Queens, New York and launder that money. CI #1 was a paid confidential informant who worked with the El Dorado Task Force for approximately sixteen months. CI #2 is a paid informant who does not have any criminal record. CI #3 is a paid informant who does not have a criminal history. CI #3's cooperation has led to the arrest of one individual who has pleaded guilty to drug money laundering charges. The CD is a cooperating defendant who has been working with the El Dorado Task Force for approximately eighteen months. The CD has pleaded guilty pursuant to a cooperation agreement to drug money laundering charges. The CD has identified approximately twenty money remitters who he believed were laundering drug money. The CD has successfully laundered money, under the supervision of ICE agents, at these twenty remitters, thereby confirming the CD's information. The CD's information has led to the seizure of six kilograms of heroin, three arrests for drug trafficking and the seizure of approximately $300,000 in drug proceeds.

15. On August 14, 2006, the CD went to LA NACIONAL and

02/07/2009   17:18   212-471-2997   MARLE BROWN, PC   PAGE 11/17

Case 1:07-mj-00144-JMA   Document 1   Filed 02/02/2007   Page 11 of 17

met with defendant NAVARRO CANALES. During the meeting, the CD gave defendant NAVARRO CANALES, approximately $5,270.00 in small denomination bills (i.e. $10s and $20s) and a structuring list. Defendant CANALES remitted the money to Colombia, using the information on the structuring list. The remittances were structured in amounts between $638 and $1,200. On neither this occasion nor any of the occasions described below did defendant NAVARRO CANALES ask any the CIs or CD for identification.

16. On August 16, 2006 and August 21, 2006, the CD went to LA NACIONAL on two occasions and met with defendant NAVARRO CANALES. During these meetings, the CD gave defendant NAVARRO CANALES a total of approximately $18,000 as well as structuring lists. Defendant CANALES remitted the money to Colombia pursuant to the structuring list.

17. On August 29, 2006, the CD went into LA NACIONAL and met with defendant NAVARRO CANALES. During the meeting, the CD removed approximately $8,000 from his jacket and a bag and the money to defendant NAVARRO CANALES, along with a structuring list. During the meeting, the CD and defendant NAVARRO CANALES discussed another money remitter store to which the CD could bring money. The CD told defendant NAVARRO CANALES that the CD had a client in Tarrytown who normally bought a half-kilo from the CD. Defendant NAVARRO CANALES related that she used to be a manager of a store in Ossining and that she now had a friend who

02/07/2007 17:18 FAX 212 471 2997    MERCE & BROWN, PC    PAGE 12

worked at the store; she then offered to give the CD the store address so that the CD could go there as well. Defendant NAVARRO CANALES told the CD that when she worked at the Ossining store, there was a lady who used to go around to different stores with the same list over and over again. Defendant NAVARRO CANALES told the CD that she explained to the lady that it was bad practice to keep using the same list over and over.

18. On September 8, 2006, the CD went to LA NACIONAL and met with defendant NAVARRO CANALES. During the meeting, the CD gave defendant NAVARRO CANALES approximately $10,000 to remit, along with a structuring list. Defendant NAVARRO CANALES told the CD that she could refer the CD to another remitter store, and gave directions to the store. During this meeting, the CD explained to defendant NAVARRO CANALES that nothing had moved the previous week but that he/she expected movement the following week (a coded reference to drug sales) and that therefore, the CD could bring defendant NAVARRO CANALES money the following week. The CD explained that an Ecuadorian woman had flown from Caracas to San Juan, with a final destination of New York. The woman got caught in San Juan. In my opinion, in this conversation, the CD is explaining to defendant NAVARRO CANALES that he/she had not brought her money the previous week because a drug courier had been apprehended in Puerto Rico and therefore, there were no drug proceeds to remit. The CD explained that on Sunday, a new

courier who was American was expected to arrive. Later in the conversation the CD spoke of "manteca" (a coded reference to heroin) as well as "heroin" itself and informed defendant CANALES that the CD was going to New York and would come by the following Wednesday.

19. On September 14, 2006, the CD and CI #2 went into LA NACIONAL and met with defendant NAVARRO CANALES. The CD introduced CI #2 to defendant NAVARRO CANALES as the passenger who had just arrived in the United States. Defendant NAVARRO CANALES gave the CD $9,600.00 in money orders which had been purchased in amounts ranging from $300 and $500 a structured fashion. The CD told defendant NAVARRO CANALES how they bribed the security guards so that they would not search the courier.

20. On September 19, 2006, the CD went into LA NACIONAL and met with defendant NAVARRO CANALES. The CD gave defendant NAVARRO CANALES a total of $30,000 in undercover funds and asked defendant CANALES to convert the money to money orders.

21. On September 27, 2006, the CD and CI # 2 went into LA NACIONAL and met with defendant NAVARRO CANALES. Defendant NAVARRO CANALES gave the CD $28,800 in money orders, purchased in amounts ranging from $400 to $1,000. The CD commented that the money orders had been purchased at three different stores; defendant NAVARRO CANALES indicated that she couldn't do all of the money orders at her store so she had gone to other stores.

During the meeting, defendant NAVARRO CANALES asked how long CI #2 was staying. The CD related that CI #2 was leaving the following week because the CI's cousin, another courier, had not been allowed to enter the country. Defendant NAVARRO CANALES asked, "But did they catch her?" The CD said no, they returned her with the suitcase.

22. On October 18, 2006, the CD went into LA NACIONAL and met with defendant NAVARRO CANALES. The CD removed $10,000 in undercover funds from his socks and gave the money to defendant NAVARRO CANALES to purchase money orders. The CD informed defendant CANALES that the CD had stopped using remittances because he was now selling pills that the kids bought at the disco. The CD explained that the pills went from Holland to Colombia and from Colombia to the CD in New York. Defendant NAVARRO CANALES stated that she would not like working with things like that (referring to drugs) because of the police. The CD and defendant NAVARRO CANALES then discussed the manner in which drugs entered the U.S. The CD explained that drugs came into the U.S. in suitcases and in statues of the saints or the Virgin Mary. The CD and defendant NAVARRO CANALES also discussed counterfeit currency. The CD told defendant NAVARRO CANALES that he had received counterfeit currency as payment for a kilogram of heroin. Defendant NAVARRO CANALES issued money orders in amounts ranging from $300 to $500.

23. LA NACIONAL is described as a money remitter business located at 120 East Post Rd. White Plains, N.Y. on East Post Rd. between Court Street and Grand Street, and further between Kennedy Fried Chicken and Westchester Botanica Health Products. LA NACIONAL is in a masonry and glass building made up of four stores in total, each using the 120 East Post Rd. White Plains, N.Y. address. LA NACIONAL has a yellow and black colored sign with black letters displaying the words LA NACIONAL on it over the store windows and glass front entrance door that bears the number 12 on it. The front entrance door has an air conditioner above it and the front entrance door and front store window displays several brightly covered signs.

WHEREFORE, Your deponent respectfully requests that:

A. a warrant issue for the arrest of defendant PATRICIA NAVARRO CANALES so that she may be dealt with according to law;

B. a search warrant issue authorizing Immigration and Customs Enforcement agents, with proper assistance from other law enforcement officials, to enter the SUBJECT PREMISES, to search for and seize the following: records and documents reflecting structuring of financial transactions, including, money order receipts, structuring lists, invoices, lists of sender and/or recipient names, currency amounts, senders and

beneficiaries/recipients, data stored in fax machine memory, data stored on computers and computer systems, including any and all equipment which can collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic, optical or similar computer impulses or data, any data-processing devices, such as central processing units and laptop or notebook computers, floppy disk drives and diskettes, tape drives and tapes and other memory storage devices, computer printouts, records and faxes pertaining to the transfer, mailing, receipt, purchase, possession, export and/or import of currency, money counting machines, cash or other monetary instruments in excess of $3,000, and bank statements, for the time period August 14, 2006 to the present, all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1956, laundering of monetary instruments and Title 31, United States Code, Section 5313(a), 5322, 5324 and 5325, failure to file currency transaction reports, failure to maintain identification as required by Section 103.33(f) of Title 31, Code of Federal Regulations and structuring financial transactions to avoid the currency reporting requirements; and

C.  the warrants and this affidavit be filed under seal until further order of the Court.

---

Anthony Kressevich
Task Force Officer
Immigration and Customs Enforcement

Sworn to before me this
___ day of February, 2007

---

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

Sworn to before me this
__2ND__ day of February, 2007

SIGNED BY JUDGE JOAN M. AZRACK

---

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK