# EXHIBIT 6

02/07/2007  17:13   212-471-2997            MERLE & BROWN, PC                PAGE  01

Case 1:07-mj-00143-JMA   Document 1   Filed 02/02/2007   Page 1 of 15

CP:BSK

07-143 M

917 529
0760

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

LUZ JANETH BARBA,
   also known as "La Mona" and
   and "Luz,"

       Defendant.

To Be Filed
Under Seal

AFFIDAVIT IN SUPPORT
OF ARREST AND SEARCH
WARRANTS

(Title 18, U.S.C., §§
1956 (a)(2)(B)(i))

- - - - - - - - - - - - - - - - - X

IN RE THE SEARCH OF
THE PREMISES KNOWN AS:
La Nacional
96-15H Roosevelt Avenue
Jackson Heights, New York

- - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

      Michael Kearns, being duly sworn, hereby deposes and says as follows:

      On or about and between April 21, 2005 and December 13, 2006, within the Eastern District of New York, the defendant LUZ JANETH BARBA did conduct financial transactions that affected interstate commerce, to wit: the transmission of United States currency from a place in the United States, to wit: Queens, New York, to or through a place outside the United States, to wit: Colombia, knowing that the funds involved in the transmissions represented the proceeds of some form of unlawful activity, and knowing that the transmissions were designed in whole or in part

02/07/2007  17:13    212-471-2997              MERLE & BROWN, PC                    PAGE  02

to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit: narcotics trafficking.

(Title 18, United States Code, Section 1956(a)(2)(B)(i)).

Upon information and belief, there is probable cause to believe that there is currently concealed on the Premises known as LA NACIONAL, 96-15 Roosevelt Avenue, Jackson Heights, New York certain property, to wit: records and documents reflecting structuring of financial transactions, including, money order receipts, structuring lists, invoices, lists of sender and/or recipient names, currency amounts, senders and beneficiaries/recipients, data stored in fax machine memory, data stored on computers and computer systems, including any and all equipment which can collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic, optical or similar computer impulses or data, any data-processing devices, such as central processing units and laptop or notebook computers, floppy disk drives and diskettes, tape drives and tapes and other memory storage devices, computer printouts, records and faxes pertaining to the transfer, mailing, receipt, purchase, possession, export and/or import of currency, money counting machines, cash or other monetary instruments in excess of $3,000, and bank statements, for the time period April 21, 2005 to the present, all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1956, laundering of monetary instruments and Title 31, United States Code, Section 5313(a), 5322, 5324 and 5325, failure

02/07/2007  17:13    212-471-2997              MERLE & BROWN, PC                    PAGE  03

Case 1:07-mj-00143-JMA    Document 1    Filed 02/02/2007    Page 3 of 15

to file currency transaction reports, failure to maintain identification as required by Section 103.33(f) of Title 31, Code of Federal Regulations and structuring financial transactions to avoid the currency reporting requirements.

The source of Your deponent's information and the grounds for his belief are as follows:

1. I, Michael Kearns, am a Special Agent with Immigration and Customs Enforcement ("ICE"), Department of Homeland Security. I have been a Special Agent for approximately three years. I am currently assigned to the El Dorado Task Force, a Task Force consisting of Special Agents with the Department of Homeland Security, Secret Service Agents, New York City Police Department Detectives, New York State Troopers and other local law enforcement agencies which purpose is to investigate narcotics money laundering. I have had extensive experience investigating money remitters involved in money laundering.

<u>Currency Reporting Requirements</u>

2. Transactions in currency were defined as transactions involving the physical transfer of money, as defined in Title 31, Code of Federal Regulations, Sections 103.11(h) and (ii).

3. Domestic financial institutions, including nonbank financial institutions such as money remitters, money order sellers and check cashers, are required by law and regulation to file a Currency Transaction Report (IRS Form 4789, hereinafter referred to as a "CTR") with the Internal Revenue Service ("IRS")

for each transaction in currency, such as a deposit, withdrawal, exchange of currency or other payment or transfer by, through or to a financial institution, in excess of $10,000, as required by Title 31, United States Code, Section 5313 and Title 31, Code of Federal Regulations, Sections 103.22(a) et seq. CTRs are filed with the IRS on forms which required, among other things, disclosure of the identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed. CTRs are required to be filed to assist the United States in criminal, tax and regulatory investigations and proceedings, as required by Title 31, Code of Federal Regulations, Section 103.21.

    4. Bank and nonbank financial institutions must maintain records of the following information in the case of any remittance or any sale of money orders in the amount of $3,000 or more: the purchaser's name, address, social security number or alien identification number and date of birth; the date of purchase; the types of instruments purchased; the serial numbers of the instruments purchased; and the dollar amount of each of the instruments, as required by Title 31, United States Code, Section 5325 and Title 31, Code of Federal Regulations, Section 103.29(a). These records are subject to inspection on demand by an Internal Revenue Service examiner.

    5. "Structuring" financial transactions means the breaking down of amounts of currency into: (i) amounts of $10,000 or less prior to transacting business with one or more domestic financial institutions or businesses, or (ii) amounts of less

02/07/2007  17:13   212-471-2997           MERLE & BROWN, PC                    PAGE  05

than $3,000 prior to purchasing money orders, traveler's checks, cashier's checks or bank checks, in an attempt to evade the above-described currency reporting requirements, as stated in Title 31, Code of Federal Regulations, Section 103.11(rr).

<u>Money Remitters</u>

6. A money remitter is a nonbank financial institution which received money from customers to remit, or send, to the place designated by the customer. The typical legitimate customer of the ethnic money remitter is an immigrant who does not have the appropriate documentation necessary to open a bank account or for whom maintaining a bank account is too costly. In the money remitter industry, this is often referred to as the "unbanked" segment of the population. For the most part, these individuals are recent immigrants to the United States who work at low paying jobs and who use the money remitter to send money home to their families.

7. Almost all of the licensed money remitters in New York state operate through agents. The agent of the licensed money remitter receives the remittance from the sender, along with sender information, such as name, address, and telephone number, and recipient information, usually name and telephone number. The agent enters this information into a computer provided by the money remitter, and a pre-numbered invoice is generated. The agent then sends the information to the money remitter by computer or by fax. The agent must deposit the money into a bank account set up for the agent but controlled by the money remitter. The agent is not permitted to make withdrawals

02/07/2007  17:13    212-471-2997              MERLE & BROWN, PC                    PAGE  06

Case 1:07-mj-00143-JMA    Document 1    Filed 02/02/2007    Page 6 of 15

from this account; only the money remitter can withdraw funds. On a daily basis, the money remitter will transfer all of the money into one of several main transmission accounts. The funds are then moved through the domestic and foreign banking system by way of wire transfer. Copies of the remittance invoices are retained both by the agent and by the money remitter. In addition, information relating to the agent's remittances are kept in the computer of both the agent and the money remitter. Most money remitter agents are agents of several licensed remitters.

8. Most agents of money remitters operate several businesses at the same location. Typically, the money remitter agent will also offer services such as the sale of money orders, travel agency services and an international phone booth. Beeper companies, cellular phone companies, money order sellers, and car insurance agents are often located on these premises as well. Like the money remitter, these other businesses, when operating legitimately, service immigrant communities.

Money Laundering

9. Money laundering is the term given to financial transactions which have as their purpose the concealment of funds which are generated by illegal activity, and the efforts undertaken to give those funds the appearance of legitimacy. In the United States, the criminal activity which generates the largest amount of illicit funds, and, therefore, the largest amount of funds which require laundering, is drug trafficking.

02/07/2007  17:13    212-471-2997              MERLE & BROWN, PC                  PAGE  07

Money remitters are frequently used by drug traffickers to launder drug proceeds.

10. The primary method of laundering drug money through money remitters is by structuring the transactions to avoid reporting requirements. The money remitter agent accepts illicit funds, structures the remittances to avoid the reporting requirements, and then transmits the funds to the designated recipient location. The remittance locations in Hispanic countries are referred to as "casas de cambio." By way of example, the trafficker brings in a large amount of currency which needs to be returned to a drug source country, for example, Colombia. The money remitter agent creates invoices which make it appear as if the money was brought in by a number of different senders, in amounts less than $10,000 to avoid the CTR requirements and less than $3,000 to avoid the identification requirements. The sender then provides the money remitter with a structuring list which typically contains a list of recipient names and contact information in the foreign country for each of the remittances, again using a different name for each remittance. In this way, it appears as if there are a number of smaller, unrelated remittances instead of one remittance in excess of $10,000 or $3,000 which would trigger the filing of a CTR or the obtaining and maintaining of identification.

11. As part of this process, in the case of money remitters, the money launderer or drug trafficker must have correspondents in the drug source country. The remittances are sent to these correspondents, which pay out the remittances in pesos. The money launderers must also have individuals in the drug source country who are prepared to pick up the remittances. These individuals are usually paid a small percentage of the money they pick up. While the sender information for the remittances is almost always false, the recipient information in most cases must be accurate; otherwise, the correspondent would be unable to contact the recipient to notify the recipient that the remittance had arrived.

12. Another common method of laundering drug money is the use of money orders. As described above, a money order seller must obtain identification from anyone who wishes to purchase $3,000 or more in money orders. In order to evade the identification requirement, the money order seller will accept the drug money and then issue money orders throughout the day, in blocks of less than $3,000, so that the money orders do not appear to have been issued sequentially and so that they appear to have been purchased by different individuals.

Probable Cause

13. Defendant LUZ JANETH BARBA is currently an employee of La Nacional, a money remitter business located at 96-15 Roosevelt Avenue, Jackson Heights, New York.

14. The El Dorado Task Force is involved in an investigation to identify drug proceeds and bank accounts into

02/07/2007  17:13    212-471-2997            MERLE & BROWN, PC                    PAGE 09

which those drug proceeds flow. As part of this investigation, confidential informants acting under the direction of the El Dorado Task Force receive instructions from cooperating individuals in Colombia to pick up drug money generated in Queens, New York and launder that money. CI #1 was a paid confidential informant who worked with the El Dorado Task Force for approximately sixteen months. CI #2 is a paid informant who does not have any criminal record. CI #3 is a paid informant who does not have a criminal history. CI #3's cooperation has led to the arrest of one individual who has pleaded guilty to drug money laundering charges. The CD is a cooperating defendant who has been working with the El Dorado Task Force for approximately eighteen months. The CD has pleaded guilty pursuant to a cooperation agreement to drug money laundering charges. The CD has identified approximately twenty money remitters who he believed were laundering drug money. The CD has successfully laundered money, under the supervision of ICE agents, at these twenty remitters, thereby confirming the CD's information. The CD's information has led to the seizure of six kilograms of heroin, three arrests for drug trafficking and the seizure of approximately $300,000 in drug proceeds.

15. On April 21, 2005, the CD, accompanied by an ICE Special Agent acting in an undercover capacity, went to the La Nacional store located at 89-14 Roosevelt Avenue and met with

defendant LUZ JANETH BARBA. During that meeting, the CD removed $10,500 which was hidden in his sock and gave it to defendant BARBA. The money was in small denomination bills (i.e. $20s and $10s). The CD also gave defendant BARBA a structuring list. Defendant BARBA agreed to make up sender information and remit the money pursuant to the structuring list. Defendant BARBA structured the remittances in amounts ranging from $800 to $900. On neither this occasion nor any of the occasions described below did defendant BARBA ask any of the CD for identification.

16. On April 22, 2005, the CD and the undercover agent went to the 89-14 Roosevelt Avenue La Nacional store and met with defendant BARBA for the purpose of picking up the remittance receipts. Defendant BARBA explained that she needed actual phone numbers of the senders in order to make the transactions look legitimate to the licensing company. When the CD indicated that he/she did not have any sender numbers, defendant BARBA agreed to provide four phone numbers to facilitate the transactions. Later that day, the CD went to La Nacional and gave defendant BARBA five phone numbers, informing her that these people would vouch for the senders if contacted by the licensing agency.

17. On or about and between August 3, 2005 and November 2006, CI #1 and/or the CD went to the La Nacional store and met with defendant BARBA on nine occasions. In total, CI #1/the CD gave defendant BARBA approximately $45,000 to remit to Colombia, along with structuring lists containing sender information. Defendant BARBA remitted all of this money to

Colombia in a structured fashion, using the information on the structuring lists.

18. Some time between November 16, 2006 and November 20, 2006, defendant BARBA transferred to the La Nacional location at 96-15 Roosevelt Avenue, Jackson Heights, NY (the "Subject La Nacional store"). On November 20, 2006, the CD and CI #3 went to the Subject La Nacional location and met with defendant BARBA. The CD gave defendant BARBA $10,500 and a structuring list. The CD informed defendant BARBA that the money should be handled "the same as always" and "ten names for $10,000." Defendant BARBA agreed to take the money and stated that she would charge a 3% fee. At this time, defendant BARBA asked the CD for his cell phone number.

19. On November 27, 2006, CI# 3 went to the Subject La Nacional store and met with defendant BARBA. CI# 3 gave the defendant BARBA $5,145 and a structuring list. CI #3 instructed defendant BARBA to send the money in the same fashion as always. CI #3 asked defendant BARBA if the La Nacional store sold money orders. Defendant BARBA responded that it did and CI #3 told defendant BARBA that he/she would bring her $30,000 to turn into money orders. Defendant BARBA responded that this was too much money because it would heat up the store (slang for bringing the attention of law enforcement). After some discussion, defendant BARBA and CI #3 agreed upon a 5% commission for turning the currency into money orders; defendant BARBA agreed to accept $30,000, stating that what she could not do it at the store but

would bring the money elsewhere. Defendant BARBA then remitted the $5,000 in a structured fashion.

20. On December 8, 2006, the CD met with defendant BARBA at the Subject La Nacional store. The CD gave defendant BARBA $12,000 in undercover government funds; the money was in small denomination bills (i.e. $20s and $10s). The CD directed defendant BARBA to use the money to purchase money orders. While conducting the transaction with defendant BARBA, the CD informed defendant BARBA that he "still had 600 grams of "perico'" (Colombian slang for cocaine) and defendant BARBA responded "I know he needs" (referring to a friend defendant BARBA had discussed with the CD during an earlier meeting). The CD told defendant BARBA "Yes, well tell him to call me . . . if the guy calls, I am going to receive a passenger" (a coded reference to a drug courier). Defendant BARBA responded "when he calls." The CD referred again to "600 grams of perico" and left the store.

21. On December 13, 2006, the CD returned to the Subject La Nacional store at 96-15 Roosevelt Avenue, Jackson Heights, NY and met with defendant BARBA in order to pick up the money orders from the December 8, 2006 meeting. The money orders had all been purchased in varying amounts at the Subject La Nacional store. The CD inquired about the defendant BARBA's friend and asked her "What happened to the Colombian" (a reference to defendant BARBA's friend who wanted to purchase drugs). Defendant BARBA replied "He's not Colombian, he is Dominican." The CD told defendant BARBA that "The first client gives me "manteca" (Colombian slang for heroin) and I have to pay

him in Miami . . . the other who's sending me the white (slang for cocaine), I have to send it to Cucuta via giros (wire transfer). Defendant BARBA responded "yes". The CD then said goodbye and left the location.

22. La Nacional is described as a money remitter business located at La Nacional 96-15H Roosevelt Avenue, Jackson Heights, New York, between 97th Street and Junction Blvd. La Nacional is located in a two story building, with on Roosevelt Avenue. It is entered through a glass door with La Nacional on the door. There is large sign above the door in the colors yellow and blue stating La Nacional.

WHEREFORE, Your deponent respectfully requests that:

A. a warrant issue for the arrest of defendant LUZ JANETH BARBA so that she may be dealt with according to law;

B. a search warrant issue authorizing Immigration and Customs Enforcement agents, with proper assistance from other law enforcement officials, to enter the SUBJECT PREMISES, to search for and seize the following: records and documents reflecting structuring of financial transactions, including, money order receipts, structuring lists, invoices, lists of sender and/or recipient names, currency amounts, senders and beneficiaries/recipients, data stored in fax machine memory, data stored on computers and computer systems, including any and all equipment which can collect, analyze, create, display, convert, store, conceal or

Case 1:07-mj-00143-JMA   Document 1   Filed 02/02/2007   Page 14 of 15

transmit electronic, magnetic, optical or similar computer impulses or data, any data-processing devices, such as central processing units and laptop or notebook computers, floppy disk drives and diskettes, tape drives and tapes and other memory storage devices, computer printouts, records and faxes pertaining to the transfer, mailing, receipt, purchase, possession, export and/or import of currency, money counting machines, cash or other monetary instruments in excess of $3,000, and bank statements, for the time period April 21, 2005 to the present, all of which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Section 1956, laundering of monetary instruments and Title 31, United States Code, Section 5313(a), 5322, 5324 and 5325, failure to file currency transaction reports, failure to maintain identification as required by Section 103.33(f) of Title 31, Code of Federal Regulations and structuring financial transactions to avoid the currency reporting requirements; and

C. the warrants and this affidavit be filed under seal until further order of the Court.

                                  _____
                                  Michael Kearns
                                  Special Agent
                                  Immigration and Customs Enforcement

Sworn to before me this

02/07/2007  17:13    212-471-2997              MERLE & BROWN, PC                    PAGE  14

__2ND__ of February, 2007

SIGNED BY JUDGE JOAN M. AZRACK
_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK