**EXHIBIT 7**

SQUIRE SANDERS | LEGAL COUNSEL WORLDWIDE

SQUIRE, SANDERS & DEMPSEY L.L.P.

4900 Key Tower
127 Public Square
Cleveland, Ohio 44114-1304

Office: +1.216.479.8500
Fax: +1.216.479.8780

Direct Dial: +1.216.479.8564
TKilbane@ssd.com

April 5, 2007

<u>Via Fax (809) 686-6633 & Federal Express</u>

Jose Andres Hernandez Andujar
c/o Club Rotorio #28
Ens. Ozama
Distrito Nacional
Dominican Republic

Jose Andres Hernandez Andujar
Envios de Valores La Nacional Corp.
566 W. 207th Street
New York, NY 10034

Re:  Notice Pursuant to Section 11.1 of the January 12, 2007 Stock Purchase Agreement

Dear Mr. Hernandez:

We write to you and Mr. Zamer as counsel for Euronet Payments & Remittance, Inc. ("Euronet"). All capitalized terms used but not defined in this letter have the meanings ascribed to them in the January 12, 2007 Stock Purchase Agreement (the "SPA").

Contrary to the assertions in your March 22, 2007 correspondence, Euronet has complied fully with the provisions of Section 4.1 of the SPA regarding Regulatory Consents, whereas the Companies and Seller have failed repeatedly to meet theirs. Under Section 4.1, the Companies and Seller are to "timely provide all information (all of which must be accurate and complete) relating to the Seller, the Companies, the Companies' Assets, and the Companies' Business required to obtain these Consents." The provision goes on to state that "[s]ubject to timely receiving accurate and complete information from the Companies and Seller, Euronet will use commercially reasonable efforts to make all initial filings with respect to the Required Regulatory Consents on or before February 12, 2007, and in any event will make such initial filings no later than March 12, 2007." The provision also states, however, that "Euronet will not be responsible for any delays or other problems resulting from Seller's or the Companies' delay or failure to provide accurate and complete information ...." Euronet has met its obligations under this provision.

As you are aware, Euronet made its initial filings in Connecticut, the District of Columbia, Georgia, Illinois, Maryland, Massachusetts, North Carolina, and Pennsylvania on or about January 30, 2007. Copies of those initial filings were previously provided to you. Shortly

CINCINNATI · CLEVELAND · COLUMBUS · HOUSTON · LOS ANGELES · MIAMI · NEW YORK · PALO ALTO · PHOENIX · SAN FRANCISCO · TALLAHASSEE · TAMPA · TYSONS CORNER
WASHINGTON DC · WEST PALM BEACH | CARACAS · RIO DE JANEIRO · SANTO DOMINGO | BRATISLAVA · BRUSSELS · BUDAPEST · FRANKFURT · LONDON · MOSCOW
PRAGUE · WARSAW | BEIJING · HONG KONG · SHANGHAI · TOKYO | ASSOCIATED OFFICES: BUCHAREST · BUENOS AIRES · DUBLIN · KYIV · MILAN · SANTIAGO

www.ssd.com

SQUIRE, SANDERS & DEMPSEY L.L.P.

Jose Andres Hernandez Andujar
Page 2
April 5, 2007

after making those filings, however, our client learned from public sources (rather than from the Companies and Seller) that on February 6, 2007 company documents had been seized and two company employees had been arrested and charged with money laundering involving two separate La Nacional locations. Because of the serious nature of those money laundering charges and the uncertainty surrounding the events, we suspended our filing of additional regulatory applications or notifications, and began the process of evaluating the impact of the events on the applications and notifications previously filed. Euronet also contacted you immediately by letter dated February 9, 2007, requesting necessary and additional information.

In your letter in response on February 14, 2007, you confirmed the above stated arrests, but suggested you saw no reason for delay of the regulatory process. We plainly disagree. As our client explained in its letter of February 24, 2007, it is hard to imagine a more serious violation of law applicable to a money transfer company than federal and state charges of money laundering being committed by company personnel on and through the use of company property, particularly where multiple company locations are alleged to have facilitated actively the laundering of the funds. Our client also advised you in that letter that following those arrests we learned (again from sources other than the Companies and Seller) that the La Nacional General Manager of the Sales Department, Ramon Corporan, had himself been <u>convicted</u> in 1998 of conspiracy to engage in money laundering and had served more than four years in a federal prison.

On March 6, 2007, you wrote and confirmed that the General Manager of the Sales Department, a four year employee of the Companies and Seller, had indeed been convicted of felony conspiracy to commit money laundering in 1998. You acknowledged that he was nonetheless knowingly hired and further admitted that despite your knowledge of the criminal conviction for money laundering, you did not make a disclosure of Mr. Corporan's criminal record in your license application to the Bank Commissioner as "the State of Delaware requires." You then instructed our client "that no information pertaining to the instance regarding the former employees be included in any new applications or filings in connection with the Required Regulatory Consents or in any amendments to the ones that had already been filed without the prior written consent of Envios NY."

Frankly, given the context, our client was more than dismayed by your continued desire for non-disclosure. Euronet believes in following the best business practices and adhering to high standards of integrity, not only in its operations and employment decisions, but with respect to its communications with regulators. Euronet believed then and believes now it would be improper to make any additional regulatory filings without including accurate information as to the arrests, convictions and investigations involving La Nacional's employees.

We appreciate that on March 23, 2007, contrary to your instruction to our client, you at last advised the State of Delaware that the General Manager of National's Sales Department was in fact convicted of money laundering and that two of the Companies' tellers at two different locations were also arrested for money laundering activity to Columbia with respect to illegal drugs. We appreciate as well that you have now acknowledged that your filings

SQUIRE, SANDERS & DEMPSEY L.L.P.

Jose Andres Hernandez Andujar
Page 3
April 5, 2007

in several states were false; you have indicated that you plan to similarly advise the State of Rhode Island, but you still have not offered to correct the false information in other states. Because of (1) the serious nature of these money laundering charges and the conviction, (2) the uncertainties surrounding the Companies' practices regarding these events, (3) the Companies' insistence that we not provide such information to regulators, and (4) the Companies' and Seller's failure to provide timely and accurate information to us and regulatory authorities, our client concluded that it must not only suspend the filing of additional applications or notifications, but also withdraw those applications or notifications previously filed.

Following the post-signing arrests of two of your employees for money laundering and the belated disclosure that your National Sales Manager, Ramon Corporan, served more than four years in a federal prison for pleading guilty to a count of conspiracy to commit money laundering, you refused our client's reasonable request for Euronet's lawyers to participate in a conference call with the U.S. Attorney, the New York State Banking Department and the Financial Crimes Enforcement Network of the United States Department of the Treasury in order to determine whether La Nacional is a subject or a target of a money laundering investigation. The hearsay from Mr. Brown is not an appropriate substitute for a written confirmation from the U.S. Attorney (and is silent, in any event, with respect to the New York and U.S. Treasury authorities) that La Nacional has not been, nor will it be, a target or subject of an investigation regarding money laundering as a result of those arrests, the continuing investigation and the lax compliance practices of La Nacional. These events and circumstances constitute a Material Adverse Effect.

Since those devastating disclosures, we have now learned from confidential sources of a conspiracy by you and your agents to arrange for certain key La Nacional sales employees and Agents to divert their customers and business to a money transfer company other than La Nacional after the Closing of the proposed transaction. Such a business stripping operation will result in the significantly diminished worth of La Nacional and likewise constitutes another Material Adverse Effect. Moreover, as set forth more fully in the Amended Petition being filed today in the District Court of Johnson County, Kansas (and incorporated herein by reference), our client is entitled to rescission of the SPA for both fraud in the inducement of the SPA and for negligent misrepresentations and material omissions. Accordingly, we, on behalf of Euronet, hereby rescind the SPA and request that you instruct the Escrow Agent to return Euronet's $26 million deposit with all earnings thereon.

Regardless of any entitlement to rescission, this letter shall serve as notice of Euronet's immediate termination of the SPA pursuant to Sections 6.1 and 10.1.3 thereof for the reasons set forth above and for any one or more of the breaches of or failures to perform, by Seller or any Company, its representations, warranties or covenants contained in the SPA and the occurrence of one or more Material Adverse Effects. The breaches of the representations and warranties include but are not limited to:

(1) Section 2.12. Permits. Seller and the Companies have admitted the untruth of their representations that, "There has been no material change in the facts or circumstances

SQUIRE, SANDERS & DEMPSEY L.L.P.

Jose Andres Hernandez Andujar
Page 4
April 5, 2007

reported or assumed in the application for, or granting of, any Existing Permit." For example, the failure to previously disclose on its Amended Renewal Application for a transmission of money license in Delaware (the "Delaware Application") that its national sales manager is a known felon, and has served a prison term for violation of money-laundering statutes, cannot be cured for purposes of the Agreement because had Euronet known this fact, it would not have entered into the Agreement.

    (2)    Section 2.13. PATRIOT Act Compliance. Seller's and Companies' representations that none of their employees were engaged in money laundering and that none of their employees had been convicted of any PATRIOT Act Offense were not true when made in that an employee, Ramon Corporan, had been convicted of money laundering and two employees were then under investigation and have now been arrested and charged with money laundering for acts occurring prior to the date of the SPA. These facts further contravene the represented effectiveness of the compliance representation and cannot be cured because had Euronet known these facts it would not have entered into the SPA.

    (3)    Section 2.14. Compliance with Laws. Seller's and Companies' representations were not true when made in that two employees have since been arrested and charged with money laundering at two separate La Nacional stores, and the affidavits of federal law enforcement personnel indicate that additional La Nacional stores were engaged in money laundering activities when the representations were made. This breach cannot be cured because had Euronet known these facts it would not have entered into the SPA.

    (4)    Section 2.17. Ordinary Course of Business. The representations in Section 2.17 were untrue because several Material Adverse Effects have been identified by Euronet since the Balance Sheet Date, including but not limited to the search of two La Nacional stores by state and federal law enforcement, the arrest of two La Nacional employees for money laundering, a known felon convicted of conspiracy to commit money laundering is serving as General Manager of the Companies' sales department, and the discovery of a conspiracy to cause a number of the Companies' key sales employees and Agents to divert post-Closing their substantial business from the Companies to other entities owned and controlled by Seller and his agents, all to the material adversity of the Companies and in contravention of your covenant not to compete.

    (5)    Section 2.20. Financial Matters and Liabilities. The representations in Section 2.20.01 were untrue when made and are not susceptible of cure because Seller and one or more of its agents have been conspiring to cause certain of the Companies' key sales employees and Agents to divert their business post-Closing from the Companies to other entities owned by Seller or its agents, all to the material adversity of the Companies. These moves have already created a Material Adverse Effect because they have created unstable working relationships with some of the sales employees and Agents, who are the sources of a substantial portion of the Companies' revenues. Concealing this conspiracy had encouraged Euronet to agree to offer to pay $26 million for a business that will not exist in the same form after Closing and will be worth materially less.

SQUIRE, SANDERS & DEMPSEY L.L.P.

Jose Andres Hernandez Andujar
Page 5
April 5, 2007

(6)     Sections 2.22 and 4.2. Agents and Correspondents and Goodwill. Seller's and Companies' representation that, "Since the Balance Sheet Date, none of the top 50 Agents or top 25 Correspondents have indicated to the Companies that they will terminate any agreement with the Companies," is misleading since a number of key Agents have been enlisted by you and your agents to divert their business post-Closing to an entity other than La Nacional or its successor. This conspiracy further breaches Section 4.2 of the SPA. These breaches are not susceptible to cure.

(7)     Section 4.5.2.1. Seller has also breached its covenant to cause the Companies to be operated prior to and through the Closing in the Ordinary Course. See, for example, the above paragraphs related to Sections 2.20 and 2.22. This breach is not susceptible to cure.

(8)     Sections 2.7.1 and 4.16. The failure to include the Mateo Express material contract in the Document Package and the incomplete and belated explanation of that transaction constitute a breach of these provisions.

Therefore, since the SPA has been terminated, we hereby request that you, as the Seller, join Euronet in instructing the Escrow Agent to return to Euronet its $26 million deposit and all earnings thereon as soon as possible.

Very truly yours,

*Thomas S. Kilbane*

Thomas S. Kilbane

TSK/jao

cc:    John E. Zamer, Esq. (Fax: 404.581.8330)
       Jones Day
       1420 Peachtree Street, Suite 800
       Atlanta, Georgia  30309-3053

       Eric Mettemeyer
       Jeffrey B. Newman, Esq.
       Scot Hill, Esq.